**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: PETITION OF | ) |
| | ) |
| BENJAMIN WITTES | ) |
| Lawfare | ) |
| 1509 Sixteenth Street, NW | ) |
| Washington DC 20036; | ) |
| | ) Misc. Case No. _____ |
| JACK GOLDSMITH | ) |
| 1563 Massachusetts Avenue | ) |
| Cambridge, MA 02138; | ) |
| | ) |
| and | ) |
| | ) |
| STEPHEN BATES | ) |
| 269 Canyon Spirit Dr. | ) |
| Henderson, NV 89012. | ) |
| _____ | ) |

**PETITION FOR ORDER DIRECTING RELEASE OF THE "ROAD MAP"**
**TRANSMITTED BY THE WATERGATE GRAND JURY TO THE HOUSE JUDICIARY**
**COMMITTEE IN 1974**

Benjamin Wittes, Jack Goldsmith, and Stephen Bates (hereinafter, collectively,

"Petitioners") hereby petition this Court to order disclosure of the impeachment referral report

known as the "Road Map" that the Watergate grand jury transmitted to the House Judiciary

Committee in 1974. Specifically, Petitioners seek an order disclosing the Road Map pursuant to

this Court's inherent supervisory authority to release grand jury materials or, alternatively,

pursuant to Federal Rule of Criminal Procedure 6(e)(6). The Road Map is located at the National

Archives and Records Administration in College Park, Maryland, as part of Record Group 460,

Records of the Watergate Special Prosecution Force, Special Prosecutor's File, Records Relating to Richard Nixon.

## PETITIONERS

1. Benjamin Wittes is a journalist, focusing on issues of national security and American law. Mr. Wittes is Co-Founder and Editor-in-Chief of *Lawfare*.[1] Mr. Wittes is also a Senior Fellow in Governance Studies at the Brookings Institution.

2. Jack Goldsmith is the Henry L. Shattuck Professor at Harvard Law School, Co-Founder of *Lawfare*, and Senior Fellow at the Hoover Institution. Professor Goldsmith served as Assistant Attorney General, Office of Legal Counsel from 2003-2004, and Special Counsel to the General Counsel of the Department of Defense from 2002-2003.

3. Stephen Bates is Associate Professor in the Hank Greenspun School of Journalism and Media Studies at the University of Nevada, Las Vegas. From 1995 to 1999, he served on the staff of the Office of Independent Counsel under Independent Counsel Kenneth W. Starr, where he helped to draft the Office's Referral to the House of Representatives regarding President Bill Clinton.

## FACTS

4. More than 40 years ago, a group of five men broke into the Democratic National Committee headquarters with the intent to secretly record conversations and steal documents. The result lead to the first and only resignation of a U.S. president. The break-in and its subsequent coverup became known as the "Watergate scandal."

5. In 1973, during the burglary trial of the five men, it was alleged that President Richard Nixon and members of his staff were suspected of involvement in the break-in as well as

---

[1] *Lawfare* is devoted to the discussion of U.S. national security law and policy. LAWFARE, https://www.lawfareblog.com.

obstruction of justice. Leon Jaworski was appointed as Special Prosecutor to investigate

the allegations after the dismissal of his predecessor, Archibald Cox.

6.  In 1974, a grand jury in Washington, D.C., indicted several former aides of President

Nixon, for conspiring to hinder the Watergate investigation. The grand jury secretly

named President Nixon as an unindicted co-conspirator.

7.  The Watergate grand jury submitted the Road Map and accompanying materials to Chief

Judge Sirica of the U.S. District Court for the District of Columbia on March 1, 1974,

along with a two-page transmittal letter recommending that the materials be submitted to

the House Judiciary Committee for its consideration and decision on what action, if any,

might be warranted in the circumstances. Chief Judge Sirica approved the transmission of

the Road Map and its accompanying documents to the Judiciary Committee of the House

of Representatives. *See In re Report & Recommendation of June 5, 1972 Grand Jury

Concerning Transmission of Evidence to the House of Representatives*, 370 F. Supp.

1219, 1221 (D.D.C. 1974).

8.  The 55-page Road Map identified the evidence relevant to President Nixon's alleged

involvement in a criminal conspiracy, without explicit accusation, accompanied by a

package of 800 pages of documents and thirteen tape recordings comprising the evidence

itself. The Road Map served as an index "to the evidence [that] could avoid the drawing

of formal conclusions by the jury." RICHARD BEN-VENISTE AND GEORGE FRAMPTON, JR.,

STONEWALL: THE REAL STORY OF THE WATERGATE PROSECUTION 242 (1977). As Special

Prosecutor Jaworski stated, "There were no comments, no interpretations, and not a word

or phrase of accusatory nature. The 'road map' was simply that – a series of guideposts if

the House Judiciary Committee wished to follow them." LEON JAWORSKI, THE RIGHT AND THE POWER: THE PROSECUTION OF WATERGATE 102 (1976).

9.  Between March and August of 1974, a series of events transpired that led to the resignation of the President and the conclusion of the Watergate investigations: (i) the Road Map and accompanying records were delivered to the House Judiciary Committee, (ii) the House Judiciary Committee initiated impeachment hearings, (iii) the White House tapes were released, (iv) the House Judiciary Committee voted for three articles of impeachment against President Nixon, (v) President Nixon announced his resignation, (vi) the House Judiciary Committee released its final report, and (vii) the Senate and the Watergate Special Prosecution Force also issued reports.

10. The grand jury investigation of President Nixon and the Watergate scandal was the subject of widespread public interest and substantial media coverage at the time. Four decades later, Watergate continues to capture the interest of historians, legal scholars, the press, and the public. The Road Map is one of the last major elements of the Watergate story that remains under seal, though its contents were publicly disclosed through a variety of sources over the years. And it has particular resonance now, at a time when Special Counsel Robert Mueller is investigating potential unlawful conduct by President Donald Trump and is reportedly considering writing a report on obstruction.

11. This petition seeks the release of the Road Map only, without the underlying grand jury material that accompanied it.

12. Submitted in support of this petition are a memorandum of law and the declarations of Stephen Bates, Richard Ben-Veniste, John Dean III, Jack Goldsmith, Philip Lacovara, and Benjamin Wittes.

13. WHEREFORE, petitioners respectfully request that this Court order the release of the

Road Map.

Dated: September 14, 2018          Respectfully submitted,

LAURENCE SCHWARTZTOL (D.D.C. No. MA0007)
larry.schwartztol@protectdemocracy.org
DEANA EL-MALLAWANY*
deana.el-mallawany@protectdemocracy.org
**The Protect Democracy Project, Inc.**
10 Ware Street
Cambridge, MA 02138
Telephone: (202) 599-0466
Fax: (929) 777-8428

CAMERON KISTLER (D.C. Bar No. 1008922)
cameron.kistler@protectdemocracy.org
JUSTIN FLORENCE (D.C. Bar No. 988953)
justin.florence@protectdemocracy.org
**The Protect Democracy Project, Inc.**
2020 Pennsylvania Avenue NW, #163
Washington, D.C. 20006
Telephone: (202) 599-0466
Fax: (929) 777-8428

STEPHANIE LLANES*
stephanie.llanes@protectdemocracy.org
**The Protect Democracy Project, Inc.**
222 Broadway, 19th Floor
New York NY 10038
Telephone: (202) 599-0466
Fax: (929) 777-8428

* *pro hac vice* application forthcoming

*Attorneys for Petitioners*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE: PETITION OF | ) |
| | ) |
| BENJAMIN WITTES | ) |
| Lawfare | ) |
| 1509 Sixteenth Street, NW | ) Misc. Case No. _____ |
| Washington DC 20036; | ) |
| | ) |
| JACK GOLDSMITH | ) |
| 1563 Massachusetts Avenue | ) |
| Cambridge, MA 02138; | ) |
| | ) |
| and | ) |
| | ) |
| STEPHEN BATES | ) |
| 269 Canyon Spirit Dr. | ) |
| Henderson, NV 89012. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION TO ORDER DISCLOSURE OF THE "ROAD MAP" TRANSMITTED BY
WATERGATE GRAND JURY TO THE HOUSE JUDICIARY COMMITTEE IN 1974**

## TABLE OF CONTENTS

**INTRODUCTION**                                                                         1

**FACTUAL BACKGROUND**                                                                   2

**I.      THE ROAD MAP'S PLACE IN WATERGATE HISTORY.**                                    2

    A.      The Genesis of the Road Map and Its Disclosure to the House
           Judiciary Committee.                                                          2

    B.      The Extensive Watergate Historical Record.                               5

**II.     THE ROAD MAP'S RELEVANCE TO THE CURRENT DEBATE ON
      SPECIAL COUNSEL MUELLER'S FRAMEWORK FOR REPORTING
      HIS FINDINGS.**                                                                   8

**ARGUMENT**                                                                             10

**I.      THIS COURT HAS INHERENT AUTHORITY TO ORDER DISCLOSURE
      OF THE ROAD MAP.**                                                                10

    A.      The District Court Has Inherent Authority to Order Disclosure of Grand
           Jury Material Where Appropriate and That Authority Is Consistent
           with Rule 6(e).                                                              10

    B.      Rule 6(e)'s History and Text Support the District Court's Inherent
           Authority to Order Disclosure of Grand Jury Material.                         14

**II.     SPECIAL CIRCUMSTANCES JUSTIFY DISCLOSURE OF THE
      ROAD MAP.**                                                                       15

    A.      The Interests in Public Access to the Road Map Militate Strongly in
           Favor of Authorizing Disclosure.                                             17

        1.      Petitioners' reasons for seeking disclosure weigh in favor of
               releasing the Road Map.                                                  17

        2.      Petitioners' identities weigh in favor of disclosure.                21

        3.      The narrow scope of Petitioners' request weighs in favor            23
               of disclosure.

B.      Any Remaining Secrecy Interests in the Road Map Are Minimal and
        Outweighed by the Compelling Interest in the Road Map's Release.          23

        1.      The passage of forty-four years and the death of President Nixon
                greatly reduce any secrecy interest in the Road Map.              24

        2.      The current status of Watergate principals and the privacy interests
                of grand jury witnesses do not justify continued secrecy.         24

        3.      The extent to which the Road Map and its contents have been
                previously made public diminishes any remaining secrecy
                interest.                                                          28

**III.    DISCLOSURE IS ALSO WARRANTED UNDER RULE 6(E).**                          28

**CONCLUSION**                                                                     30

# **TABLE OF AUTHORITIES**

Cases

*Carlson v. United States*, 837 F.3d 753 (7th Cir. 2016) ...............................................12, 14, 15

*Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211 (1979)................................................. 10, 11

*Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974)............................................................. 4, 13

*In re Application to Unseal Dockets Related to Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314 (D.D.C. 2018)........................................13, 14, 16, 19

*In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138 (D.C. Cir. 2006) ..................... 10, 29

*In re Hastings*, 735 F.2d 1261 (11th Cir. 1984)................................................................... 12, 15

*In re Nat'l Sec. Archive for Order Directing Release of Grand Jury Minutes*, No. 08 Civ. 6599, 2008 WL 8985358 (S.D.N.Y. Aug. 26, 2008) ...................................................................24

*In re Petition of Am. Historical Ass'n*, 49 F. Supp. 2d 274 (S.D.N.Y. 1999)...................... passim

*In re Petition of Bruce Craig for Order Directing Release of Grand Jury Minutes*, 131 F.3d 99 (2d Cir. 1997) ................................................................................................................... passim

*In re Petition of Stanley Kutler*, 800 F. Supp. 2d 42 (D.D.C. 2011) .................................. passim

*In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219 (D.D.C. 1974).................3, 4, 13, 25

*In re Tabac*, No. 3:08-mc-0243, 2009 WL 5213717 (M.D. Tenn. Apr. 14, 2009)......................24

*McKeever v. Sessions*, No. 17-5149 (D.C. Cir. filed June 26, 2017) ........................................ 13

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959).................................10, 11, 12

*United States v. Mitchell*, Crim. No. 74-110 (D.D.C. indictment filed March 1, 1974) ...............4

*United States v. Nixon*, 418 U.S. 683 (1974) ..............................................................................5

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ...............................................11

Statutes

28 C.F.R. § 600.1 *et seq.*.............................................................................................................9

28 U.S.C. § 595(c).....................................................................................................................9

Rules

Fed. R. Crim. P. 57(b)...............................................................................................................14

Fed. R. Crim. P. 6(e)................................................................................................................11

Fed. R. Crim. P. 6(e), Advisory Committee's Notes (1944)................................................ 12, 13

Other Materials

A GUIDE TO WATERGATE IN COURT (Univ. Publications of America 1975) .................................7

ARTICLES OF IMPEACHMENT ADOPTED BY THE HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY (July 27, 1974) ...............................................................................................5

Benjamin Wittes & Quinta Jurecic, *Will We Ever Learn What Bob Mueller Knows?*, LAWFARE (Mar. 21, 2018)...............................................................................................................21

Benjamin Wittes, *How Can the President Obstruct Justice?,* LAWFARE (Dec. 5, 2017)............. 20

Daniel J. Hemel & Eric A. Posner, *Presidential Obstruction of Justice*, 106 CAL. L. REV. 1277 (2018)............................................................................................................................ 20

HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY: AUTHORITY TO ISSUE FINAL REPORT BY SPECIAL PROSECUTOR (Jan. 30, 1975)................................................................29

JAMES DOYLE, NOT ABOVE THE LAW (1977).............................................................................2

James M. Naughton, *38 in House Begin to Hear Evidence on Impeachment*, N.Y. TIMES
   (May 10, 1974) ..................................................................................................................... 5

Josh Blackman, *Obstruction of Justice and the Presidency: Part I*, LAWFARE
   (Dec. 5, 2017) .................................................................................................................... 20

Josh Blackman, *Obstruction of Justice and the Presidency: Part II*, LAWFARE
   (Dec. 12, 2017) .................................................................................................................. 20

Mem. of Law in Supp. of Petition, *In re Petition of Stanley Kutler*, 1:10-mc-00547
   (D.D.C. filed Sept. 13, 2010) ....................................................................................... 25, 26

PETER W. RODINO, FOREWORD TO STATEMENT OF INFORMATION: BOOK I – EVENTS PRIOR TO THE
   WATERGATE BREAK-IN, HEARINGS OF THE HOUSE JUDICIARY COMMITTEE ON RESOLUTION TO
   IMPEACH PRESIDENT NIXON (H. RES. 803) ........................................................................... 5

PETER W. RODINO, IMPEACHMENT OF RICHARD M. NIXON, PRESIDENT OF THE UNITED STATES,
   H.R. REP. NO. 93-1305 (1974) ............................................................................................ 6

Reply Br. for Court-Appointed *Amicus Curiae* in Supp. of Appellant, *McKeever v. Sessions*, No.
   17-5149 (D.C. Cir. filed June 25, 2018) .............................................................................. 14

RICHARD M. NIXON'S RESIGNATION LETTER (Aug. 9, 1974) ....................................................... 5

THE FINAL REPORT OF THE SENATE SELECT COMMITTEE ON PRESIDENTIAL CAMPAIGN ACTIVITIES,
   S. REP. NO. 96-981 (June 1974)........................................................................................... 7

WATERGATE SPECIAL PROSECUTION FORCE: REPORT, U.S. GOVERNMENT PRINTING OFFICE
   (Oct. 16, 1975)...................................................................................................................... 6

## **INTRODUCTION**

`       Petitioners seek disclosure of the report transmitted by the grand jury investigating

President Richard Nixon to the House Judiciary Committee in 1974.  That report, which

summarized grand jury material potentially relevant to the Judiciary Committee's consideration

of possible articles of impeachment, has become known as the "Road Map."  Disclosure of the

Road Map would provide the public with vital historical information relating to the Watergate

grand jury's ability to investigate potential criminal conduct by a sitting president and transmit

its investigative materials to Congress – a matter of intrinsic historical interest that has

extraordinary significance as a historical precedent bearing on matters of urgent public interest.

        The Court possesses inherent authority to unseal grand jury records when the

considerations normally justifying secrecy are outweighed by special circumstances favoring

disclosure.  This petition raises a paradigmatic case for the appropriate exercise of that authority.

The release of the Road Map – a spare document summarizing information that, over the last 40-

plus years, has largely become public – would not burden the interests typically served by grand

jury secrecy.  The individuals implicated by the grand jury's work are almost all deceased and

the underlying investigative material has overwhelmingly become public in the decades since

Watergate.  Permitting the public access to the Road Map, however, would inform public debate

over the appropriate legal and institutional mechanisms for addressing investigations of

potentially unlawful conduct by a sitting President.  Petitioners in this case, leading scholars and

public intellectuals who have examined many of those complex questions, are extraordinarily

well suited to ensure that release of the Road Map would illuminate the public's understanding.

For the reasons explained in detail below, this Court should allow petitioners and the public to

access the Road Map, perhaps the last major piece of Watergate history that remains blocked

from public view.

## FACTUAL BACKGROUND

**I.      THE ROAD MAP'S PLACE IN WATERGATE HISTORY**.

       **A.      The Genesis of the Road Map and Its Disclosure to the House Judiciary Committee.**

Few events in modern U.S. history are as well chronicled, studied, and cited as the

Watergate scandal.  While the public historical record contains thousands of pages of testimony,

tape recordings, interviews, reports, and notes, there is one critical document in Watergate

history that has never been released to the public.  That is the Road Map.

The Road Map is a document containing "a series of short statements setting forth

documented facts" that the Special Prosecutor's Office (officially termed the Watergate Special

Prosecution Force) uncovered in its investigation of President Nixon's involvement in the

Watergate break-in and cover-up.  Ben-Veniste Decl. ¶ 11; Lacovara Decl. ¶ 15.  Each statement

is followed by references to the evidence supporting that statement, including the grand jury

testimony of various individuals and secret tape recordings of conversations in the White House

that the Special Prosecutor had obtained by grand jury subpoena.  Ben-Veniste Decl. ¶¶ 9, 11;

Lacovara Decl. ¶ 15.  The Road Map has been described as "a simple document, fifty-five pages

long, with only a sentence or two on each of the pages.  Each page was a reference to a piece of

evidence—sentences from one of the tape recordings, quotations from grand jury testimony...."

*See* Wittes Decl. ¶15 (quoting JAMES DOYLE, NOT ABOVE THE LAW (1977)).[1]  The Road Map

---

[1] The Road Map was accompanied by about 800 pages of documents and 13 tape recordings.
*See* Goldsmith Decl. ¶ 17.  This petition seeks only the Road Map and not the accompanying
records.

"draws no accusatory conclusions" and "contains no recommendations." *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1226 (D.D.C. 1974). Its purpose was not to indict, but rather to "assist the Judiciary Committee, helping it reassemble the individual pieces of… evidence into a coherent narrative as [the Special Prosecutor's Office] and the [grand] jury saw it." Ben-Veniste Decl. ¶ 11.

The genesis of the Road Map was itself history-making. By that point in its investigation, the Special Prosecutor's Office had amassed substantial evidence that President Nixon had violated various criminal statutes, including by participating in a conspiracy to obstruct the Watergate investigation. Lacovara Decl. ¶¶ 16-17; Ben-Veniste ¶ 11. The Special Prosecutor's authority to indict a sitting president, however, was far from clear. *See* Lacovara Decl. ¶ 16; Goldsmith Decl. ¶¶ 15-16. Meanwhile, the House Judiciary Committee, pursuant to its jurisdiction over possible impeachments, was conducting an inquiry into whether President Nixon had committed "high crimes and misdemeanors." Lacovara Decl. ¶ 17. Its authority to obtain the same evidence the Special Prosecutor had gathered, however, was limited. *See* Bates Decl. ¶ 12.

Although his legal team concluded that the president has no special immunity from indictment while in office, Special Prosecutor Jaworski opposed both indicting President Nixon and transmitting a presentment charging him with crimes to the House Judiciary Committee. *See* Lacovara Decl. ¶ 16; Goldsmith Decl. ¶ 16; Bates Decl. ¶¶ 12-13. After considerable deliberation among the prosecution team, Special Prosecutor Jaworski resolved to advise the grand jury that it could name President Nixon as an unindicted co-conspirator in the indictment charging his aides with criminal activity, while seeking the permission of the federal district

court to transmit the evidence it had gathered about President Nixon's conduct, in an organized

form, to the House Judiciary Committee.  Lacovara Decl. ¶ 17; *see also* Ben-Veniste Decl. ¶¶ 9-

10; Goldsmith Decl. ¶ 17; Bates Decl. ¶ 13.  The grand jury voted 19-0 to take that course of

action.  Ben-Veniste Decl. ¶ 11.

On March 1, 1974, the Watergate grand jury issued an indictment charging several of

Nixon's aides with obstruction of justice and conspiracy to obstruct justice and naming President

Nixon as an unindicted co-conspirator in *United States v. Mitchell*, Crim. No. 74-110 (D.D.C.

indictment filed March 1, 1974).  That same day, the grand jury presented Chief Judge John J.

Sirica, who was supervising all grand jury matters, with a sealed report that consisted of the

Road Map, a collection of evidence cited therein, and a two-page transmittal memorandum that

"strongly" recommended that Judge Sirica transmit the materials to the House Judiciary

Committee.  *In re Report & Recommendation*, 370 F. Supp. at 1221.  While several indicted

defendants objected to any disclosure of the sealed report, President Nixon did not object to its

transmittal of the House.  *Id.* at 1229.  Judge Sirica ruled that "delivery to the Committee is

eminently proper, and indeed, obligatory." *Id.* at 1227.  Specifically, he concluded that the grand

jury had the authority to create the sealed report and that the court had the authority to disclose

the report to the House consistent with the "principles of grand jury secrecy," *id.* at 1230,

embodied in Rule 6(e) of the Federal Rules of Criminal Procedure.  *See also id.* at 1222-30.  The

U.S. Court of Appeals for the D.C. Circuit upheld Judge Sirica's decision, noting "general

agreement with his handling of these matters" and "no necessity to expand his discussion."

*Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974).

The transmission of the Road Map and its accompanying materials to the House Judiciary

Committee marked a major turning point in the Watergate investigation.  It provided the

Committee with the basis to summon witnesses and subpoena additional evidence and prevented President Nixon from keeping additional tape recordings from Congress.  *See* Ben-Veniste Decl. ¶ 13.  On May 9, 1974, the House Judiciary Committee initiated impeachment hearings.[2]  In late July, it adopted three articles of impeachment against President Nixon for obstruction of justice, abuse of power, and contempt of Congress.[3]  Before the House could vote on the impeachment resolutions, President Nixon made public one final tape recorded conversation, known as the "smoking gun" tape, under order of the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974).  Lacovara Decl. ¶ 16.  His complicity in the cover-up now clear, Nixon lost most of his remaining political support and resigned from office on August 9, 1974.[4]

## B.    The Extensive Watergate Historical Record.

In the forty-four years since the Watergate investigation's culmination, the details of the Watergate story have been revealed to the public through a variety of sources.  The articles of impeachment, of course, are the public record that describes the key revelations about President Nixon's conduct that would be found in the Road Map.  Before issuing the articles of impeachment, the House Judiciary Committee publicly released a trove of records from its ongoing impeachment proceedings.[5]  Among them were the Statements of Information and

---

[2] James M. Naughton, *38 in House Begin to Hear Evidence on Impeachment*, N.Y. TIMES (May 10, 1974), *available at* https://www.nytimes.com/1974/05/10/archives/38-in-house-begin-to-hear-evidence-on-impeachment-leaders-of.html.

[3] ARTICLES OF IMPEACHMENT ADOPTED BY THE HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY (July 27, 1974), *available at* http://www.presidency.ucsb.edu/ws/?pid=76082.

[4] RICHARD M. NIXON'S RESIGNATION LETTER (Aug. 9, 1974), available at https://www.archives.gov/historical-docs/todays-doc/?dod-date=809.

[5] PETER W. RODINO, FOREWORD TO *STATEMENT OF INFORMATION: BOOK I – EVENTS PRIOR TO THE WATERGATE BREAK-IN*, *HEARINGS OF THE HOUSE JUDICIARY COMMITTEE ON RESOLUTION TO IMPEACH PRESIDENT NIXON* (H. RES. 803), at III-IV (describing the Committee's vote to "make public the initial presentation including substantially all of the supporting material presented at the hearings," as well as the President's response), *available at* https://archive.org/stream/WatergateHearingsBeforeTheHouseCommitteeOnTheJudiciary/Judici

supporting evidentiary material that its impeachment inquiry staff presented to the Committee

between May and July 1974.[6]  *See* Bates Decl. ¶ 14.  Summarizing thousands of pages of

evidence relating to the Watergate break-in and cover-up, the Statements of Information

expressly drew from materials that the Watergate grand jury furnished to the Committee,

including excerpts of numerous grand jury witnesses' testimony accompanying the Road Map.[7]

*Id.* According to several sources, the impeachment inquiry staff modeled the Statements of

Information after the Road Map, setting forth factual statements while abstaining from

conclusions.  *Id.*

Subsequently, the government issued a number of comprehensive reports of the various

Watergate investigations.  On October 16, 1975, the Watergate Special Prosecution Force

published a report totaling 277 pages ("WSPF Report").[8]  The WSPF Report contains a

comprehensive list of indictments, informations, plea agreements, convictions, sentences, fines,

acquittals, and appeals, in Watergate-related matters through October 1975.  *See* WSPF Report at

155-70.  On August 20, 1974, the House Judiciary Committee published its final report totaling

528 pages.[9]  And on June 27, 1974, the Senate Select Committee on Presidential Campaign

---

ary%20Committee%20Hearings-%20Statement%20of%20Information%2C%20Book%20I%20-
%20Events%20Prior%20to%20the%20Watergate%20Break-In#page/n1.

[6] *Id.* at IV-V (describing Books I through IV of Statements of Information).

[7] *Id.* at XI (stating in the Introductory Note that supporting material included "information furnished to the Committee by the Grand Jury of the District of Columbia and by other grand juries").  Individuals whose excerpted grand jury testimony appear in House Judiciary Committee documents pertaining to Watergate include John Dean, Fred LaRue, Jeb Magruder, L. Patrick Gray, John Ehrlichman, H. R. Haldeman, Richard Kleindienst, E. Howard Hunt, Egil Krogh, Ronald Ziegler, Henry Petersen, and Charles Colson, among others.

[8] WATERGATE SPECIAL PROSECUTION FORCE: REPORT, U.S. GOVERNMENT PRINTING OFFICE (October 16, 1975)*, available at*
https://babel.hathitrust.org/cgi/pt?id=mdp.39015005491082;view=1up;seq=7.

[9] PETER W. RODINO, IMPEACHMENT OF RICHARD M. NIXON, PRESIDENT OF THE UNITED STATES, H.R. REP. NO. 93-1305 (1974).

Activities issued its final report totaling 1,250 pages.[10]  This report detailed the Committee's

investigation into the Watergate break-in and coverup, as well as issues surrounding President

Nixon's campaign financing.  It included transcripts of the testimony that key Watergate

witnesses gave publicly under oath before the Committee, which were also published in A GUIDE

TO WATERGATE IN COURT (Univ. Publications of America 1975).

In addition, the key evidence directly relating to President Nixon is a matter of public

record.  On July 24, 1974, the U.S. Supreme Court ordered Nixon to release the 64 tape

recordings that he had withheld from prosecutors.  *Nixon*, 418 U.S. 683.  He released the tapes

on August 5, 1974.  In 2011, as a result of a petition by Watergate historians and historical

societies, Judge Lamberth ordered the disclosure of President Nixon's grand jury testimony and

certain associated grand jury materials.  *In re Petition of Stanley Kutler*, 800 F. Supp. 2d 42

(D.D.C. 2011).  Cumulatively, the public record includes, among other things, "the articles of

impeachment, the Watergate Special Prosecution Force's report, the House Judiciary

Committee's report, transcripts and materials relating to the House Judiciary Committee's

impeachment hearings, the Senate Select Committee on Presidential Campaign Activities' report,

published transcripts of compendiums of the White House tapes, and the records of the public

trials of President Nixon's co-conspirators."  Ben-Veniste Decl. ¶ 14.

Not only have these primary sources populated the Watergate public historical record, the

Watergate story has been revealed through countless reports of investigative journalism,

primarily contemporaneous reports in *The Washington Post*, and articles and books by Watergate

participants, investigators, and others close to the events.  These include Samuel Dash, chief

---

[10] THE FINAL REPORT OF THE SENATE SELECT COMMITTEE ON PRESIDENTIAL CAMPAIGN
ACTIVITIES, S. REP. NO. 96-981 (June 1974), *available at*
https://babel.hathitrust.org/cgi/pt?id=mdp.39015011697870;view=1up;seq=7.

counsel for the Senate Watergate Committee; John Dean, White House Counsel to President

Nixon; H.R. Haldeman, White House Chief of Staff to President Nixon; Leon Jaworski,

Watergate special prosecutor; Jeb Stuart Magruder, a Nixon official who pled guilty to

Watergate-related charges; James W. McCord, an electronics expert involved in the Watergate

burglaries; Lawrence F. O'Brien, an electoral strategist whose office in the Watergate complex

was burglarized; Raymond Price, the chief speechwriter for President Nixon; John J. Sirica, the

Chief Judge for the U.S. District Court for the District of Columbia, who presided over several

key Watergate trials.[11]

## II.     THE ROAD MAP'S RELEVANCE TO THE CURRENT DEBATE ON SPECIAL COUNSEL MUELLER'S FRAMEWORK FOR REPORTING HIS FINDINGS.

Special Counsel Robert Mueller's current investigation has several parallels to Special

Prosecutor Jaworski's Watergate investigation.  *See, e.g.*, Dean Decl. ¶ 12; Goldsmith Decl. ¶¶

23-30.  Both investigations include an inquiry into whether the president has participated in a

criminal conspiracy and whether he has obstructed or attempted to obstruct justice.  Both raise

legal questions, which are actively being debated today, about whether a federal prosecutor has

the power to indict a sitting president and whether a president's obstruction of justice would

amount to a crime or merely an impeachable offense.  *See* Lacovara Decl. ¶ 22 & nn. 1-3;

Goldsmith Decl. ¶ 29.  And finally, both have generated debate about the extent to which the

Office of the Special Prosecutor/Counsel can share the fruits of its investigation with the House

Judiciary Committee for consideration of impeachment – a debate that becomes all the more

pressing if, as the Department of Justice has opined, a sitting president cannot be indicted.

---

[11] For citations to these and other relevant publications, see footnote 17, *infra*.

Goldsmith Decl. ¶¶ 15-17, 26-27; Bates Decl. ¶¶ 23-25; Wittes Decl. ¶¶ 16, 18-20; Lacovara
Decl. ¶¶ 16-17; Dean Decl. ¶ 11.

According to some scholars, the Special Counsel's ability to report his findings beyond
the Attorney General is an open question because the regulations governing the Special
Counsel's Office (28 C.F.R. § 600.1 *et seq.*), like those governing Watergate Special
Prosecutor's Office, do not specifically address transmittal of a report to the House Judiciary
Committee or to the public.  Bates Decl. ¶ 23.  By contrast, the statute governing the Office of
Independent Counsel, which under Kenneth Starr investigated President Clinton during his
second term, specifically required the Independent Counsel to advise the House of
Representatives of "any substantial and credible information . . . that may constitute grounds for
an impeachment."  28 U.S.C. § 595(c) (now lapsed); Bates Decl. ¶¶ 3, 23.  In the silence left by
Congress, Special Counsel Mueller's Office, like the Watergate Special Prosecutor's Office,
must navigate difficult questions of separation of powers, individual rights, and executive power,
in deciding what type of report, if any, to provide Congress.  Goldsmith Decl. ¶¶ 27-29; *see also*
Bates Decl. ¶ 25.

Because few judicial precedents expressly apply to these issues, legal analysts have
turned to historical precedent to "inform both legal meanings and proper government practice."
Goldsmith Decl. ¶ 26; *see also* Bates Decl. ¶ 24.  Two precedents can be found in modern U.S.
history.  The first is the Road Map, a spare and non-accusatory recitation of facts intended to
point the House Judiciary Committee to the evidence to draw its own conclusion.  The second is
Kenneth Starr's report on the results of his Clinton investigation (known as the "Starr Report"), a
comprehensive, detailed, and evaluative narrative that both revealed the investigation's findings
and evaluates them against the law.  Goldsmith Decl. ¶ 26; Wittes Decl. ¶ 19.  While the Starr

Report is public, the Road Map remains under seal.  Amid widespread news reports that Special

Counsel Mueller is drafting a report of his findings, the debate over the appropriate framework

for Special Counsel Mueller to report any findings to Congress has drawn increasing public

interest.  *See* Goldsmith Decl. ¶¶ 22-27; Wittes Decl. ¶¶ 18-20.

## ARGUMENT

I.   **THIS COURT HAS INHERENT AUTHORITY TO ORDER DISCLOSURE OF THE ROAD MAP.**

   A.   **The District Court Has Inherent Authority to Order Disclosure of Grand Jury Material Where Appropriate and That Authority Is Consistent with Rule 6(e).**

   District courts maintain inherent authority to permit the release of grand jury material

under appropriate circumstances.  That discretion, however, must be exercised in light of the

long tradition of keeping grand jury proceedings, and records of those proceedings, from public

view.  *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959).  The Supreme

Court has identified the following reasons for grand jury secrecy:  preventing those about to be

indicted from fleeing, ensuring the "utmost freedom" and security of the grand jury in its

deliberations, encouraging witnesses to testify "fully and frankly," preventing perjury by or

tampering with grand jury witnesses, and ensuring that "persons who are accused but exonerated

by the grand jury will not be held up to public ridicule." *Douglas Oil Co. v. Petrol Stops Nw.*,

441 U.S. 211, 219 & n.10 (1979) (citations omitted).

   "Grand jury secrecy is not unyielding, however."  *In re Grand Jury Subpoena, Judith*

*Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006).  Equally part of the tradition is the discretion of

trial courts to order disclosure of grand jury material where appropriate.  *See Douglas Oil Co.*,

441 U.S. at 223 ("[W]e emphasize that a court called upon to determine whether grand jury

transcripts should be released necessarily is infused with substantial discretion."); *Pittsburgh*

*Plate Glass*, 360 U.S. at 399 (noting that the federal courts "have been nearly unanimous in regarding disclosure [of grand jury material] as committed to the discretion of the trial judge"); *In re Petition of Am. Historical Ass'n*, 49 F. Supp. 2d 274, 286 (S.D.N.Y. 1999) (stating that "federal courts historically have exercised supervisory power in this area to develop exceptions to the rule of secrecy when appropriate").  In upholding such exercise of discretion, the Supreme Court has recognized that the public interest in grand jury secrecy may, in some circumstances, be outweighed by the competing need for disclosure of grand jury material.  *See Douglas Oil Co.*, 441 U.S. at 223 (noting that "disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy"); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 233–34 (1940) ("Grand jury testimony is ordinarily confidential.  But after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." (citation omitted)).

Federal Rule of Criminal Procedure 6(e) codifies the general rule of grand jury secrecy, as well as several exceptions to the rule that have developed over time.  Subpart (e)(2)(B) imposes a non-disclosure obligation on specific categories of persons privy to grand jury proceedings: "(i) a grand juror; (ii) an interpreter; (iii) a court reporter; (iv) an operator of a recording device; (v) a person who transcribes recorded testimony; (vi) an attorney for the government; or (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)."  Fed. R. Crim. P. 6(e)(2)(B)(i)-(vii).  Notably, courts are not included among those bound by the secrecy obligation.  Subpart (e)(3) enumerates several exceptions to the non-disclosure obligation, with subpart (e)(3)(E) specifically addressing when a court may authorize disclosure of a grand jury matter.  Fed. R. Crim. P. 6(e)(3)(E).  In promulgating Rule 6(e), the Advisory Committee made clear that codification of the tradition of grand jury secrecy preserved the

11

district court's power to permit disclosure.  *See* Fed. R. Crim. P. 6(e), Advisory Committee's

Notes (1944) ("This rule continues the traditional practice of secrecy on the part of members of

the grand jury, except when the court permits a disclosure" (citations omitted)).  The Supreme

Court likewise has reaffirmed such power since the advent of Rule 6(e).  *See Pittsburgh Plate

Glass*, 360 U.S. at 399 (stating that "Rule 6(e) is but declaratory" of the principle that disclosure

of grand jury material is committed to the discretion of the trial judge).

Recognizing that Rule 6(e)(3)(E) was intended to complement, rather than displace, the

courts' inherent disclosure authority, three circuit courts have expressly held that district courts

may order disclosure of grand jury records in special circumstances that fall outside the

exceptions expressly enumerated in Rule 6(e)(3)(E).  *See Carlson v. United States*, 837 F.3d 753,

763 (7th Cir. 2016) (holding that "[t]he text and history of the Rules indicate that Rule 6(e)(3)(E)

is permissive, not exclusive, and it does not eliminate the district court's long-standing inherent

supervisory authority to make decisions as needed to ensure the proper functioning of a grand

jury"); *In re Petition of Bruce Craig for Order Directing Release of Grand Jury Minutes*, 131

F.3d 99, 103 (2d Cir. 1997) (concluding that "permitting departures from Rule 6(e) is fully

consonant with the role of the supervising court and will not unravel the foundations of secrecy

upon which the grand jury is premised"); *In re Hastings*, 735 F.2d 1261, 1268 (11th Cir. 1984)

("[I]t is certain that a court's power to order  disclosure of grand jury records is not strictly

confined to instances spelled out in [Rule 6(e)].").

The D.C. Circuit has not specifically addressed the question of whether courts have

inherent authority to unseal grand jury records in circumstances other than those enumerated by

Rule 6(e)(3).[12]  However, its affirmance of Judge Sirica's transmission of the Road Map to the

---

[12] This question is currently pending before the D.C. Circuit.  *See McKeever v. Sessions*, No. 17–

House Judiciary Committee in *Haldeman* indicates approval of the district courts' exercise of discretion beyond the express provisions of Rule 6(e).  In Judge Sirica's decision, he rejected arguments that disclosure of the Road Map to the House Judiciary Committee was inappropriate because it fell outside Rule 6(e)'s exception for disclosures "preliminarily to or in connection with a judicial proceeding."  *In re Report & Recommendation*, 370 F. Supp. at 1227.  Citing the Advisory Committee's 1944 Notes, Judge Sirica interpreted Rule 6(e) as "cover[ing] a rather narrow area," requiring only that "secrecy must prevail during deliberations, and that any later disclosure will occur at the court's discretion."  *Id.* at 1227-28.  He therefore exercised his discretion in determining that the interests in disclosure of the Road Map to the House Judiciary Committee outweighed the interests in secrecy.  *Id.* at 1229-30.  The D.C. Circuit expressed "general agreement" with Judge Sirica's decision.  *Haldeman*, 501 F.2d at 715.

Persuaded by the opinions of other circuits and the D.C. Circuit's *Haldeman* opinion, district courts in this circuit have recognized and exercised their inherent power to release grand jury material to the public in special circumstances where no Rule 6(e) exception applies.  *See, e.g.*, *In re Application to Unseal Dockets Related to Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314 (D.D.C. 2018) (exercising the district court's inherent authority outside of Rule 6(e) to disclose eleven dockets related to Ken Starr's 1998 investigation into President Clinton's business dealings and relationship with a former White House intern));[13] *Kutler*, 800 F. Supp. 2d 42 (D.D.C. 2011) (exercising the district court's inherent authority outside of Rule 6(e) to disclose President Nixon's testimony before the Watergate grand jury).  This well-founded reasoning should apply here as well.

---

5149 (D.C. Cir. filed June 26, 2017).

[13] The government's appeal of this decision is being held in abeyance pending resolution of *McKeever*.

**B.**     **Rule 6(e)'s History and Text Support the District Court's Inherent Authority to Order Disclosure of Grand Jury Material.**

The majority view that district courts maintain inherent authority to disclose grand jury material under appropriate circumstances finds ample support in the text and history of Rule 6(e), as well as the common law that Rule 6(e) codified.

The text of the Rule reflects a recognition of the court's inherent disclosure authority.  By its plain wording, the general rule of secrecy found in Rule 6(e)(2) does not impose an obligation of secrecy on the district court.  Rule 6(e)(2) imposes a secrecy obligation, "[u]nless these rules provide otherwise," on a specific list of people privy to grand jury proceedings, including government attorneys, grand jurors, and court reporters.  Because "[t]he district court is notably absent from this list," it cannot follow that the district court needs express permission from elsewhere in Rule 6(e) to disclose grand jury records.  *See 1998 Investigation of President Clinton*, 308 F. Supp. 3d at 324-25.[14]

Moreover, Rule 6(e)(3)(E), the provision that lists circumstances where the court "may authorize disclosure," is permissive, rather than limiting.  As a matter of statutory construction, this permissive rule that contains none of the limiting language used in other subsections of Rule 6(e) "should not give rise to a negative inference that it abrogates the district court's inherent power" without a clear expression of that purpose.  *Carlson*, 837 F.3d at 762-63 (also noting that Fed. R. Crim. P. 57(b) allows a judge to "regulate practice in any manner consistent with federal law, these rules, and local rules of the district" in the absence of controlling law); *see also Craig*,

---

[14] As the *amicus curiae* in support of the appellant in *McKeever* points out, the government, in its filings in *Haldeman*, itself acknowledged the import of the district court's omission from Rule 6(e)(2)'s disclosure bar—i.e., that Rule 6(e) does not apply where disclosure by the court is involved.  *See* Reply Br. for Court-Appointed *Amicus Curiae* in Supp. of Appellant, *McKeever v. Sessions*, No. 17-5149 (D.C. Cir. filed June 25, 2018), at 7-8 & Add. 1.

131 F.3d at 101-03.

Finally, changes to Rule 6(e) over time demonstrate that it "was not designed to ossify the exceptions to the general rule of grand jury secrecy" by prohibiting district courts from exercising discretion to unseal grand jury records outside the Rule's confines. *Kutler*, 800 F. Supp. 2d at 45. To the contrary, "exceptions to the secrecy rule" found in Rule 6(e) "have developed through conformance of Rule 6 to the 'developments wrought in decisions of the federal courts,' not vice versa." *Am. Historical Ass'n*, 49 F. Supp. 2d at 285-86 (quoting *Hastings,* 735 F.2d at 1268); *see also Kutler*, 800 F. Supp. 2d at 45-46 (noting that "as new exceptions outside of those enumerated in Rule 6(e) have gained traction among the courts, the scope of the rule has followed suit"). This evolution of the Rule is "in keeping with courts' traditional discretion regarding disclosure . . . and utterly inconsistent with the notion that Rule 6(e) limits courts' ability to disclose grand jury records to those exceptions expressly contemplated by the rule." *Kutler*, 800 F. Supp. 2d at 46 (citation omitted); *see also Carlson*, 837 F.3d at 765. In short, Rule 6(e) was meant to allow the development of exceptions like the "special circumstances" exception, now firmly established in multiple jurisdictions.

## II.     SPECIAL CIRCUMSTANCES JUSTIFY DISCLOSURE OF THE ROAD MAP.

This petition presents a paradigmatic case for the court to exercise its inherent authority to disclose grand jury materials. In evaluating whether to disclose the Road Map, the court should weigh the interest in disclosure against the need to maintain secrecy. Several courts have applied the Second Circuit's formulation of the "special circumstances" exception in *Craig*, which provides a non-exhaustive list of factors for balancing the interests in disclosure against the need to maintain secrecy:

> (i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why

disclosure is being sought in the particular case; (iv) what specific information is being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceedings and that of their families; (vii) the extent to which the desired material—either permissibly or impermissibly—has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question.

*Craig*, 131 F.3d at 106.  *See also 1998 Investigation of President Clinton*, 308 F. Supp. 3d at 327; *Kutler*, 800 F. Supp. 2d at 48; *Am. Historical Ass'n*, 49 F. Supp. 2d at 284.  While the assessment is fact-specific, generally courts authorizing disclosure of grand jury material have found that the material has great historical significance to matters of public interest and that the traditional justifications for secrecy have waned due to the passage of time and the deaths or public disclosures of grand jury principals and witnesses.  *See, e.g.*, *1998 Investigation of President Clinton*, 308 F. Supp. 3d at 330-31; *Kutler*, 800 F. Supp. 2d at 50; *Am. Historical Ass'n*, 49 F. Supp. 2d at 283.

This petition presents an extraordinarily compelling interest in disclosure arrayed against a vanishingly small countervailing interest.  Not only does the Road Map carry immense historical significance in understanding the Watergate investigation, it provides a key precedent for assessing the appropriate framework for Special Counsel Mueller to report to Congress any findings of potentially unlawful conduct by President Trump.  Petitioners, moreover, are well positioned to analyze the importance of the Road Map in furthering the public understanding of both Watergate history and of any action Special Counsel Mueller may take with respect to disclosing his investigation's findings.  On the other side of the scales, none of the traditional secrecy interests are implicated by disclosure of the Road Map.

### A.     The Interests in Public Access to the Road Map Militate Strongly in Favor of Authorizing Disclosure.

The three *Craig* factors relevant to the "interests in disclosure" side of the scales – (1) "why disclosure is being sought" (the third *Craig* factor) (2) "the identity of the party seeking disclosure" (the first *Craig* factor) and (3) "what specific information is being sought" (the fourth *Craig* factor), *Craig*, 131 F.3d at 106 – weigh heavily in favor of releasing the Road Map. These factors are discussed in turn below.

### 1.     Petitioners' Reasons for Seeking Disclosure Weigh in Favor of Releasing the Road Map.

Petitioners seek disclosure of the Road Map for two reasons. First, the Road Map has inherent historical value as a critical missing piece of the Watergate story, which itself would be independently sufficient to justify disclosure. And second, the Road Map illuminates a current debate of extraordinary national importance.

The historical significance of Watergate generally, and of the Road Map specifically, justifies release of the Road Map. As the court in *Kutler* found, "Watergate's significance in American history cannot be overstated. Nearly forty years later, Watergate continues to capture both scholarly and public interest." 800 F. Supp. 2d at 48. Special Prosecutor Jaworski's decision to create the Road Map, in particular, is a pivotal part of Watergate history. The idea of the Road Map originated through intensive discussions within the Special Prosecutor's Office about how to hold President Nixon accountable for alleged crimes uncovered through the investigation, where authority to indict a sitting president was unclear, doing so could impair the prosecution of other principals, and the president's individual rights were at stake. *See* Lacovara Decl. ¶¶ 16-17; Ben-Veniste Decl. ¶¶ 11-12; Goldsmith Decl. ¶¶ 15-17. The Special Prosecutor's Office faced an unprecedented question of how to transmit evidence of the

17

President's unlawful conduct to House of Representatives, a separate branch of government with the authority to impeach but insufficient evidence to move forward with its investigation. *See* Bates Decl. ¶¶ 12-13. The Road Map's format and content, therefore, were the subject of careful deliberation, described in great detail in the Watergate historical literature. *See*, *e.g.*, Ben-Veniste Decl. ¶ 12 & Ex. A. Nonetheless, the document itself remains sealed, depriving the public of a full understanding of the many weighty considerations the Special Prosecutor's Office faced in creating the Road Map.

The continued secrecy of the Road Map also deprives the public of a full understanding of how the House Judiciary Committee arrived at its decision to draft articles of impeachment against President Nixon. Members of the Watergate Special Prosecution Force understand the Road Map to have played an integral role in spurring the House's investigation and decision to impeach. Ben-Veniste Decl. ¶ 13; Lacovara Decl. ¶ 18. Yet precisely what information the House drew upon at that critical turning point in Watergate history remains unknown.

Like President Nixon's grand jury testimony, the Road Map should be released to "enhance the existing historical record, foster further scholarly discussion, and improve the public's understanding of a significant historical event." *Kutler*, 800 F. Supp. 2d at 48. As courts have recognized, "[t]he public must acquire, at an appropriate time, a significant, if not compelling, interest in ensuring the pages of history are based upon the fullest possible record." *Am. Historical Ass'n*, 49 F. Supp. 2d at 295; *see also Kutler*, 800 F. Supp. 2d at 48. That time has come for Watergate history.

The historical interest in filling gaps is fortified where, as here, the "case fosters vigorous and sustained debate not only about the case itself, but also about broader issues concerning fundamental and, at times, countervailing aspects of our democracy." *Am. Historical Ass'n*, 49

F. Supp. 2d at 295.  Here, disclosure of the Road Map not only enhances the public's

understanding of the historical facts of Watergate, but also our nation's self-reflection on

governmental investigative power, separation of powers, the individual rights of a sitting

president, and the role and function of special prosecutors and grand juries themselves.  The

history of the Road Map reveals tensions in our democracy concerning the extent of presidential

power and immunity, the oversight power of Congress over the executive branch, how that

oversight role relates to the role of the special prosecutor, and the limits of the special

prosecutor's power.  Goldsmith Decl. ¶ 26; Bates Decl. ¶ 12; Dean Decl. ¶¶ 11-12.  The public

interest in such a document is substantial.  *See 1998 Investigation of President Clinton*, 308 F.

Supp. 3d at 327 (noting the "substantial public interest in learning more about what led to the

impeachment proceedings against President Clinton and in better understanding past interactions

between independent prosecutors and the Executive Branch" (quoting CNN Resp. Status Rep. at

2)).

Unlike in previous cases demonstrating a substantial historical interest in grand jury

material, however, Petitioners can also demonstrate an urgent need for this specific document to

inform one of the most pressing debates taking place in our nation today:  how Special Counsel

Mueller can or should share with Congress any evidence he may uncover of potentially unlawful

or improper conduct by President Trump.  Because there are few judicial precedents that

expressly govern those issues, "the past practices of government actors inform both legal

meanings and proper government practice."  Goldsmith Decl. ¶ 26; *see also* Wittes Decl. ¶ 21.

The experience of Petitioner Stephen Bates, who attempted to consult the Road Map while

working in the Office of Independent Counsel under Ken Starr, but was unable to because it

remained subject to grand jury secrecy, underscores this point.  Bates Decl. ¶¶ 15-16.   In

addition to providing Special Counsel Mueller with a crucial precedent as he operates in largely

uncharted territory, the Road Map may inform the public's understanding of whatever action he

ultimately takes.  Disclosure of the Road Map would provide "a vital touchstone for the public

and Congress to assess his actions."  Goldsmith Decl. ¶ 27.  If Special Counsel Mueller decides

to send a report to Congress, the Road Map will help the public assess the propriety of his

actions.  *Id.*; *see also* Bates Decl. ¶¶ 24-25.  If he does not send a report, the public again will

have a basis of comparison for assessing that course of action.  Goldsmith ¶ 28.  Simply put, the

Road Map has extraordinary relevance to the ongoing discourse about how Special Prosecutor

Mueller may proceed.  *See* Goldsmith Decl. ¶ 30; Wittes Decl. ¶¶ 18-23; Bates Decl. ¶ 24;

Lacovara Decl. ¶ 21; Ben-Veniste Decl. ¶ 17.

Finally, the Road Map will speak to the ongoing debate on the legal questions of whether

the President can violate a federal obstruction of justice statute in the discharge of his duties as

chief executive.  Goldsmith Decl. ¶ 29.  Academics and commentators have arrived at different

conclusions on that question.[15] Because many of President Trump's actions that his critics say

constitute obstruction of justice had parallels in the Nixon presidency, whether or not Special

Prosecutor Jaworski cited to such actions in the Road Map is a relevant data point.  *Id.*  For this

reason and the several others described above, the compelling public interest in the Road Map

justifies disclosure.

---

[15] *See, e.g.,* Daniel J. Hemel & Eric A. Posner, *Presidential Obstruction of Justice*, 106 CAL. L.
REV. 1277 (2018); Benjamin Wittes, *How Can the President Obstruct Justice?,* LAWFARE (Dec.
5, 2017), https://www.lawfareblog.com/how-can-president-obstruct-justice; Josh Blackman,
*Obstruction of Justice and the Presidency: Part I*, LAWFARE (Dec. 5, 2017),
https://www.lawfareblog.com/obstruction-justice-and-presidency-part-i; Josh Blackman,
*Obstruction of Justice and the Presidency: Part II*, LAWFARE (Dec. 12, 2017),
https://www.lawfareblog.com/obstruction-justice-and-presidency-part-ii.

### 2.    Petitioners' identities weigh in favor of disclosure.

The identity of the Petitioners carries great weight in the *Craig* analysis, *Craig*, 131 F.3d

at 106, and substantially favors disclosure of the Road Map.  Petitioners are extremely well

positioned to analyze the Road Map's historical significance as well as its import to today's

debate about the nature of a potential Mueller report, the propriety of Mueller's actions, and the

sensitive issues of executive power, separation of powers, and individual rights attendant to

Special Counsel Mueller's investigation and any report he releases.  They are also extremely

well suited to deliver that analysis to a broad and engaged public audience.

Petitioner Benjamin Wittes is the editor-in-chief of *Lawfare* and Senior Fellow in

Governance Studies at the Brookings Institution.  Wittes Decl. ¶ 1.  In addition to writing

regularly on *Lawfare* – which in 2017 received more than 15 million page views by more than

6.4 million unique visitors, *id.* ¶ 10 – he contributes regularly to major news publications and

television news programs.  *Id.* ¶¶ 8-9.  He also authored a book on Starr's tenure as independent

counsel.  *Id.* ¶ 7.  Since 2017, he has written dozens of articles and essays on the legal and

institutional contours of Special Counsel Mueller's investigation in leading publications.  *Id.* ¶

17.  In a March 2018 essay on *Lawfare*, he specifically analyzed the significance of the Road

Map as a potentially salient historical precedent for understanding the range of options available

to Special Counsel Mueller.  *Id.* ¶¶ 18-19 (citing Benjamin Wittes & Quinta Jurecic, *Will We

Ever Learn What Bob Mueller Knows?*, LAWFARE (Mar. 21, 2018)).

Petitioner Jack Goldsmith is a professor at Harvard Law School.  During the presidency

of George W. Bush, Goldsmith was the Assistant Attorney General for the Office of Legal

Counsel, where he advised the White House, the Attorney General, and federal agencies on

constitutional, federal statutory and treaty issues.  *Id.* ¶ 6.  As a scholar, he has written

extensively about presidential power and the office of the presidency. *Id.* ¶¶ 2-4, 7. Among

other things, he has written two books on the topic of the presidency, presidential power, and

presidential history, published scholarly articles in the nation's leading law reviews on those

topics, and published commentary on similar themes numerous leading news publications. *Id.* ¶

3. Goldsmith also recently published an essay exploring the extent of Special Counsel Mueller's

authority to issue a report to Congress in which he cited the Road Map as an instructive historical

precedent. *Id.* ¶¶ 23-24.

As a former OIC staff member who participated in drafting the report submitted to

Congress by Independent Counsel Ken Starr, Petitioner Bates provides a singular perspective on

what the Road Map means for Special Counsel Mueller's investigation. In 1997, while

researching how the OIC should convey evidence supporting allegations of impeachable offenses

to the House of Representatives, Bates sought to examine the Road Map as a relevant historical

precedent. Bates Decl. ¶¶ 4, 15. A national archivist denied him access because the Road Map

was still under seal. *Id.* ¶ 16. Bates is preparing to write an article comparing the currently-in-

effect Special Counsel regulations to Section 595(c), which permitted the OIC to transmit the

Starr Report directly to Congress. *Id.* ¶ 23. In Bates' view, "the value of the Road Map as

precedent may be much greater for Special Counsel Mueller today than it was for the OIC in

1997 and 1998" because of how similarly situated Special Counsel Mueller is to Special

Prosecutor Jaworski. *Id.* ¶ 24. In conducting research for his article, Bates again sought (this

time through a Freedom of Information Act request) and was denied access to the Road Map by

the National Archives. *Id.* ¶ 17.

3. **The narrow scope of Petitioners' request weighs in favor of disclosure.**

Petitioners have narrowly tailored their request to the purpose of their petition.  They seek disclosure of only the 55 pages of sparse factual statements that the Watergate grand jury transmitted to the House.  This document focuses on the key evidence of President Nixon's involvement in a criminal conspiracy, rather than evidence against other Watergate subjects or the various offshoots of the investigation.  Ben-Veniste ¶ 11.  Petitioners do not seek the voluminous documents that accompanied and were referenced in the Road Map.  Because Petitioners seek no more than is necessary to further the important public interests outlined above, this factor, too, should weigh in favor of disclosure.  *See Kutler*, 800 F. Supp. 2d at 48-9 (granting petition that sought disclosure of only the transcript of President Nixon's grand jury testimony and certain associated materials).

B. **Any Remaining Secrecy Interests in the Road Map Are Minimal and Outweighed by the Compelling Interest in the Road Map's Release.**

On the other side of the scales, the court must weigh the secrecy interests in the Road Map.  The relevant considerations are (1) the passage of time and the defendant's position on disclosure (the second and fifth *Craig* factors); (2) the current status of the principals of the grand jury proceedings and the privacy interests of grand jury witnesses who might be affected by disclosure (the sixth and eighth *Craig* factors); and (3) the extent to which the desired material – either permissibly or impermissibly – has been previously made public (the seventh *Craig* factor).  *Craig*, 131 F.3d at 106.  As shown below, each of these factors weighs in favor of disclosure.

1.     **The passage of forty-four years and the death of President Nixon greatly reduce any secrecy interest in the Road Map.**

In the analysis of whether special circumstances warrant disclosure, the "timing of the request remains one of the most crucial elements" because "the passage of time erodes many of the justifications for continued secrecy." *Craig*, 131 F.3d at 107.  Here, forty-four years have elapsed since the Road Map's transmission to the House, and the Watergate investigations have long closed.  President Nixon, moreover, passed away in 1994.  Eight years ago, these facts were enough to persuade the court in *Kutler* that the traditional objectives justifying grand jury secrecy were not implicated in a petition seeking the release of President Nixon's testimony.  800 F. Supp. 2d at 48-49.  Other courts have drawn the same conclusion when faced with requests for decades-old grand jury material.  *See, e.g., Am. Historical Ass'n*, 49 F. Supp. 2d at 277 (finding no national security or privacy interests implicated by 50-year-old grand jury testimony related to the investigation of Alger Hiss); *In re Nat'l Sec. Archive for Order Directing Release of Grand Jury Minutes*, No. 08 Civ. 6599, 2008 WL 8985358, at *1 (S.D.N.Y. Aug. 26, 2008) (ordering disclosure of 57-year-old testimony related to Julius and Ethel Rosenberg grand jury, in part because witnesses had died or otherwise could not be located); *In re Tabac*, No. 3:08-mc-0243, 2009 WL 5213717, at *1 (M.D. Tenn. Apr. 14, 2009) (ordering disclosure of 46-year-old grand jury testimony related to indictment of Jimmy Hoffa).  The secrecy interests are at least as negligible here.

2.     **The current status of Watergate principals and the privacy interests of grand jury witnesses do not justify continued secrecy.**

As an initial matter, the very secrecy interests at stake here were previously found to be surmountable in 1974, when Judge Sirica allowed the limited disclosure of the Road Map to the House Judiciary Committee.  Judge Sirica determined that the secrecy interests were diminished

because "the Grand Jury ha[d] ended its work," so there was no need to protect against flight

risk, witness tampering, encroachments on grand jury deliberations, or prejudice to the innocent

accused.  *In re Report & Recommendation*, 370 F. Supp. at 1229.  Moreover, the "person on

whom the Report focuses, the President of the United States, [did] not object[] to its release to

the Committee." *Id.*  Others implicated by the Road Map, Judge Sirica found, were "involved

only indirectly" and "have already been the subject of considerable public testimony and will no

doubt be involved in further testimony, quite apart from this Report." *Id.* at 1230.  And indeed,

although Judge Sirica was authorizing disclosure only to the House Judiciary Committee, he

noted that "these considerations might well justify even a public disclosure of the Report." *Id.*

The secrecy interests are even less weighty today.

Given that forty-four additional years have now passed, the secrecy interests in the Road

Map have even further diminished, if not disappeared.  Not only has President Nixon passed

away, but many other Watergate principals, people with close ties to President Nixon or his

Administration, and people involved in conducting the investigations are also deceased.[16]  Dean

---

[16] The petitioners in *Kutler* advised the court in September 2010 of the following deaths of
Watergate principals and others close to the investigation: Alexander Haig (died Feb. 2010),
Herbert Miller (died Nov. 2009), Bernard Barker (died July 2009), Donald Alexander (died Feb.
2009), W. Mark Felt (died Dec. 2008), E. Howard Hunt (died Jan. 2007), L. Patrick Gray (died
July 2005), Peter Rodino (died May 2005), Rose Mary Woods (died Jan. 2005), Fred LaRue
(died July 2004), Archibald Cox (died May 2004), Samuel Dash (died May 2004), Ron Ziegler
(died Feb. 2003), Richard Helms (died Oct. 2002), Herman Talmadge (died Mar. 2002), Vernon
Walters (died Feb. 2002), James St. Clair (died Mar. 2001), Richard Kleindienst (died Feb.
2000), Elliot Richardson (died Dec. 1999), John Ehrlichman (died Feb. 1999), Charles "Bebe"
Rebozo (died May 1998), Maurice Stans (died Apr. 1998), H.R. Haldeman (died Nov. 1993),
John Connally (died June 1993), John J. Sirica (died Aug. 1992), Henry Petersen (died June
1991 ), John Mitchell (died Nov. 1988), Sam Ervin (died Apr. 1985), Leon Jaworski (died Dec.
1982), J. Fred Buzhardt (died Dec. 1978), Howard Hughes (died Apr. 1976), J. Edgar Hoover
(died May 1972). *See* Mem. of Law in Supp. of Pet'n, *Kutler*, 1:10-mc-00547 (D.D.C. filed Sept.
13, 2010), ECF No. 1, at 38-39.

The Petitioners are aware of one living Watergate participant, Gordon C. Strachan, who served

Decl. ¶ 16.  Others have no cognizable privacy interest because they themselves have publicized

their involvement in the Watergate story through writings or interviews.[17]  John Dean, perhaps

one of the individuals most likely to have privacy interests at stake, expressly consents to the

disclosure of any material relating to him that the Road Map may include.  Dean Decl. ¶ 15.

---

as H. R. Haldeman's principal political assistant and general counsel of the U.S. Information
Agency.  Strachan is unlikely to have privacy interests arising from the substance of the Road
Map because his role in Watergate has been described in detail in the House Judiciary
Committee's Statements of Information, the House Judiciary Committee's 1974 Report, and the
WSPF Report, as well as secondary accounts of Watergate.  The Statements of Information, for
instance, recount much of Strachan's testimony before the Senate Select Committee on
Presidential Campaign Activities.  *See, e.g.*, Statement of Information: Book I – Events Prior to
the Watergate Break-In, Hearings of the House Judiciary Committee on Resolution to Impeach
President Nixon (H. Res. 803), ¶¶ 8-9.  To the extent the Road Map contains any previously
undisclosed information about Strachan that implicates his legitimate privacy interests, the
appropriate course may be to redact such information.

[17] The petitioners in *Kutler* advised the court of the following publications by people involved in
the Watergate investigation:  SAMUEL DASH, CHIEF COUNSEL: INSIDE THE ERVIN COMMITTEE-
THE UNTOLD STORY OF WATERGATE (1976); JOHN DEAN, BLIND AMBITION (1976); H.R.
HALDEMAN AND JOSEPH DIMONA, THE ENDS OF POWER (1978); LEON JAWORSKI, THE RIGHT AND
THE POWER: THE PROSECUTION OF WATERGATE (1976); FRANK MANKIEWICZ, U.S. V. RICHARD
M. NIXON: THE FINAL CRISIS (1975); JEB STUART MAGRUDER, AN AMERICAN LIFE: ONE MAN'S
ROAD TO WATERGATE (1974); JAMES W. MCCORD, A PIECE OF TAPE: THE WATERGATE STORY:
FACT AND FICTION (1974); LAWRENCE F. O'BRIEN, NO FINAL VICTORIES: A LIFE IN POLITICS-
FROM JOHN F. KENNEDY TO WATERGATE (1974); RAYMOND PRICE, WITH NIXON (1977); JOHN J.
SIRICA, TO SET THE RECORD STRAIGHT: THE BREAK-IN, THE TAPES, THE CONSPIRATORS, THE
PARDON (1979); JOHN CONNALLY AND MICKEY HERSKOWITZ, IN HISTORY'S SHADOW: AN
AMERICAN ODYSSEY (1993); HARRY S. DENT, COVER-UP: THE WATERGATE IN ALL OF US (1986);
JOHN EHRLICHMAN, WITNESS TO POWER: THE NIXON YEARS (1982); SAM J. ERVIN, JR., THE
WHOLE TRUTH: THE WATERGATE CONSPIRACY (1980); MARK FELT AND JOHN O'CONNOR, A G-
MAN'S LIFE: THE FBI 'DEEP THROAT' AND THE STRUGGLE FOR HONOR IN WASHINGTON (2006);
LEONARD GARMENT, CRAZY RHYTHM: MY JOURNEY FROM BROOKLYN, JAZZ, AND WALL STREET
TO NIXON'S WHITE HOUSE, WATERGATE, AND BEYOND … (1997); H.R. HALDEMAN, THE
HALDEMAN DIARIES: INSIDE THE NIXON WHITE HOUSE (1994); RICHARD KLEINDIENST, JUSTICE:
THE MEMOIRS OF ATTORNEY GENERAL RICHARD KLEINDIENST (1985); EGIL "BUD" KROGH AND
MATTHEW KROGH, INTEGRITY: GOOD PEOPLE, BAD CHOICES, AND LIFE LESSONS FROM THE
WHITE HOUSE (2007); G. GORDON LIDDY, WILL: THE AUTOBIOGRAPHY OF G. GORDON LIDDY
(1996); WILLIAM SAFIRE, BEFORE THE FALL: AN INSIDE VIEW OF THE PRE-WATERGATE WHITE
HOUSE (2005). *See* Mem. of Law in Supp. of Pet'n, *Kutler*, 1:10-mc-00547 (D.D.C. filed Sept.
13, 2010), ECF No. 1, at nn.6, 8.

Finally, most or all of the content included in the Road Map was subsequently made public in the trial of Watergate defendants and related judicial proceedings, the House Judiciary Committee's Statements of Information, and in the reports released by the House Judiciary Committee, the Senate, and the Watergate Special Prosecutor Force.  Ben-Veniste Decl. ¶ 14; Bates Decl. ¶¶ 14, 32.  Thus, here, as in *Kutler*, "[g]iven the extent to which Watergate figures – both indicted and unindicted – have written, spoken, or testified about Watergate, privacy concerns are of limited significance."  *Kutler*, 800 F. Supp. 2d at 49.

Where the requested grand jury materials are decades old, some courts have focused on "the forward-looking interest in ensuring future grand jurors and grand jury witnesses will not be inhibited due to the possibility of subsequent disclosure of proceedings based on historical interest."  *Am. Historical Ass'n*, 49 F. Supp. 2d at 292.  As an initial matter, information related to the Watergate grand jury has largely already become public.  Moreover, the inhibiting effect of disclosing the 44-year-old Road Map is likely insignificant.  Potential grand jurors and witnesses in future investigation are unlikely to be influenced by the prospect of a court unsealing records of the proceeding decades later, "especially when compared with far more immediate potential causes of disclosure, such as leaks, general press attention, public statements by witnesses and revelations at trial."  *Id.*  In such investigations, "the often extensive contemporaneous attention given to the case is likely to magnify the importance of those more proximate causes of disclosure in the minds of potential jurors and witnesses, and make the possibility of disclosure decades hence based on historical interest seem a trifling concern, or even an inevitability."  *Id.*; *see also Kutler*, 800 F. Supp. 2d at 49.  Thus, the secrecy interest rooted in ensuring future grand jurors and grand jury witnesses' participation is not compelling here.

### 3.     The extent to which the Road Map and its contents have been previously made public diminishes any remaining secrecy interest.

The fact that the Road Map remains under seal is remarkable to those familiar with Watergate history.  *See, e.g.*, Wittes Decl. ¶ 22; Lacovara Decl. ¶ 19.  That is for two reasons. First, the Road Map's format and the story of the Road Map's origin and transmission to the House Judiciary Committee have been chronicled with vivid detail in the historical accounts of James Doyle, Richard Ben-Veniste, and others.  Wittes Decl ¶¶ 11, 13-15; Ben-Veniste Decl. ¶ 11 & Ex. A.  The Road Map is thus part of the public imagination, but not part of the public record.

Second, the grand jury material likely contained in the Road Map – that is, the evidence that incriminated President Nixon – has been revealed to the public through a variety of means over the last forty-four years.  The public record that likely covers the grand jury material in the Road Map includes President Nixon's grand jury testimony, the Nixon White House tapes, the House Judiciary Committee's final report, the WSPF Report, portions of grand jury testimony of certain Watergate figures included in published House Judiciary Committee impeachment hearings materials, and the Senate Watergate Report.  Ben-Veniste Decl. ¶ 14.  Given the extensive Watergate public record, it is hard to believe that the Road Map contains much substance that is not already known to the public.  The only remaining secret is the Road Map's structure – how the evidence was assembled, curated, and presented.

## III.    DISCLOSURE IS ALSO WARRANTED UNDER RULE 6(E).

Even if the court determines that it does not have the inherent supervisory power to unseal the Road Map where no Rule 6(e)(3)(E) exception applies, disclosure is still warranted under Rule 6(e) itself.  Rule 6(e)(6) pertaining to "Sealed Records" provides: "Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal *to the extent and as*

*long as necessary* to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6) (emphasis added). The D.C. Circuit has interpreted this part of the Rule to permit disclosure of grand jury material that is no longer entitled to secrecy because it is already public. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138 (D.C. Cir. 2006). In *Miller*, the court ordered disclosure, with limited redaction, of sealed pages of a judge's opinion that contained grand jury material where the grand jury had already indicted the target of the investigation because the "indictment, now part of the public record, reveal[ed] some grand jury matters, and we see little purpose in protecting the secrecy of grand jury proceedings that are no longer secret." *Id.* at 1140. The D.C. Circuit reasoned that "'[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material. The purpose in Rule 6(e) is to preserve secrecy. Information widely known is not secret.'" *Id.* (quoting *In re Oliver L. North*, 16 F.3d 1234, 1235 (D.C. Cir. 1994)).

At this point, any grand jury information referenced in the Road Map has long since become sufficiently widely known to lose its Rule 6(e) character. Ben-Veniste Decl. ¶ 16 (stating his view as a Watergate prosecutor that "the Road Map has lost its Rule 6(e) character given the public disclosures of the grand jury material contained therein"). Even in January 1975, at a hearing before a subcommittee of the House Judiciary Committee on the WSPF's authority to issue the WSPF Report, Watergate Special Prosecutors Henry Ruth and Leon Jaworski testified that the facts about President Nixon's involvement in the Watergate cover-up already had been made public.[18] As discussed in the preceding section, nothing remains secret

---

[18] HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY: AUTHORITY TO ISSUE FINAL REPORT BY SPECIAL PROSECUTOR (Jan. 30, 1975), at 3 ("To a large extent, the goal of public disclosure as to the so-called Watergate coverup has been accomplished by the impeachment hearings and conclusions of the House Judiciary Committee, the hearings of the Senate Select Committee on Presidential Campaign Activities and the information made public by the Special

about what President Nixon did to precipitate the articles of impeachment that the House of Representatives drew against him.  Accordingly, maintaining the Road Map under seal is not necessary "to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6).  Given the compelling interests in disclosure in this case, the district court should exercise its discretion to release the Road Map under Rule 6(e)(6).

## CONCLUSION

Petitioners urge the court to order the disclosure of the Road Map either pursuant to its inherent authority to disclosure grand jury material or on the grounds that the Road Map should no longer be treated as Rule 6(e) material because its contents are publicly known.  Disclosure will enhance an important public discourse at a critical moment in history, while harming none. For all of the foregoing reasons, the petition should be granted.

Dated: September 14, 2018              Respectfully submitted,

LAURENCE SCHWARTZTOL (D.D.C. No. MA0007)
larry.schwartztol@protectdemocracy.org
DEANA EL-MALLAWANY*
deana.el-mallawany@protectdemocracy.org
**The Protect Democracy Project, Inc.**
10 Ware Street
Cambridge, MA 02138
Telephone: (202) 599-0466
Fax: (929) 777-8428

---

Prosecutor's Office through normal judicial channels."), *available at* https://babel.hathitrust.org/cgi/pt?id=pur1.32754077571911;view=1up;seq=1; *id.* at 10 ("[T]he testimony with respect to the Watergate coverup, as it is generally termed is complete.  I don't think you are going to find very much on that subject that hasn't been made public through the trial."); *id.* at 19-20 ("[I]n terms of the Watergate coverup . . . as to Mr. Nixon, you are just not going to find that much more.  I remember everybody wanted a smoking gun and they got the smoking gun.  We do not have 10 more smoking guns lying around our office.").

CAMERON KISTLER (D.C. Bar No. 1008922)
cameron.kistler@protectdemocracy.org
JUSTIN FLORENCE (D.C. Bar No. 988953)
justin.florence@protectdemocracy.org
**The Protect Democracy Project, Inc.**
2020 Pennsylvania Avenue NW, #163
Washington, D.C. 20006
Telephone: (202) 599-0466
Fax: (929) 777-8428

STEPHANIE LLANES*
stephanie.llanes@protectdemocracy.org
**The Protect Democracy Project, Inc.**
222 Broadway, 19th Floor
New York NY 10038
Telephone: (202) 599-0466
Fax: (929) 777-8428

\* *pro hac vice* application forthcoming

*Attorneys for Petitioners*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: PETITION OF BENJAMIN WITTES, JACK GOLDSMITH & STEPHEN BATES | ) ) ) ) ) ) ) ) |

Misc. Case No. _____

**DECLARATION OF STEPHEN BATES**

I, Stephen Bates, hereby declare as follows:

1. I am an Associate Professor at the Hank Greenspun School of Journalism and Media Studies at the University of Nevada, Las Vegas (UNLV).  I joined the faculty in August 2006. I also co-teach a course on law and technology at UNLV's Boyd School of Law. The focus of my teaching and writing has been political communication and the intersection of politics with the press and the First Amendment.  I also have taught and written about law and technology, privacy, libel, reporter's privilege, and other subjects.

2. Before entering academia, I served as literary editor of the *Wilson Quarterly* and published articles as a freelance journalist. I obtained my J.D. from Harvard Law School in 1987 and my A.B. from Harvard College in 1982.

3. From 1995 to 1999, I worked on the staff of the Office of Independent Counsel (OIC) under Independent Counsel Kenneth W. Starr. One of my tasks was to help draft the OIC's referral to the House of Representatives, which, pursuant to 28 U.S.C. § 595(c) (now lapsed), summarized substantial and credible information that could constitute grounds for the impeachment of President Clinton. The referral, which the OIC submitted

1

to the House of Representatives on September 9, 1998, came to be known as the Starr Report.

4. While on the OIC staff, I researched two issues raised by Section 595(c): first, what sort of allegations could give rise to the impeachment of a president under the Constitution; and, second, how the OIC could best convey evidence supporting such allegations to the House of Representatives for consideration as possible grounds for an impeachment. In the course of the research, I examined the publications of the House Judiciary Committee as it considered the impeachment of President Nixon, the reports of the Watergate Special Prosecution Force (WSPF), court cases litigated by the WSPF, autobiographies and biographies of those involved in the Watergate scandal, and historical accounts and contemporaneous press coverage of Watergate, as well as historical accounts of other impeachment inquiries and the legislative history of Section 595(c). I also consulted with Sam Dash, the former Chief Counsel for the Senate Watergate Committee, who was an adviser to the OIC. In addition, I examined archival materials, as detailed below.

5. Since leaving the OIC in 1999, I have continued to research Watergate-related topics. In *Slate* in 2001, I published an article on a libel lawsuit brought by one Watergate figure, G. Gordon Liddy.[1]

6. I currently plan to write one or more articles related to the Road Map and Special Prosecutor Jaworski's transmittal of evidence to the House of Representatives.

7. This declaration is based on my experience as a scholar, professor, writer, and Associate Independent Counsel.

8. In this declaration, I seek to provide, *first*, an overview of the Road Map, my interest in it, and my unsuccessful efforts to obtain it; *second*, information regarding the historical

---

[1] Stephen Bates, *Flipping His Liddy*, Slate (Feb. 5, 2001).

importance of the Road Map; *third*, an explanation of the importance of the Road Map in the context of Special Counsel Robert Mueller's current investigation; and, *finally*, an analysis of the attenuated privacy interests in the Road Map.

## OVERVIEW OF THE ROAD MAP

9. In the course of my research at OIC in preparation for drafting a referral to the House of Representatives, I obtained material relating to Watergate from the Records of the WSPF at the National Archives and the Leon Jaworski Papers in the Texas Collection at Baylor University. In the years since, I have acquired additional Watergate-related material from the William S. Cohen Papers at the University of Maine and the John J. Sirica Papers at the Library of Congress. I have also consulted archivists about the Elizabeth Holtzman Papers at Harvard's Schlesinger Library, the Howard Fields Papers at Duke University's Goodson Law Library, and the Albert E. Jenner Papers at the Chicago History Museum.

10. One document I have been unable to examine is the so-called Road Map, which the WSPF prepared as an index to evidence transmitted to the Judiciary Committee of the House of Representatives for use in the Nixon impeachment inquiry.

11. My understanding of the Road Map is based on memoirs by Judge John J. Sirica, Watergate Special Prosecutor Leon Jaworski, WSPF prosecutors Richard Ben-Veniste and George Frampton, Jr., and Special Assistant to Watergate Prosecutors James Doyle, as well as a court transcript from the Sirica Papers, published opinions by Judge Sirica and the D.C. Circuit, and accounts by journalists, particularly United Press International reporter Howard Fields, and historians.

12. From those sources, I understand that the House Judiciary Committee sought access to evidence gathered by WSPF prosecutors working with the grand jury, and that WSPF

prosecutors wanted to provide the evidence. Special Prosecutor Jaworski had concluded that a sitting president could not be indicted; impeachment by the House and removal by the Senate were the only remedies for criminal acts by a president. At the same time, the WSPF had obtained important evidence through the grand jury, which the House Judiciary Committee had not obtained. It seemed possible that the WSPF possessed the evidence but not the constitutional authority to use it, whereas the House possessed the constitutional authority but not the evidence.

13.  The prosecutors believed that, in addition to the raw evidentiary materials, the House Judiciary Committee would benefit from an explanatory overview of the evidence, to be prepared by the prosecutors. Special Prosecutor Jaworski believed that Judge Sirica would not authorize transmittal of an accusatory document. As a result, prosecutors prepared a neutral, non-accusatory index to the evidence, which came to be known as the Road Map. The Road Map was adopted by the grand jury, and Judge Sirica and the D.C. Circuit authorized transmittal of the Road Map and pertinent evidence to the Judiciary Committee, under seal.

14. In July 1974, the House Judiciary Committee published extensive records of its impeachment proceedings.[2]  Included among the thousands of pages of documents were the Statements of Information that the House Judiciary Committee's impeachment inquiry staff presented at the impeachment hearings from May to July 1974, setting forth the evidence relating to the Watergate break-in and cover-up.[3]  According to several sources, the impeachment inquiry staff's presentation was modeled on the Road Map in

---

[2] Hearings before the House Judiciary Committee on Resolution to Impeach President Nixon (H. Res. 803), *available at* https://archive.org/details/WatergateHearingsBeforeTheHouseCommitteeOnTheJudiciary.
[3] *Id.* (see Statement of Information, Book I-Book IV).

4

that it presented factual statements, with citations to the evidence, while abstaining from conclusions so that each Judiciary Committee member could draw his or her own conclusion.  Significantly, the published Statements of Information quoted the grand jury testimony of many witnesses, citing the evidence provided by the Watergate grand jury as the source.  They also reprinted pages from the grand jury transcripts.  Individuals whose excerpted grand jury testimony appears in these published materials include John Dean, Fred LaRue, Jeb Magruder, L. Patrick Gray, John Ehrlichman, H. R. Haldeman, Richard Kleindienst, E. Howard Hunt, Egil Krogh, Ronald Ziegler, Henry Petersen, and Charles Colson, among others. The Statements of Information are important for two reasons. First, in form and substance, they demonstrate the historic importance of the Road Map and the evidence transmitted with it. Second, in extensively citing, quoting, and reprinting grand jury transcripts, the Statements of Information indicate that confidentiality concerns surrounding the Road Map have diminished.

15. I initially wanted to look at the Road Map while on the staff of the OIC. Under Section 595(c), the OIC could transmit evidence to the House of Representatives without the authorization of the judge supervising the grand jury, so the particular concern that animated the Watergate prosecutors, in seeking Judge Sirica's authorization, did not apply. Nonetheless, I believed that the Road Map might constitute a model worthy of consideration by Independent Counsel Starr and his staff. Although the Road Map was not necessary to the OIC as a legal precedent, I was interested in it as a historical precedent.

16. When I asked, however, an archivist at the National Archives told me in 1997 that I could not see the Road Map, because it was still under the seal imposed by Judge Sirica.

17. I have remained interested in Watergate in general and the Road Map in particular since I left the OIC. In connection with an article I am preparing to write, I requested the Road Map again on July 10, 2018, via the Freedom of Information Act. On July 26, Christopher Abraham, an archivist with the Special Access and FOIA Branch of the National Archives, informed me that "[t]he report is sealed to preserve the secrecy of grand jury proceedings per 5 USC 552 (b)(3), pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure." I have been unable to find a copy of the Road Map through the other archival collections noted above.

18. I believe that the Road Map constitutes an important part of the historical record of Watergate, that it has relevance to current and future federal investigations of a sitting president, and that its public revelation would not impinge substantially on privacy interests.

THE ROAD MAP'S HISTORICAL IMPORTANCE

19. Watergate represents a unique episode in the history of American politics. Never before or since has an American president, facing the likelihood of impeachment by the House of Representatives, resigned. In 2011, a court, in releasing President Nixon's grand jury testimony, noted that "Watergate's significance in American history cannot be overstated. Nearly forty years later, Watergate continues to capture both scholarly and public interest." *In re Petition of Stanley Kutler*, 800 F. Supp. 2d 42, 48 (D.D.C. 2011).

20. People ascribe President Nixon's downfall to various factors, including the Senate Watergate investigation, the revelations by former White House counsel John Dean, and the investigative reporting by *The Washington Post* and other newspapers. The historical significance of the WSPF's Road Map, in my view, has been neglected.

21. I intend to write an article about the WSPF's transmittal of materials to the House Judiciary Committee. The Road Map is a key part of the story, and it would be enormously helpful for me to be able to consult it in my research.

## THE ROAD MAP'S RELEVANCE TO CURRENT QUESTIONS OF URGENT PUBLIC CONCERN

22. In *The Washington Post*, I recently wrote about Special Counsel Mueller's ongoing investigation of President Trump.[4] I argued that the Special Counsel has the constitutional authority to subpoena President Trump to testify before the grand jury, but that as a prudential matter, he should not exercise it.

23. For another article, I have been researching the regulations governing reports by Special Counsel Mueller. In my view, the regulations make no provision for transmittal of grand jury information to the House of Representatives, either directly by the Special Counsel or indirectly, through the Attorney General (or acting Attorney General). Because Section 595(c) has lapsed, it appears that the Special Counsel cannot follow the approach that the OIC took in 1998 with its referral. Instead, the Special Counsel apparently must seek the authorization of the district judge supervising the grand jury, as in Watergate. Although I focus here on investigations of a president by a special counsel, the same arguments would apply to any federal prosecutor, such as a United States Attorney, in possession of evidence that could constitute grounds for the impeachment of the president.

24. In seeking judicial authorization to transmit grand jury evidence to the House of Representatives, the Special Counsel may find it helpful to consider the approach of the WSPF Road Map from 1974, just as I had hoped to consider it in 1997 and 1998. Indeed,

---

[4] Stephen Bates, *Mueller Could Subpoena Trump. But It's Not Worth the Chaos That Would Follow*, Wash. Post. (July 13, 2018).

the value of the Road Map as precedent may be much greater for Special Counsel

Mueller today than it was for the OIC in 1997 and 1998. To reiterate, the OIC under

Section 595(c) could transmit grand jury material to the House directly; my

understanding is that Special Counsel Mueller, like Special Prosecutor Jaworski, cannot

do so without judicial authorization. The Road Map thus may represent important legal as

well as historical precedent for Special Counsel Mueller.

25. Beyond the Special Counsel, the public would benefit from disclosure of the Road Map,

as a model of a report summarizing evidence relating to a president, prepared by a

prosecutor and transmitted to the House of Representatives. Disclosure of the Road Map

would also help clarify, in the public mind, the distinction between the Department of

Justice, acting as the entity charged with enforcing federal criminal law, and the House of

Representatives, acting as the entity charged with determining whether the impeachment

of a president is warranted. Some commentators now appear to harbor the misconception

that the Special Counsel and the House collaborate in investigating a president. The

Watergate example shows that they exercise very different functions and that, at least

with regard to grand jury evidence, collaboration is prohibited. The Watergate example,

in fact, demonstrates that a prosecutor can share grand jury information with the House of

Representatives only with permission of the court.

26. The impeachment inquiry staff of the House Judiciary Committee in 1974 may have

relayed the most important factual revelations from the Road Map in the Statements of

Information, which are already public. Similarly, the articles of impeachment probably

include the key facts from the Road Map. One might argue, accordingly, that the Road

Map holds only modest importance as a historical document. That conclusion, however,

is misguided. Even if the Road Map proves to contain nothing new in the way of allegations or evidence, its importance is great. Outside of the now-lapsed procedure set forth in Section 595(c), the Road Map provides a model — the only such model — for a special counsel to transmit grand jury evidence and an explanatory overview to the House of Representatives. In this respect, the Road Map's form may well be more important than its substance. In Special Counsel Mueller's investigation and in any future investigation, the Road Map will provide valuable guidance if a grand jury uncovers evidence that may constitute grounds for a presidential impeachment.

27. In light of the Road Map's relevance to the historical and legal frameworks relating to Special Counsel Mueller's investigation, its continued secrecy deprives the public of information regarding a vital precedent.  As a former lawyer on the OIC staff and as a scholar following and contributing to today's debates, I believe that releasing the Road Map would significantly enrich the public's understanding.

<u>PRIVACY CONCERNS ARE ATTENUATED</u>

28. In 1974, President Nixon did not object to transmittal of the Road Map and accompanying evidence to the House of Representatives. Two defendants in upcoming Watergate trials did object. H. R. Haldeman and Gordon C. Strachan sought writs of prohibition or mandamus barring Judge Sirica from transmitting the materials to the House.

29. The D.C. Circuit rejected the petitions and allowed Judge Sirica to transmit the materials. In reaching its conclusion, the D.C. Circuit stated: "We think it of significance that the President of the United States, who is described by all parties as the focus of the report and who presumably would have the greatest interest in its disposition, has interposed no

objection to the District Court's action." *Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974).

30. The D.C. Circuit thus suggested that the Road Map impinged on the interests of President Nixon above all, and that its impact on the interests of other individuals was secondary. The court's conclusion matches the intent underlying the Road Map: to summarize evidence of wrongdoing on the part of President Nixon, not on the part of anyone else.

31. As long as the Road Map remains sealed, one cannot say definitively that its revelation would have no significant effect on privacy interests. But that conclusion seems likely, given President Nixon's decision not to object in 1974, combined with the deaths in the subsequent forty-four years of President Nixon (in 1994) and many others involved in the Watergate investigation.

32. The government itself has probably disclosed the most important contents of the Road Map. In addition to the impeachment materials released by the House Judiciary Committee, the other government reports of the Watergate investigation, and the memoirs by those involved in the investigation, the Road Map is quoted in the book *High Crimes and Misdemeanors* (1978) (quoting the Road Map on pages 129-30), by a United Press International journalist, Howard Fields. In an email to me dated September 7, 2018, Mr. Fields confirmed that he had access to at least parts of the Road Map while writing his book. It is time for the public to have access as well.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 12, 2018, in Prague, Czech Republic.

Stephen Bates

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

IN RE: PETITION OF BENJAMIN    )
WITTES, JACK GOLDSMITH &    )
STEPHEN BATES    )
    )
    )    Misc. Case No. _____
    )
    )
    )
    )
    )
    )
    )
    )
_____    )

### <u>DECLARATION OF RICHARD BEN-VENISTE</u>

I, Richard Ben-Veniste, hereby declare as follows:

1. I am an attorney with five decades of experience working on, among many other things, issues of accountability of individuals privileged to hold public office. I submit this declaration in support of the above-captioned petition to unseal the "Road Map" that was transferred from the first Watergate grand jury to the House Judiciary Committee in 1974.

2. From 1973 to 1975, I served as chief of the Watergate Special Prosecution Force's Watergate Task Force.

3. In addition to my role with the Watergate Special Prosecutor's office, I have held numerous positions in government and public service.  From 1968 to 1973, I served as an assistant United States attorney for the Southern District of New York, where I was chief of the Official Corruption and Special Prosecutions Section.  From 1976 to 1977, I served

as special outside counsel for the Senate Subcommittee on Governmental Operations.  In

1984 I served as outside counsel to the Senate Judiciary Subcommittee on Prison Reform

for the District of Columbia.  I acted as minority chief counsel of the Senate Whitewater

Committee from 1995 to 1996.  From 1998-2007, I served as a presidential appointee to

the Nazi War Crimes & Japanese Imperial Government Records Interagency Working

Group (IWG), the largest congressionally mandated declassification effort in history.

From 2003 to 2004, I served as a member of the bipartisan 9/11 Commission.  In 2009, I

became a member of the Aspen Security Group, a task force created by the Secretary of

the Department of Homeland Security to provide analysis and advice to the Secretary.

From 2015 to 2017, I served on the NSA Advisory Board legal panel, providing advice to

the director of NSA and its Office of General Counsel.

4.  I have also spent many years handling complex civil and criminal litigation in private

practice.  In 1981, I co-founded Ben-Veniste and Shernoff, where I practiced for 10

years. From 1991 to 2002, I was as a partner at Weil, Gotshal and Manges.  Since 2002, I

have been a partner at Mayer Brown, LLP.

5.  I received my J.D. from Columbia University Law School in 1967 and L.L.M. from

Northwestern University School of Law in 1968 under a Ford Foundation Fellowship.

6.  I have authored two books that examine the Watergate prosecution: *Stonewall: The Real

Story of the Watergate Prosecution* (1977) (co-authored with George Frampton), and *The

Emperor's New Clothes: Exposing the Truth from Watergate to 9/11* (2009).

7.  I have spoken out and written extensively about Special Counsel Robert Mueller's

investigation as it relates to issues of executive power and congressional oversight,

including articles in *The Atlantic*, CNN, and the *Washington Post*. I have also given

numerous interviews on this subject on CNN, MSNBC, PBS and NPR, as well as several foreign broadcast and print publications.

8.  This declaration is based primarily on my experience as chief of the Watergate Special Prosecution Force's Watergate Task Force.

9.  I was part of the team that discussed whether we, as legal advisors to the first Watergate grand jury, should inform the grand jury of its right to request permission from the chief judge of the federal district court for the District of Columbia to transmit evidence it had gathered to the United States House of Representatives Judiciary Committee, which was then investigating whether to vote articles of impeachment against president Richard M. Nixon.  In addition to grand jury testimony of various individuals, we had obtained through grand jury subpoena a number of secret tape-recorded conversations made in various locations in the White House under the auspices of President Nixon.  Up to that point, we had treated that grand jury testimony and related documents, as well as the White House tape recordings, with the utmost secrecy, as it was our obligation to do under Rule 6(e) of the Federal Rules of Criminal Procedure.  This is significant because while Congress had attempted to compel production of White House tapes, it had been rebuffed by the courts on separation of powers grounds.

10. Special Prosecutor Leon Jaworski agreed that the grand jury should be apprised of its rights in this regard, and we so advised the jurors of their options.  The grand jury authorized the special prosecutor to petition the court for permission to transmit a body of evidence, including tapes and transcripts of testimony, to the House Judiciary Committee, along with an index of the material to be transmitted.  The index became known by the shorthand description of "the Road Map."

11. In the book I co-authored with George Frampton, *Stonewall: The Real Story of the Watergate Prosecution*, we discuss the Road Map and the events that led to its creation and transmission to the House Judiciary Committee. Attached as Exhibit A is a true copy of an excerpt of our book. We explain that the Road Map consisted of an "index," or a series of short statements setting forth documented facts, each of which "[was] followed by a list of tapes or other evidence supporting the statement."[1] It was intended to assist the Judiciary Committee, helping it assemble the individual pieces of grand-jury testimony and other evidence into a coherent narrative as we and the jury saw it.[2] The grand jury believed Richard Nixon had participated in a criminal conspiracy to obstruct the investigation into Watergate, and voted to authorize the Special Prosecutor to name him as an unindicted co-conspirator at an appropriate later date.

12. As described in our book, the Watergate Special Prosecution Force deliberated at length over the nature and format of the Road Map.[3] Recognizing that "a report about the President would raise a unique legal question, especially if it accused the President of a crime," Jaworski sought to frame the evidence in the Road Map in a way that would not infringe on the individual rights of the President but would still be a useful guide to the House Judiciary Committee.[4]

13. I believe the Road Map played a significant role in facilitating the House Judiciary Committee investigation. Furthermore, the transmission of accompanying tapes in possession of the grand jury prevented President Nixon from keeping them from Congress, forcing him to produce his own transcripts of those tapes.

---

[1] RICHARD BEN-VENISTE AND GEORGE FRAMPTON, JR., STONEWALL: THE REAL STORY OF THE WATERGATE PROSECUTION 244 (Simon & Schuster, 1st ed. 1977).
[2] *Id* at 242-43.
[3] *Id.* at 241-244.
[4] *Id.* at 242.

14. I am familiar with the public record of Watergate.  It includes, but is not limited to, the articles of impeachment, the Watergate Special Prosecution Force's report, the House Judiciary Committee's report, transcripts and materials relating to the House Judiciary Committee's impeachment hearings, the Senate Select Committee on Presidential Campaign Activities' report, published transcripts of compendiums of the White House tapes, and the records of the public trials of President Nixon's co-conspirators.  It is, of course, normal and commonplace that the content of grand jury material becomes public information by reason of its use in subsequent public trials and related proceedings.  All of these documents revealed material that we, at one point, treated as grand jury material subject to Rule 6(e).  Based on my first-hand recollection of the structure and content of the Road Map, I can confirm that those publications viewed in their totality contained most, if not all, of the information that was referenced in the Road Map.

15. In light of the publications described in the previous paragraph, I believe that any privacy concerns relating to the release of the Road Map are minimal, and are far outweighed by widespread public interest in the document.

16. As a Watergate prosecutor bound by Rule 6(e), I believe that the Road Map has lost its Rule 6(e) character given the public disclosures of the grand jury material contained therein.

17. The historical precedent of the transmittal of the Road Map and accompanying grand jury materials under the auspices of then-Chief Judge John Sirica, pursuant to a proper exception to Rule 6(e) F.R.Cr.P., as set forth in the well-reasoned opinion of Judge Sirica and affirmed by the United States Court of Appeals for the D.C. Circuit, is particularly timely.  Independent Counsel Robert Mueller will in due course conclude his

investigation and will be faced with a variety of decisions, including whether and how to share the evidence he has uncovered.  The public will benefit from understanding the history and context of the Watergate Road Map.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September **11**, 2018.



Richard Ben-Veniste

# EXHIBIT A

# STONEWALL

THE REAL STORY
OF THE WATERGATE PROSECUTION

BY **Richard Ben-Veniste**
AND **George Frampton, Jr.**



**SIMON AND SCHUSTER**
*New York*

860
.B43

Copyright © 1977 by Richard Ben-Veniste and George T. Frampton, Jr.
All rights reserved
including the right of reproduction
in whole or in part in any form
Published by Simon and Schuster
A Division of Gulf & Western Corporation
Simon & Schuster Building
Rockefeller Center
1230 Avenue of the Americas
New York, New York 10020

Designed by Irving Perkins
Manufactured in the United States of America

1   2   3   4   5   6   7   8   9   10


Library of Congress Cataloging in Publication Data

Ben-Veniste, Richard.
  Stonewall.

  1. Watergate Affair, 1972–      I. Frampton, George, joint author.   II. Title.
E860.B43   364.1′32′0973   76–56340

ISBN 0-671-22463-8

# Contents

|  | Introduction | 11 |
|---|---|---|
| CHAPTER 1: | The First Special Prosecutor | 13 |
| CHAPTER 2: | The Script and the Players | 45 |
| CHAPTER 3: | The Case Against Richard Nixon: | |
|  | "If you shoot at a king . . ." | 83 |
| CHAPTER 4: | The Linchpin—John W. Dean III | 95 |
| CHAPTER 5: | The Bugging of Richard Nixon | 111 |
| CHAPTER 6: | Saturday Night Massacre or Saturday Night Suicide? | 123 |
| CHAPTER 7: | The Tapes Hearings: No More Mr. Nice Guy | 158 |
| CHAPTER 8: | Archie's Orphans Meet the Silver Fox: Jaworski Arrives | 187 |
| CHAPTER 9: | Cancer on the Presidency | 199 |
| CHAPTER 10: | Le Grand Fromage | 211 |
| CHAPTER 11: | The Indictment—"By deceit, craft, trickery . . ." | 255 |
| CHAPTER 12: | The Unindicted Co-conspirator | 264 |
| CHAPTER 13: | Resignation and Pardon: | |
|  | President Ford Adopts the Monkey | 291 |
| CHAPTER 14: | The Trial Begins: A Jury Is Selected | 316 |
| CHAPTER 15: | "Truth , . . T-r-u-t-h . . . Truth" | 333 |
|  | Epilogue | 388 |
|  | Index | 397 |

*Le Grand Fromage*   241

peachment inquiry. The Special Prosecutor apparently had decided to recommend to the grand jury that it send the most damaging Nixon tapes to the House Judiciary Committee. In Jaworski's thinking, the grand jury had the authority to do this, while the prosecutors did not. If the Special Prosecutor could get the grand jury to send to the House committee a "report" containing the tapes, he could leapfrog the legal barriers to our sending the tapes directly to the committee ourselves.

Beyond that, we thought that more than new tapes would be needed to get the House committee up to speed on the available evidence. The atmosphere surrounding the impeachment inquiry at that time was still avowedly partisan and political. There were quarrels about staffing, about procedures and about scheduling. The committee had even been engaged in a running battle among its members and with the White House over what constituted an "impeachable offense."

John Doar, the House Judiciary Committee's chief counsel, had launched an exhaustive staff effort to gather and cross-index every fact, however insignificant, that related to the committee's inquiry. In an ideal world and with infinite time this endeavor could have proved useful. Under the circumstances, however, it precluded immediate action to what was most urgently needed: an attempt to summarize the most *important* evidence against the President in a meaningful way, so that it could be readily understood and assessed by Congress and the public. In the meantime the President, seeing the Judiciary Committee's slow start and realizing he could win easily if the issue were brought to a head soon, was calling for a quick vote on impeachment. If the President succeeded in forcing a vote before Doar's "information-gathering" machine shifted gears and began summarizing the case, or if the committee split hopelessly over preliminary procedural issues, the momentum for impeachment might be shattered no matter how strong the evidence.

The Judiciary Committee's plight convinced some of us that members of Congress from both sides of the aisle were going to have to have the significance of the evidence spelled out for them in neon letters before they would act. The Watergate Task Force believed that the grand jury should be told it could make a report to the Judiciary Committee that not only transmitted evidence but summarized and commented on it. The summary, we thought, could artic-

ulate the "theory of the case" against the President. It could show how the tapes and other evidence fit together and demonstrate that the President had been trying to hold the cover-up together in March and April of 1973. The report could also juxtapose the President's public statements denying knowledge of the cover-up with evidence from the tapes showing he really knew far more.

But the Special Prosecutor already had ruled out any analysis or summarization of evidence by the grand jury. Raw evidence, Jaworski argued to us, spoke for itself. Summarization meant the grand jury was "interpreting" the evidence. That was just as dangerous as drawing conclusions from evidence, Jaworski said. The grand jury, he claimed, could be drawn into a position vulnerable to criticism.

Something else worried Jaworski. He professed to uncertainty about Judge Sirica's reaction to an attempt by the grand jury to make a report. Sirica, then Chief Judge of the United States District Court, "presided over" all grand juries in the District, including the Watergate grand jury. All indictments were "returned" in his courtroom. Technically the Watergate grand jury would make any report on President Nixon directly to Judge Sirica. The grand jury would have to request the judge to pass the report along to the House Judiciary Committee. There were plenty of legal precedents for a grand-jury report. But a report about the President of the United States would present a unique legal question, especially if it accused the President of a crime. Jaworski seemed convinced Sirica wouldn't accept a report that was accusatory of the President.

We didn't agree with the Special Prosecutor's argument that summarizing the evidence was tantamount to accusing the President, nor did we share his concern that Judge Sirica might not honor a grand-jury request to transmit such a summary to Congress. But Jaworski would not be swayed. The task force then suggested there was a middle course. Without analyzing the evidence, the grand jury could nevertheless arrange it in a format that made its significance as clear as possible. Even better, the jury could supply the House Judiciary Committee with an "index" to the evidence showing how various pieces fitted together. The phrase we coined for this index was "the road map." We argued to the Special Prosecutor that transmission not only of raw evidence but of a road map to the evidence could avoid the drawing of formal conclusions by the jury. In truth, though, we hoped that a road map could serve as a do-it-yourself kit for the

Judiciary Committee, helping it reassemble the individual pieces of grand-jury testimony and other evidence into a coherent theory of a criminal case as we and the jury saw it.

On February 18, the four young prosecutors who had earlier urged in writing that the grand jury return a presentment met with Jaworski and Ruth, at Jaworski's invitation. They suggested transmission to Congress of a road map to accompany tapes and other evidence. The Special Prosecutor was noncommittal, but he did not rule out the idea.

Two days later, Ben-Veniste met with Jaworski to urge on him our idea of seeking grand-jury authorization now to name the President as an unindicted co-conspirator at some later time. Ben-Veniste downplayed the moral and constitutional aspects of the Nixon problem. Instead he appealed to Leon Jaworski the trial lawyer—to Jaworski's strong desire to mount an airtight prosecution against Haldeman, Ehrlichman and Mitchell—and to Jaworski the political professional, who could appreciate the insulation that grand-jury authorization would give him if he later decided to name the President in the bill of particulars. Jaworski seemed receptive to the idea of grand-jury authorization. He asked Ben-Veniste to prepare a written memorandum outlining the procedure.

Later that same afternoon the task force met with Jaworski to review the cases against several potential defendants. Jaworski brought up the subject of grand-jury authorization. He intimated that it made good sense, and said he was mulling it over. But time was getting short. We wanted to return our indictment no later than the end of February, a week and a half away, and we still had no firm decisions on Nixon.

At about noon the next day the Special Prosecutor called Ben-Veniste to his office. He had made up his mind, he said, to suggest to the grand jury that it transmit evidence about the President to the House Judiciary Committee. However, he said he had ruled out summarizing the evidence, making any accusations or drawing any conclusions. He said nothing at the meeting about naming the President as an unindicted co-conspirator.

The task force now concentrated its efforts on the concept of a "road map." Jaworski did not seem to have ruled out that possibility by his decision that the grand jury could "report" evidence to the House Judiciary Committee but must not analyze or summarize the

evidence. Frampton began to assemble all the pertinent evidence before the grand jury that we wanted to send to the House. Together with others, he began to draft a road map to go with the evidence. We wanted to be prepared with a draft if the Special Prosecutor gave us the go-ahead. Perhaps if Jaworski saw in black and white what we were contemplating he would give his consent.

The task force was scheduled to meet with Jaworski Saturday morning for final consideration of the perjury charges that we would ask the grand jury to include in the comprehensive cover-up indictment. When discussion of the perjury counts concluded we turned to the road map. Well, said the Special Prosecutor, he could go along with such a thing, but it must be scrupulously neutral—no inferences, no characterization of evidence. Frampton explained what we had in mind: a series of short statements setting forth indisputable facts, each of which would be followed by a list of tapes or other evidence supporting the statement. In using tapes, we would cite to page numbers of tape transcripts wherever possible. "Try your hand at it and let me see what you come up with," Jaworski replied. That was all the go-ahead we needed.

As the meeting broke up, Jaworski gave Ben-Veniste a typed draft of what he proposed to say to the grand jury about President Nixon. The Special Prosecutor had informed us the day before that he intended to accompany us to the courthouse and address the jurors personally first thing Monday morning. The draft advised the jurors that it would "not be responsible conduct" to indict the President, because of the uncertainty of the law, the "trauma the nation would suffer" while the legal issue was resolved, and the appropriateness of Congress rather than the grand jury dealing with the evidence against Mr. Nixon. However, Jaworski proposed to tell the jurors, they could transmit evidence to the House Judiciary Committee by way of a "report," and the prosecutors would assist in this task in any way desired by the jurors. Again, nothing was said about authorization to later name Nixon as an unindicted co-conspirator. Was this because he intended to leave this matter for later discussion with the grand jury or because he had changed his mind?

We decided that the grand jury ought to get in one sitting our total decision on how to deal with Nixon. For nearly two hours we drafted and redrafted an addition for Jaworski's proposed statement to the grand jury which included a request to the jurors to authorize

us to name President Nixon as an unindicted co-conspirator at a later date. The insertion amounted to three sentences. The question now was how to submit it to the Special Prosecutor as gently as possible.

Almost two months earlier, well before relations between the task force and Leon Jaworski had soured, we had decided to give a dinner party for the Special Prosecutor and his wife. At the time, we wanted to show our hospitality to Jaworski. A nice, relaxed social evening would be just the thing, we reasoned, to convince Jaworski that he need not feel isolated or uncomfortable with us on account of differences in age and style. Long ago, the dinner party was set for the home of Jill and Ian Volner on this very Saturday night, February 23.

While our rapport with Jaworski was now on the mend, there was still wariness and reserve on both sides. And all of us, the task force and the Special Prosecutor, were exhausted by the workload and the tension of the decisions we faced. Jaworski more so than anyone, because of the prodigious pace he maintained for a man of sixty-eight and the strain of having the Nixon problem constantly staring him in the face. Moreover, Jaworski was always his most chipper and at his best for business first thing in the morning. By late afternoon—especially at the end of a long week—he was often too tired or wound up to concentrate on new problems. He preferred to relax, reminisce, spin a few yarns. Given the events of the past month within our office, a Saturday-evening dinner party attended by the entire task force and the Special Prosecutor seemed the worst possible setting in which to approach Jaworski for the final time with the most important bit of business our office ever had to deal with. But we had little choice. In order to accommodate the schedule we would have to present our redraft to Jaworski at the party.

That night, the Special Prosecutor's Justice Department driver got hopelessly lost, delivering the Jaworskis to the party well past the appointed hour. Jaworski was his courtly and charming self, as usual, but the tension and fatigue that were affecting all of us showed on his face. During pre-dinner cocktails, the atmosphere was cordial but guarded. Jaworski appeared to assume the air—if not the physical posture—of one intent on keeping his back to the wall at all times. As casually as possible, Ben-Veniste took him aside and mentioned that we had tried our hand at redrafting a few lines in his proposed statement for the grand jury for Monday morning. Ben-Veniste pulled the papers out of his pocket and handed them to Jaworski. Glancing

246   STONEWALL

at them, Jaworski told Ben-Veniste he'd think the matter over. The Jaworskis departed immediately as dinner finished, and the rest of us struggled home shortly afterwards to try for a little sleep.

Bright and early Monday morning, the Special Prosecutor came down the hall to the task force offices. His secretary had not yet arrived and he wanted one of our secretaries to type something for him. Only Frampton was in. He was surprised to see the Special Prosecutor, for Jaworski hardly ever came down to the task force offices. Frampton promised to get the material typed as soon as someone came in to do it. "It's what I'm going to tell the jury," Jaworski said, and he departed for his own office. Frampton whipped through it. The Special Prosecutor had bought our approach! The statement said that co-conspirators would be named "at a later date" and that a list of persons "including the President" would be discussed with the grand jury and their "authorization" sought to name them in the "bill of particulars."

At ten o'clock that morning, February 25, Leon Jaworski addressed the grand jurors on the subject of President Richard Nixon. The jurors besieged him with questions. Most were tough and intelligent ones. Some jurors expressed views much like those we on the task force—and the four young prosecutors who had started the whole dispute—had voiced within our office. Sitting with Jaworski in the grand-jury room, some of us could hardly suppress wry smiles. The give-and-take between the jurors and the Special Prosecutor seemed a brief but thorough reprise of the discussions within the Special Prosecutor's office that had raged over the past month. Jaworski ably defended his recommendation. It was obvious to us that the logic of his position was winning the jurors' approval.

When the Special Prosecutor had fielded the grand jury's questions, he departed. The task force remained to show the grand jurors a draft of our proposed indictment and the list of conspirators we proposed to name, arranged in alphabetical order. Then we left the jurors to digest and discuss our recommendations among themselves.

After due deliberation, grand-jury foreman Vladimir Pregelj informed us that the jury had voted 19–0 to authorize us to name each of the recommended co-conspirators. The vote was not unanimous. Twenty of the twenty-three jurors were present that day (all who remained active on the jury), but one abstained. Whether the one juror was recording a protest against our refusal to seek the Presi-

ter over. The
d the rest of
sleep.
ecutor came
had not yet
mething for
the Special
task force
n as some-
," Jaworski
d through
statement
," and that
ssed with
m in the

ddressed
con. The
telligent
the task
whole
in the
s. The
eemed
Special
i ably
gic of

ques-
urors
s we
the
lves.

in-
ach
ous.
who
ne
si-

dent's indictment or whether, on the contrary, he wanted no part of accusing Mr. Nixon we were not entitled to know. One of the two regular stenographers who had taken down testimony for the grand jury throughout the investigation was summoned. Ben-Veniste "read into the record" the grand jury's authorization vote and the list of co-conspirators. When he reached "Richard M. Nixon" in the alphabetical procession, the stenographer's eyes bulged. When she finished she said to Frampton, "I guess you want this typed up right away, huh?"

Frampton and other members of the task force were now working feverishly to finish the road map and collection of evidence to be transmitted so that we could show a draft to the jury. The form already chosen for the report was a series of "statements of fact," most of which were one or a few sentences long. Each "statement of fact" was numbered. Each was followed by a list of evidence that supported the numbered statement: a tape, a few pages of recorded grand-jury testimony, a document. (Later, we were flattered by the fact that the House Judiciary Committee staff copied our format precisely for presenting all its impeachment evidence to the committee members and the public.) We wanted to be sure that everything we had gathered that contributed to the case against President Nixon was sent over to the Judiciary Committee. More important, we wanted the road map to make "perfectly clear" how each piece of evidence fit together in the overall scheme.

Jaworski himself had drafted the preamble to the report, requesting Judge Sirica to transmit the enclosed evidence to the House Judiciary Committee. As drafted, the preamble stated that the grand jury had "heard evidence relating to" the impeachment inquiry but had concluded it should "defer to" the House and let the House decide what action was warranted, if any, by this evidence. When the preamble and the road map itself were presented to the grand jurors for their consideration, they were generally pleased. There was only one major change upon which the jury insisted. The preamble, as approved by the jurors, was changed to say that they would "presently" defer to the Judiciary Committee and allow the committee to decide what should be done "at this time." This language was a none-too-subtle hint to the Congress that the jury would still be around to move against the President if the politicians faltered. Strangely, when the preamble eventually was made public, none of the media commentators remarked on these highly pregnant phrases.

248   STONEWALL

From a constitutional standpoint they were perhaps the most important words in the report!

Throughout the last week of February the task force was preoccupied with presenting the indictment and report to the grand jury and with summarizing the evidence against the defendants. (The cases against the Big Three had been reviewed with the jury the previous week. Only the more difficult decisions were left for presentation the final week prior to indictment.) By Thursday afternoon we were ready to return the indictment and report. That night, Frampton and Volner packaged together the road map and the evidence—tape boxes, retyped tape transcripts and other material, all neatly numbered to coincide with the references in the road map. We had intended to put all of the evidence into two briefcases to give to the judge, but we decided to see if it would all fit in one big government-issue case. It did, barely. The last tape box had to be pounded to fit it in. For good reason, the press would call this the "bulging brief-case."

Some weeks before, Frampton had received from a friend a screaming orange anti-Nixon automobile bumper sticker that proclaimed in bold letters, "SAY GOODBY, DICK," a play on the traditional ending of the *Laugh In* television series. On Friday morning, as we were departing our offices for court and the return of our indictment, we affixed the sticker to the outside of the briefcase containing the report. Nervous but exhilarated by the imminent conclusion of our long investigation, we thought the sticker would make a good practical joke on the Special Prosecutor. With a fine irony it bespoke the months of professional restraint we believed we had exercised under siege from the Nixon forces—people who were seldom restrained by legal or ethical niceties in the way they exercised *their* power. And the sticker was perfect counterpoint to the scrupulous objectivity we had labored to bring to the grand jury's report itself. Frampton flashed the bumper sticker at Hank Ruth. Ruth laughed briefly—like a man with a bone stuck in his throat—and then started to make menacing noises. We decided it would be better not to try the prank out on Leon. The sticker came off the bulging briefcase and went into Frampton's suit pocket instead.

The grand jury had already reviewed the indictment and report in final form by Friday morning. That day, the task force and the

Special Prosecutor met with the jurors for a brief formal session in the jury room. We then proceeded together to Judge Sirica's court-room, via the back elevator. Our office had announced there would be a "proceeding" in court that morning, following the usual prac-tice of giving the press some short warning of official court action. Since Jaworski had earlier announced that we hoped to recommend action to the grand jury by the end of February (this was March 1) and since there had been press speculation that action would come this week, there was a huge crowd of TV newsmen and reporters on hand at the courthouse.

When Judge Sirica entered, Leon Jaworski rose to inform the judge that the grand jury had "material to be delivered" to the court. The jury foreman, Vladimir Pregelj, then came forward from the front row of spectator benches, where the entire grand jury was seated, and handed the judge two envelopes. One contained our indictment charging seven men—Mitchell, Haldeman, Ehrlichman, Colson, Mardian, Strachan and Parkinson—with conspiracy in the Water-gate cover-up; the other contained what Pregelj told the judge was "a sealed report." In fact the second envelope contained the pre-amble to the report and road map, asking the judge to forward the evidence in the separate, bulging briefcase on to the House Judi-ciary Committee.

In dead silence, the rasp of his letter-opener cutting clearly through the hushed room, Judge Sirica slit open the two envelopes. He glanced at the indictment, then briefly read the preamble to himself.

As he appeared to finish it, Ben-Veniste arose and brought forward from under our counsel table the chocolate-brown bulging briefcase containing the tapes and other evidence and our road map. He asked to "hand it up" to the court. "If it please Your Honor," he said, "this is the material made reference to in the document you just read." Ben-Veniste explained that the briefcase was locked and that the key to it was contained in a sealed letter-sized envelope given to the judge along with the preamble to the report.

So far, spectators and press had learned nothing, since the judge had not read out loud either the "caption" of the indictment (reveal-ing the names of those indicted) or the preamble to the report. The judge thanked the grand jurors, reminding them that they had fur-

250   STONEWALL

ther business and that they should not discuss the case with anyone, and dismissed them. There was then a brief exchange between the judge and Ben-Veniste about setting the date for arraignment (the time when indicted defendants are required to surrender to the court and enter their formal pleas of guilty or not guilty). Ben-Veniste suggested that the following Saturday morning should be convenient to defendant Mitchell, since Mitchell was then permanently occupied five days a week in New York being prosecuted in the so-called Vesco case.* There was a murmur in the courtroom at Mitchell's name. It was no surprise, of course, but his was the first one mentioned. The formalities completed, we left the courthouse by the basement parking-garage exit as the press ran for the court clerk's office on the second floor of the courthouse to get their copies of the indictment.

WOULD THE WATERGATE grand jurors have indicted President Nixon if it had been left up to them? The events of March 1 suggest they would have.

On the afternoon our indictment was returned, the task force gathered with Hank Ruth and a few of the other younger prosecutors in Leon Jaworski's office. Jaworski had already left for a weekend in Texas, as much to escape reporters as anything; we too were looking forward to a few days of sleep. Totally drained by the tensions of ten months of seven-day work weeks, by the Saturday Night Massacre and by everything in its wake, we felt for the first time that something concrete had been achieved. There had been many times when it seemed that this day would never come. But the prosecution was still on track, and evidence against the President seemingly was on its way to the House Judiciary Committee. No matter what happened now, in Congress with impeachment or in the political arena, we could be proud of what we had done and how we had done it. Our investigation had been conducted with fairness and integrity. The President had attacked us and had made what we knew to be false statements about the tapes. But we had kept the secret of the

* In that case, Mitchell and Maurice Stans, former Nixon campaign finance chairman, had been indicted for conspiracy and perjury in connection with an alleged attempt to improperly influence an SEC investigation into the affairs of international financier (and Nixon contributor) Robert Vesco. Both defendants were eventually acquitted on all charges.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: PETITION OF BENJAMIN | ) | |
| WITTES, JACK GOLDSMITH & | ) | Misc. Case No. _____ |
| STEPHEN BATES | ) | |
| | ) | |

**DECLARATION OF JOHN W. DEAN III**

## DECLARATION OF JOHN W. DEAN III

I, John W. Dean III, hereby declare as follows:

1.  I submit this declaration in support of a petition to unseal the report of evidence relating to President Nixon's involvement in unlawful activity that the Watergate grand jury transmitted to the House Judiciary Committee for consideration of impeachment in 1974 (the "Road Map").

2.  I served as Counsel to the President of the United States (i.e., "White House Counsel") from 1970-1973.

3.  Between 1973-1975, I became the key witness for the U.S. Government in the Watergate-related investigations undertaken initially by the United States Attorney for the District of Columbia, followed by the Watergate Special Prosecution Force, the Select Committee on Presidential Campaign Activities of the United States Senate, and the impeachment inquiry of President Richard Nixon undertaken by the Committee on the Judiciary of the United States House of Representatives. Before I became the government's key prosecution witness, I pled guilty to conspiracy to obstruct justice (18 U.S.C. 371) in connection with my role in the so-called Watergate cover-up. I was sentenced to time served, which I spent in the U.S. Marshal's Witness Protection Program while testifying in Watergate-related criminal trials.

4.  In my role as White House Counsel and later as a key witness, I had countless conversations with other members of the Nixon White House staff, including President Nixon, Special Prosecutor Leon Jaworski and others investigating and prosecuting violations of the law during the Nixon presidency. Accordingly, I have personal



1

knowledge of most of the key events and players related to the Watergate scandal, as well as the events that have unfolded in the more than four decades since.

5. My memory of these events was refreshed between 1991 and 2000, in the course of defamation lawsuits that my wife and I filed against a publisher and an author who made false claims about our involvement in the Watergate break-ins. During discovery in *Dean v. St. Martin's Press et al.*, I reviewed countless files from the Watergate Special Prosecution Force at the National Archives, as well as secondary sources and deposition transcripts of many Watergate principals almost two decades after the events. By the time the case was settled, I knew even more about what had happened during Watergate than when I was living through the events.

6. I have written numerous books about Watergate — including *Blind Ambition: The White House Years* (1976, with a new afterword in 2009), *Lost Honor* (1982), *Unmasking Deep Throat* (2002), *Worse Than Watergate: The Secret Presidency of George W. Bush* (2004), and *The Nixon Defense: What He Knew and When He Knew It* (2014) — all of which sought to add to the historical record and to highlight the lessons that can be drawn from the most significant and troublesome political scandal of the twentieth century.

7. Given the perennial interest in Watergate and its continuing relevance to events in American politics, I am regularly asked and agree to provide commentary for national radio and television shows about Watergate-related events in specific and the presidency in general. In addition, I have taught over 150 continuing legal education programs (CLEs) to somewhere between 35,000 to 40,000 attorneys that examine the impact of the American Bar Association's Model Rules of Professional Conduct on select historic events from Watergate with surprising and informative results.



8. Since the commencement of Special Counsel Robert Mueller's investigation of President Trump's involvement in a criminal conspiracy and obstruction of justice, I have appeared on CNN (where I am a regular contributor) as well as NPR and other radio programs to discuss my experience with Watergate as it relates to the current investigation. I have also been interviewed by numerous publications, including the New York Times, Politico Magazine, the Los Angeles Times, The Washington Post, Rolling Stone, Time Magazine, The Telegraph, and other foreign publications.

## THE PUBLIC INTEREST IN THE ROAD MAP

9. I became aware of the Road Map in 1973-1974. At that time, I was no longer White House counsel, rather I was cooperating with Special Prosecutor Leon Jaworski's investigation, and had lengthy conversations with many of the assistant Watergate special prosecutors, particularly James Neal, one of the lead trial attorneys.

10. Although I have never seen it, I have been aware of the Road Map almost from its inception. Before becoming White House Counsel, I had served as Minority Counsel of the House Judiciary Committee, the committee of the House of Representatives where all impeachment proceedings begin. After Nixon removed the initial Watergate Special Prosecutor, Archibald Cox, in what became known as the "Saturday Night Massacre," the House Judiciary Committee began looking seriously at the prospects of impeachment. From my time with the House Judiciary Committee, I was aware that this committee had no institutional experience in investigating impeachable offenses. That this committee was floundering in its investigation soon became a widespread rumor in Washington, D.C., as its specially selected staff assembled evidence from the Senate's investigation and other sources. I believe I first learned of the Watergate Special Prosecution Force's



efforts to assist the House Judiciary Committee from that committee's chief counsel, Jerome "Jerry" Zeifman, a longtime friend whom I met when I worked for the committee. Assistant Watergate Special Prosecutor confirmed to me they were preparing an "index" to assist the House Judiciary Committee focus on the most relevant evidence. It is my understanding that this index was later called the Road Map.

11. Needless to say, the precise nature of the Road Map remains publicly unknown. It can be assumed that the Road Map references the testimony of key witnesses, including myself, documents, and the Nixon tape recordings that were central to the scandal, focusing on evidence that might suggest impeachable offenses. I can recall that there were differences of opinion within the Watergate Special Prosecutor's office about how they, and the grand jury, should or should not work with the House Judiciary Committee. The Special Prosecutors were part of the Justice Department, thus the Executive Branch; the Grand Jury was overseen by the Chief Judge of the U.S. District Court for the District of Columbia, thus associated with the Judicial Branch; and the House Judiciary Committee was part of the Legislative Brach. Because of Rule 6(e) of the Federal Rules of Criminal Procedure relating to grand jury secrecy, and the fact that this undertaking involved unchartered procedures between the three branches of government, much of the endeavor was done in secrecy. But the secrecy cloaking the Road Map's scope and the manner in which it assembled, presented, and connected the evidence leaves a significant gap in Watergate history.

12. The Mueller investigation has many factual parallels to the Watergate investigation. Both investigations raise important questions about presidential power, the separation of powers, and the powers of a prosecutor investigating a sitting president. For these



4

reasons, major news outlets have asked me to give commentary on the political dynamics surrounding President Trump while under investigation, the accountability of the President for obstruction of justice, and the significance of certain developments in the Mueller investigation.

13. From my perspective having lived through Watergate, disclosure of foundational documents in the Watergate investigation, the Road Map included, contribute to the thinking of government investigators as well as defenders of the president on how to proceed, not to mention the public discourse on these important issues in our democracy.

## DIMINISHED SECRECY INTERESTS IN THE ROAD MAP

14. Based on my experience as White House Counsel, as a key witness in the Watergate investigation, as a litigant in my defamation lawsuit, and as an author of multiple books on Watergate, I can confidently say that I have reviewed most, if not all, the public record materials relating to Watergate. It is an extensive public record. It is hard to believe that the Road Map contains secrets that have not already been disclosed.

15. For my own part, I know that my testimony before the Senate Select Committee on Campaign Practices, before the House Impeachment Inquiry, and at trial in *U.S. v. Mitchell et al.*, is all a matter of public record. Because of my civil defamation lawsuit, many key documents prepared by the Watergate Special Prosecution Force have been opened. To the extent the Road Map refers to my activities relating to the events associated with Watergate, I have no personal objection to disclosure of such information. My privacy interest is not burdened here.

16. To the best of my knowledge, nearly everyone else who may be implicated by the substance of the Road Map is deceased. The few who are still living would have no



reason to object to disclosure of the Road Map given the passage of time, their own disclosures of their roles in Watergate, and the simple fact that the Watergate story is well known.

### 

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on September 1st, 2018, in Beverly Hills, California.

_____
John W. Dean III

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: PETITION OF BENJAMIN WITTES, JACK GOLDSMITH & STEPHEN BATES | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Misc. Case No. _____

## DECLARATION OF JACK L. GOLDSMITH

I, Jack L. Goldsmith, hereby declare as follows:

1. I am the Henry L. Shattuck Professor of Law at Harvard University. I submit this declaration to support the above-captioned petition to unseal material relating to President Richard Nixon that Watergate Special Prosecutor Leon Jaworski transmitted to the House Judiciary Committee with authorization from the United States District Court for the District of Columbia in 1974 (the "Road Map").

2. Since 1994, when I became a law professor, I have been teaching and writing about presidential power, national security law, cybersecurity, international law, internet law, conflicts of law, and foreign relations law. I have written four books, many dozens of law review articles, and hundreds of op-eds, blog posts, and other public commentary on these topics. I am also co-editor of three casebooks.

3. Two of my books are on the topic of the presidency, presidential power, and presidential history. *See Power and Constraint: The Accountable Presidency After 9/11* (2012); *The Terror Presidency: Law and Judgment Inside the Bush Administration* (2009). I have published approximately twenty law review articles on these specific topics, including in the *Harvard Law Review* and *Yale Law Journal*, among other legal publications. I have also written on the these topics as a commentator in such venues as the *New York Times*, *Washington Post*, *The Atlantic*, *Time*, *The New Republic*, and *The Weekly Standard*. I have been interviewed and quoted scores of times by these and other publications.

4. I am a senior fellow at the Hoover Institution, a public policy and research center at Stanford University. I co-chair the Hoover Institution's Working Group on National Security, Technology and Law, which holds conferences and publishes papers on those topics.

5. I am a co-founder of and frequent contributor to *Lawfare*, an online forum devoted to the analysis of U.S. national security law and policy, broadly conceived. *See* https://www.lawfareblog.com.

6. I served as Assistant Attorney General, Office of Legal Counsel, from October 2003 through July 2004, where I advised the White House, the Attorney General, and federal agencies on constitutional and federal statutory and treaty issues. Before serving in the Justice Department, I served as Special Counsel to the General Counsel of the Department of Defense from September 2002 through June 2003.

7. I have testified twice before Congress on issues of presidential power. *See* Senate Committee on Armed Services, *Hearing on Law of Armed Conflict, the Use of Military Force, and the 2001 Authorization for Use of Military Force* (May 16, 2013); Senate

Committee on the Judiciary, *Preserving the Rule of Law While Combating Terrorism* (Oct. 2, 2007) (sole witness).

8.  Prior to teaching at Harvard Law School, I taught at the University of Chicago Law School from 1997-2002, and at the University of Virginia Law School from 1994-1997.

9.  I clerked for Supreme Court Justice Anthony M. Kennedy from 1990-1991, Judge J. Harvie Wilkinson on the United States Court of Appeals for the Fourth Circuit from 1989-1990, and Judge George Aldrich on the Iran-U.S. Claims Tribunal from 1991-1993.

10. I have a J.D. from Yale Law School, a B.A. and M.A. from Oxford University, and a B.A. from Washington & Lee University.

11. For a fuller collection of my writings that includes lectures, speeches, book reviews, essays, op-eds, and blog posts, see www.jackgoldsmith.org.

12. This declaration is based on my research of publicly available information, including papers of the Senate Select Committee on Presidential Campaign Activities, the papers of the Watergate Special Prosecution Force, the hearings and report of the House Judiciary Committee on its resolution to impeach President Nixon, and numerous books and articles about the history of and legal issues concerning the Watergate scandal and the role of the Office of the Special Prosecutor.

13. This declaration has two objectives. *First*, it provides an overview of my understanding of the Road Map. *Second*, it explains the contemporary interest in the Road Map, and why releasing it is important to the public's understanding of the Mueller investigation.

<u>OVERVIEW OF THE ROAD MAP</u>

14. The 55-page Road Map drafted by Watergate Special Prosecutor Leon Jaworski provides factual information regarding the investigation into President Nixon's involvement in the Watergate break-in and cover-up, with supporting documents but no legal conclusions.

15. The Road Map grew out of intensive discussions within the Special Prosecutor's Office about how to proceed against President Nixon for alleged crimes uncovered by the Special Prosecutor's investigation of the Watergate scandal. Some members of the Special Prosecutor's Office wanted to indict President Nixon for obstruction of justice and related crimes. Others in the Office argued that the Special Prosecutor should draft a presentment charging President Nixon with crimes, including obstruction of justice. According to this plan, the grand jury would approve the presentment and the presiding federal district court judge, John Sirica, would transmit it to the House of Representatives for its consideration in deliberations about possible impeachment proceedings against President Nixon.

16. Special Counsel Leon Jaworski opposed both courses of action. He doubted that a sitting president could be indicted for obstruction of justice. These doubts were informed by his belief that his office should defer to ongoing deliberations in the House Judiciary Committee about whether to impeach President Nixon. And he opposed the idea of sending a grand jury presentment to the House because he believed that the Special Prosecutor should not be seen to prejudge issues under consideration by the House, because he feared that Judge Sirica would not transmit such a presentment, and because he wanted to protect the fair trial rights of the presidential aides whom he would soon indict.

17. Jaworski concluded that the best course of action would be for the grand jury, through Judge Sirica, to provide the House with some of the evidence it had collected about Nixon's alleged crimes and thus let the House decide whether and how the evidence implicated impeachable offenses. The evidence consisted of 800 pages of documents and thirteen tape recordings of President Nixon's Oval Office conversations. In order to assist the House in understanding the evidence, the Special Prosecutor's Office included the 55-page "Road Map" to the evidence. The Road Map did not contain any legal analysis or draw any legal conclusions. Each page had a sentence or two of factual statements followed by references to the underlying documents and tapes.

18. The special assistant to Jaworski, James Doyle, explained in his book *Not Above the Law* how the Road Map worked. As an example, he said that one page of the Road Map might state: "On March 16, 1973, E. Howard Hunt demanded $120,000." And then that page of the Road Map would, according to Doyle, "list page references to grand jury testimony from witnesses who saw Hunt's blackmail note and references to the tapes where Hunt's demand was discussed." James Doyle*, Not Above the Law: The Battles of Watergate Prosecutors Cox and Jaworski — A Behind-the-Scenes Account* 290 (Morrow, 1977). As Jaworski explained in his memoir, *The Right and the Power*, the "success of the plan depended on our ability to spell out simply the facts of the cover-up story as they appeared from our investigation and let the [House Judiciary] Committee members reach their own conclusions." Leon Jaworski, *The Right and the Power: The Prosecution of Watergate* 101 (Reader's Digest Press, 1976).

19. On March 1, 1974, the grand jury tendered to Judge Sirica a sealed "Report" that consisted of the Road Map, the underlying evidence, and a two-page transmittal

memorandum that "strongly" recommended that Judge Sirica transmit the underlying materials to the House Judiciary Committee. *In Re Report & Recommendation of June 5, 1972 grand jury*, 370 F. Supp. 1219, 1221 (D.D.C. 1974). The transmittal memorandum explained that the grand jury "has heard evidence that it regards as having a material bearing on matters within the primary jurisdiction of the Committee in its current inquiry, and notes further its belief that it ought now to defer to the House of Representatives for a decision on what action, if any, might be warranted in the circumstances." *Id.*

20. Judge Sirica determined that "delivery to the Committee is eminently proper, and indeed, obligatory." *Id* at 1227. He reached this conclusion after ruling that the Road Map and underlying evidence were material to the House Judiciary Committee's investigation, that the grand jury had power to make the report and recommendation, and that he had the power to disclose the report to the House consistent with the "principles of grand jury secrecy" embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. *Id.* at 1230. The United States Court of Appeals for the District of Columbia Circuit affirmed Judge Sirica's decision. *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974).

<u>THE ROAD MAP'S RELEVANCE TO CURRENT QUESTIONS OF URGENT PUBLIC CONCERN</u>

21. Special Counsel Mueller is investigating "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." Deputy Attorney General Rod Rosenstein, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters*, May 17, 2017. There are widespread news reports, including some apparently

sourced to the White House, that the Special Counsel may be drafting a report about what

he has discovered about the President's activities related to obstruction of justice and

possibly related to other matters.[1]

22. Since the Mueller investigation began in May 2017, I have written over a dozen articles

and essays about the investigation and related issues in *Lawfare*, *Time*, *The Weekly*

*Standard*, and *The Atlantic*.[2] I have also been interviewed on the PBS NewsHour about

---

[1] *See, e.g.,* Matt Apuzzo, *What Will Mueller Do? The Answer Might Lie in a By-the-Book Past*, N.Y. Times (Aug. 25, 2018); Carol D. Leonnig and Robert Costa, *Mueller Told Trump's Attorneys the President Remains Under Investigation but is Not Currently a Criminal Target*, (Apr. 3, 2018).
[2] Jack L. Goldsmith, *Mueller Won't Decide Trump's Fate, Only the American Public Can*, Time (June 7, 2018); Jack L. Goldsmith and Maggie McMahon, *The Executive Branch's Extraordinarily Broad View of the Presidential Pardon Power*, Lawfare (May 31, 2018); Jack L. Goldsmith, *The Cycles of Panicked Reactions To Trump*, Lawfare (Apr. 11, 2018); Jack L. Goldsmith, *Can Mueller or Rosenstein Issue an Interim Report on Obstruction?*, Lawfare (Apr. 9, 2018); Jack L. Goldsmith and Maddie McMahon, *Don't Expect a Starr-Like Report from Mueller*, Lawfare (Mar. 22, 2018); Jack L. Goldsmith, *The Downsides of Mueller's Russia Indictment*, Lawfare (Feb. 19, 2018); Jack L. Goldsmith, *Independence and Accountability at the Department of Justice*, Lawfare (Jan. 30, 2018); Jack L. Goldsmith, *Why Hasn't Rod Rosenstein Recused Himself From the Mueller Investigation?*, Lawfare (Jan. 5, 2018); Jack L. Goldsmith, *The President Can't Kill the Mueller Investigation*, Lawfare (Jan. 1, 2018); Jack L. Goldsmith, *In Defense of Rosenstein and Wray's Responses to Trump*, Lawfare (Dec. 6, 2017); Jack L. Goldsmith, *The Cost of Trump's Attacks on the FBI*, The Atlantic (Dec. 4, 2017); Jack L. Goldsmith, *Will Donald Trump Destroy the Presidency?*, The Atlantic (Oct. 2017); Jack L. Goldsmith, *The Trump Interview and DOJ Independence*, Lawfare (July 20, 2017); Jack L. Goldsmith and Benjamin Wittes, *If Rod Rosenstein Recuses: What Happens Next?*, Lawfare (June 16, 2017); Jack L. Goldsmith, *If Trump Fires Mueller (Or Orders His Firing)*, Lawfare (June 13, 2017).

these issues,[3] and quoted in newspaper stories about them in *The New York Times* and

*The Washington Post.*[4]

23. In an article I recently co-wrote on *Lawfare*, I explained how the Special Counsel

regulations, 28 CFR § 600.1 *et seq*., govern, in the first instance, what kind of report

Special Counsel Robert Mueller can provide regarding his investigation of Russian

election interference. Jack Goldsmith & Maddie McMahon, *Don't Expect a Starr-Like*

*Report from Mueller*, Lawfare (Mar. 22, 2018). The article discussed the relevance of the

Jaworski "Road Map" approach to Special Counsel's Mueller's decision about any such

report. One conclusion of the article was that the regulations rule out disclosure that

contains legal analysis and conclusions, like the one by Independent Counsel Ken Starr in

1999, but permits "a relatively spare factual report to Congress (and maybe the public) at

---

[3] Jack L. Goldsmith (guest), *What Are the Ramifications of Trump's FBI Spy Claims?*, PBS NewsHour (May 21, 2018); Jack L. Goldsmith (guest), *The Significance of Trump's Reported Order To Fire Mueller*, PBS NewsHour (Jan. 26, 2018); Jack L. Goldsmith (guest), *Did Trump Obstruct Justice? New Russia Investigation Details Raise More Questions*, PBS NewsHour (Jan. 5, 2018).

[4] *See, e.g.,* Peter Baker, *Why Is Trump Mad at Sessions? A Tweet Provides the Answer*, N.Y. Times (June 5, 2018); Michael S. Schmidt, *et al.*, *Trump's Lawyers, in Confidential Memo, Argue to Head Off a Historic Subpoena*, N.Y. Times (June 2, 2018); Katie Benner, *Trump's Demands Escalate Pressure on Rosenstein to Preserve Justice Dept.'s Independence*, N.Y. Times (May 21, 2018); Nicholas Kristof, Opinion, *The Nation Will Pay if Trump Fires Mueller*, N.Y. Times (Apr. 11, 2018); Charlie Savage, *With Scant Precedent, White House Insists Trump Could Fire Mueller Himself*, N.Y. Times (Apr. 10, 2018); Michael S. Schmidt, *et al.*, *Trump's Lawyer Raised Prospect of Pardons for Flynn and Manafort*, N.Y. Times (Mar. 28, 2018); Sharon LaFraniere, *et al.*, *Trump's Unparalleled War on a Pillar of Society: Law Enforcement*, N,Y. Times (Feb. 3, 2018); Philip Rucker, *et al.*, *Trump Says He Won't Fire Mueller, as Campaign to Discredit Russia Probe Heats Up*, Wash. Post (Dec. 17, 2017); Greg Miller, *Russia Probe Marked by Contrasting Styles of Trump and Mueller*, Wash. Post (Oct. 31, 2017); Philip Bump, *Can Trump Pardon Anyone? Himself? Can He Fire Mueller? Your Questions, Answered.*, Wash. Post (July 21, 2017); David Ignatius, *Trump Firing the Special Counsel Would Be Disastrous*, Wash. Post (June 13, 2017).

the end of the Mueller investigation, which can be seen as a version of the Jaworski model."

24. My article was a response to an article written by Benjamin Wittes and Quinta Jurecic. *Will We Ever Learn What Bob Mueller Knows?*, Lawfare (Mar. 21, 2018). Wittes and Jurecic analyzed several models that might guide Special Prosecutor Mueller in deciding on whether and how to make public the fruits of his investigation. They discuss at length the Jaworski Road Map model of disclosure. While I disagree with Wittes and Jurecic about the range of Mueller's legally available options, we agree on the relevance of the Road Map approach and its availability as an option for Mueller.

25. As that exchange highlights, there is a live public debate about the appropriate framework for Mueller to report any findings to Congress of potentially unlawful conduct by the President. But in the midst of this debate, there is agreement, both in the *Lawfare* exchange and among experts more generally, about the potential relevance of the Road Map to Mueller and Rosenstein's decision about whether and how to disclose the fruits of the investigation to the public, and to the larger public understanding of and debate about the appropriateness of whatever he discloses.[5]

26. As Jaworski's deliberations with his staff prior to settling on the Road Map indicate, an investigation of the president by an executive branch official, and the possibility of disclosing the fruits of that investigation to Congress, raise difficult and sensitive issues of executive power, separation of powers, and individual rights. Because there are few

---

[5] *See, e.g.*, Michael S. Schmidt, *et al.*, *How the Mueller Investigation Could Play Out for Trump*, N.Y. Times (May 23, 2018); Jill Wine-Banks and Gerald Goldman, Opinion, *America Needs to Know What Mueller Knows About Trump. Here's How That Could Happen (Legally).*, NBC News (Apr. 12, 2018).

judicial precedents that expressly govern those issues, the past practices of government

actors can inform both legal meanings and proper government practice. *Compare Nat'l*

*Labor Relations Bd. v. Noel Canning*, 134 S.Ct. 2550 (2014). The Road Map is one of

two main precedents in this area, the other being the Starr report, which is public. The

Road Map was also more successful than the Starr report in informing the House about

possibly impeachable offenses by a president while at the same time respecting both the

president's prerogatives (President Nixon did not oppose the transmittal of the Road

Map) and the House's prerogatives (by not pre-judging the case for impeachment).

27. If Special Counsel Mueller decides to send a report to Congress, perhaps through Deputy

Attorney General Rosenstein, the Road Map would thus be a vital touchstone for the

public and Congress to assess his actions. It would help the public judge the legality of

his actions under the Special Counsel regulations, and the legitimacy of his actions based

on a comparison with the Road Map and the Starr Report. If Special Counsel Mueller or

Deputy Attorney General Rosenstein decides to issue a report on something akin to the

Road Map model, it would be important to compare the level of factual detail that they

include in any transmission to Congress with the level of detail in the Road Map.

28. Even if Special Counsel Mueller does not send a report to Congress, the Road Map would

be an important point of comparison in judging the validity of Mueller's failure to issue a

report. It would also have broader relevance to journalists and scholars who wish to put

the Mueller investigation and any report that Mueller may issue in historical context.

29. The Road Map might also have substantive legal relevance. The question whether the

president can violate a federal obstruction of justice statute in the discharge of his duties

as chief executive is highly contested. Many of President Trump's actions that his critics

say constitute obstruction of justice had parallels in the Nixon presidency. For example, President Trump has been accused of obstructing justice, or contributing to such obstruction, in his firing of former FBI Director James Comey and in his many statements that the Mueller investigation should end. Similarly, President Nixon fired Special Prosecutor Archibald Cox because he did not approve of some of the steps Cox took in directing the Watergate investigation towards the President. And President Nixon stated publicly, in his January 30, 1974 State of the Union address, that "I believe the time has come to bring that investigation and the other investigations of this matter to an end." The House of Representatives, in its first article of impeachment, charged President Nixon with obstruction of justice based in part in his "interfering" with the conduct of those investigations by various federal agencies, including the FBI. This charge does not necessarily involve a conclusion that the President violated a federal criminal law. It is nonetheless potentially highly relevant to Mueller's thinking about obstruction of justice, and thus to the public's analysis of any decision based on that thinking, whether Special Prosecutor Jaworski cited the Nixon actions listed above in the Road Map as potentially relevant evidence — especially if he did so.

30. For these reasons, the continued secrecy of the Road Map deprives the public of information regarding a vital historical precedent that has direct relevance to one of the most consequential events that the government is now undertaking. As an expert following and contributing to these contemporary debates, I believe that releasing the Road Map would significantly enrich the public's understanding of the Mueller investigation and any decisions that he makes about informing Congress (or not informing Congress) about the President's actions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2018.

_____
Jack Goldsmith

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| IN RE: PETITION OF BENJAMIN WITTES, JACK GOLDSMITH & STEPHEN BATES | ) ) ) ) ) | Misc. Case No. _____ |

**DECLARATION OF PHILIP ALLEN LACOVARA**

## DECLARATION OF PHILIP ALLEN LACOVARA

I, Philip Allen Lacovara, hereby declare as follows:

1.  I have been asked to provide this Declaration in support of a petition to unseal and release the so-called "Road Map" prepared by the Watergate Special Prosecutor's Office.  I discuss below the Road Map and my role in its preparation and its submission to the Judiciary Committee of the House of Representatives.  As discussed more fully below, I served as the Counsel to the Watergate Special Prosecutor at the time.

## PERSONAL AND PROFESSIONAL BACKGROUND

2.  For more than fifty years, I have worked as a lawyer in government service, private practice, international corporations, and academic institutions.

3.  Since 1967 I have been a member of the New York Bar, and since 1974 I have been a member of the Bar of the United States District Court for the District of Columbia (among other federal courts, including the Supreme Court of the United States [1970]).  My membership in the Bar of the District of Columbia derives from my 1974 admission to the Bar of the District Court. Since 2003, I also have been an enrolled Solicitor entitled to practice law in England.

4.  I received my undergraduate degree from Georgetown University in 1963.  After graduating from Columbia Law School in 1966, I became the senior law clerk to United States Circuit Judge Harold Leventhal of the United States Court of Appeals for the District of Columbia Circuit. Over the following decades I served on or chaired various committees of that court.

5.  Apart from my service in the Watergate Special Prosecutor's Office, some of my other roles in public service have included: Special Assistant to then-Solicitor General Thurgood Marshall (1967), Assistant to Solicitor General Erwin Griswold (1967-1969), Special Counsel to the New York City Police Commissioner (NYPD) (1971-1972), Deputy Solicitor General of the

United States supervising all federal criminal and national security cases in the Supreme Court (1972-1973), chairman of the Board of Trustees of the Public Defender Service of the District of Columbia, and the designee of President Ronald Reagan on the Judicial Nomination Commission for the District of Columbia.

6. As an Assistant to the Solicitor General and then later as Deputy Solicitor General, I regularly presented to the Supreme Court the position of the Executive Branch on issues of law enforcement, national security, and separation of powers. I have argued more than fifteen cases before the Supreme Court.

7. I have been actively involved with The District of Columbia Bar for decades. At various times I have served on the Bar's Legal Ethics Committee (chairperson of Subcommittee on Code of Professional Conduct), as a member of the Board of Governors of the Bar, as general counsel to the Bar, and in 1988-1989 as President of The District of Columbia Bar. Until 2018, I chaired the Bar's Leadership Development Committee.

8. In private practice, I have been a partner in the Washington and New York offices of two international law firms, Hughes Hubbard & Reed LLP (where I was the managing partner of the Washington office) and Mayer Brown LLP.

9. In the corporate world, I worked as Vice President and Senior Counsel for Legal Policy at General Electric Co. and then as Managing Director, General Counsel, and member of the Management Committee of Morgan Stanley & Co.

10. I have taught various courses on constitutional law, presidential power, and federal jurisdiction and procedure at the university level. For example, I held positions as Adjunct Professor, Department of Political Science, Hunter College of the City University of New York (teaching various courses on presidential powers, terrorism, international law of armed conflict, etc.);

Adjunct Professor at Georgetown University Law Center (federal courts and the federal system), Adjunct Lecturer Columbia Law School (issues in modern policing); and lecturer at John Jay College, City University of New York (civil liberties under the Constitution). I also have delivered formal lectures at Yale Law School (the Anderson Lecture), Columbia Law School (the Harold Leventhal Memorial Lecture), United States Military Academy (West Point), and other universities.

11. I have written frequently on issues of presidential power, control of terrorism, and the international law of armed conflict, and other similar subjects. I have published articles on various topics of public law in *Columbia Law Review, Yale Law Journal, Harvard Journal of International Law, Arizona Law Review, Delaware Law Review, Minnesota Law Review, Inter-American Law Review, St. John's Law Review, Law & Contemporary Problems, New York Times, Washington Post, Los Angeles Times, National Law Journal*, and others.

12. I am a Life Member of the American Law Institute (ALI). I worked with Professor Herbert Wechsler on the drafting of the ALI Model Penal Code, which has been adopted as the basis for the criminal law of most States. I also have been involved in various other ALI projects dealing with criminal law and procedure.

## WATERGATE SPECIAL PROSECUTOR'S OFFICE

13. In 1973 and 1974, I served as Counsel to the Special Prosecutor in the Watergate Special Prosecutor's Office (officially termed the "Watergate Special Prosecution Force" in Department of Justice regulations). As Counsel to the Special Prosecutor, I was the principal legal advisor to Special Prosecutor Archibald Cox and his successor, Leon Jaworski. This included evaluation of all constitutional and other legal issues that arose in the course of the investigation of the Watergate Cover-Up, including President Nixon's role in the cover-up,

and in the course of the other matters that had been assigned to the Special Prosecutor. Together with my staff, I also functioned as the general counsel for the Office, advising on issues of federal criminal law and procedure. We were responsible for briefing and, in many cases, arguing motions and appeals relating to the work of the Office.

14. In that capacity, I argued among other cases *United States v. Nixon*, 418 U.S. 683 (1974) (the "*Nixon Tapes Case*"), before the Supreme Court. As discussed below, I also was responsible for advising on the propriety of developing the "Road Map" and for arguing in court that the information that it contained could properly be released to the House Judiciary Committee.

## THE ROAD MAP

15. The Road Map is a document that, as best I recall, consists of a narrative of the facts that the Special Prosecutor's Office had uncovered relating to the complicity of President Nixon in the Watergate Cover-Up and in other violations of law that were within the jurisdiction of the Office to investigate (including the abuses by the White House "Plumbers," various campaign violations, etc.). The Road Map was drafted by the staff of the Office and summarized tentative findings. It was based on a variety of sources of information, including documentary evidence and interviews obtained outside the grand jury process as well as information presented to the grand jury. It is my recollection that the Road Map also included evidentiary exhibits, some (but not all) of which would be characterized as grand jury materials or as referring to matters occurring before the grand jury.

16. It may be pertinent to understand the origin of the Road Map. President Nixon was a focus of the Special Prosecutor's investigation, although not the only focus. Even before the Supreme Court's decision in the *Nixon Tapes Case* forced the President to release the "smoking gun" tape, which promptly precipitated his resignation, there was substantial evidence that the

President had violated various criminal statutes. At the time (and to this day), there was no authoritative judicial ruling on the critical question whether an incumbent president may be indicted while in office. Based on extensive research and analysis by my staff and by me, we concluded that a president has no special immunity from indictment while in office. Nevertheless, it was certain that indicting the President would complicate the proceedings against the other subjects of the investigation and delay prosecution of charges against them.

17. At the time, we were aware that the House Judiciary Committee, which has jurisdiction over possible impeachments, was conducting an inquiry into whether President Nixon had committed "high crimes and misdemeanors" and thus was liable to impeachment. Accordingly, the Special Prosecutor concluded that (as we later informed the Supreme Court during the briefing of the *Nixon Tapes Case*) the grand jury could identify President Nixon as an *unindicted* co-conspirator in the indictment charging his aides with criminal culpability, but the salient information about the President's own conduct would be transmitted, in an organized form, to the House Judiciary Committee, if that could be done lawfully. I concluded that this course was permissible under Rule 6(e) of the Federal Rules of Criminal Procedure. The Watergate Task Force team then prepared the Road Map.

18. It was understood that it would be prudent to seek judicial approval for this course before actually releasing the Road Map to the House Judiciary Committee. Accordingly, we sought approval from Chief Judge John J. Sirica, who was supervising all grand jury matters at the time. I presented the arguments supporting release of the material, which both Chief Judge Sirica and the *en banc* D.C. Circuit approved (one judge dissenting). See *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501

F.2d 714 (D.C. Cir. 1974). The Road Map was then transmitted to the House Judiciary Committee. I understand that House members and staff used the Road Map in determining whether to prepare Articles of Impeachment, which the Committee eventually did.

### RELEVANCE OF THE ROAD MAP TO CURRENT ISSUES OF PUBLIC CONCERN

19. I was surprised to learn that that the Road Map was not released years ago. It was the subject of a highly publicized judicial litigation more than forty-four years ago. The Road Map was part of congressional proceedings leading to the approval of Articles of Impeachment adopted by the House Judiciary Committee. It was widely discussed in the published memoirs of various participants in the Watergate investigation. Many historians and scholars have extensively examined the Watergate affair, including the Cover-Up and the ensuing investigations by the Special Prosecutor's Office and the House Judiciary Committee.

20. Indeed, some "revisionist" authors (as I would term them) have sought to argue that the investigation of President Nixon, including the use of the grand jury, was abusive and unfair. In my view, a full vetting of this crucial period of American history would be well served by thorough public access to all of the materials generated by the Special Prosecutor's Office, including the Road Map. In this spirit, years ago I submitted to the National Archives, without restriction, all my Watergate-related files, including confidential internal memoranda and personal diaries and calendars. I know that historians (and critics) have drawn on these materials in evaluating the entire Watergate affair.

21. In addition, an accurate and complete understanding of the Road Map may contribute substantially to an informed discussion of matters of vital, contemporary importance. Specifically, disclosure of the Road Map is likely to contribute to a public understanding of

the options available to Special Counsel Robert Mueller in his current investigation of conduct during the 2016 presidential campaign.

22. I have written several articles about Special Counsel Robert Mueller's investigation and the issues that arise out of it. For example, my "op-eds" in the *Washington Post* have addressed issues of the presidential pardon power, possible obstruction of justice by the President, the President's resistance to providing testimony to the Special Counsel and the grand jury, and the alleged immunity of an incumbent president from indictment while in office.[1]  I have also been interviewed and quoted on these topics by multiple news outlets, including NPR,[2] Politico,[3] CNN, CNBC, BBC, etc., where I have discussed the limits of executive power.

---

[1] *See*, *e.g*., Philip Allen Lacovara, *I Miss Richard Nixon*, Opinion, Wash. Post, Aug. 20, 2018, *available at* https://www.washingtonpost.com/opinions/i-miss-richard-nixon/2018/08/20/ddc065fa-a4a4-11e8-b76b-d513a40042f6_story.html?utm_term=.0c1b9ddaffc5; Philip Allen Lacovara, *Don't Wait for Trump to Testify, Mr. Mueller*, Opinion, Wash. Post, June 17, 2018, *available at* https://www.washingtonpost.com/opinions/dont-wait-for-trump-to-testify-mr-mueller/2018/06/17/1812a654-70d5-11e8-afd5-778aca903bbe_story.html?utm_term=.46cb5810961a; Philip Allen Lacovara, *Even Trump Deserves a Good Lawyer*, Opinion, Wash. Post, Mar. 28, 2018, *available at* https://www.washingtonpost.com/opinions/even-trump-deserves-a-good-lawyer/2018/03/28/83d5772a-32b6-11e8-8bdd-cdb33a5eef83_story.html?utm_term=.eb46079540a7;
Philip Allen Lacovara, *How the Pardon Power Could End Trump's Presidency*, Opinion, Wash. Post, Aug. 29, 2017, *available at* https://www.washingtonpost.com/opinions/how-the-pardon-power-could-end-trumps-presidency/2017/08/29/57365dfc-8cf7-11e7-84c0-02cc069f2c37_story.html?utm_term=.b4e1a69e6e0c; Philip Allen Lacovara, *I Helped Prosecute Watergate. Comey's Statement Is Sufficient Evidence for an Obstruction of Justice Case*., Opinion, Wash. Post, June 7, 2017, *available at* https://www.washingtonpost.com/opinions/former-watergate-prosecutor-comey-lays-out-sufficient-evidence-for-an-obstruction-of-justice-case/2017/06/07/a12964a4-4be3-11e7-9669-250d0b15f83b_story.html?utm_term=.ac314013ec6d.

[2] *Can the Sitting President of the United States Be Indicted?*, NPR, Aug. 2, 2018, *available at* https://www.npr.org/2018/08/22/641005331/can-the-sitting-president-of-the-united-states-be-indicted.

[3] Darren Samuelsohn, *Russia Probe Lawyers Think Mueller Could Indict Trump*, Politico, Feb. 2, 2018, *available at* https://www.politico.eu/article/russia-probe-investigation-lawyers-think-robert-mueller-could-indict-president-donald-trump/.

23. Recently I was quoted extensively in the *New York Times* discussing how the Road Map relates to current investigations into possible presidential wrongdoing.[4]

24. The Road Map is highly relevant to the public's understanding of the historical and legal frameworks that provide the backdrop for the Mueller investigation. Therefore, its continued secrecy deprives the public of information regarding a vital historical precedent. As the former Counsel to the Watergate Special Prosecutor, I believe that unsealing and releasing the Road Map would significantly enrich the public's understanding of a mechanism that a similarly situated investigator used to ensure that facts developed during a thorough criminal investigation were also available to another governmental institution with its own independent but related constitutional responsibilities.

25. I am familiar with the restrictions contained in Rule 6(e) and the policies underlying those restrictions. The primary goals of the restrictions, as I have understood them, are to protect the secrecy and integrity of pending criminal investigations, to protect witnesses against possible intimidation and reprisal, and to preserve the privacy of witnesses and persons investigated but not indicted.

26. Unsealing and releasing the Road Map (with or without the underlying evidence, including any grand jury testimony) would not conflict with any of those goals. The Watergate investigations were completed four decades ago. The identity of all witnesses was disclosed, one way or another, many years ago. I assume that the actual grand jury testimony of many of the witnesses who also testified at subsequent trials was provided to defense counsel. Most of the witnesses already have died; I think that this observation also may apply to the subjects of

---

[4] Adam Liptak and Jim Rutenberg, *Cohen Implicates President Trump. What Do Prosecutors Do Now?*, N.Y. Times, Aug. 21, 2018, *available at* https://www.nytimes.com/2018/08/21/us/politics/cohen-trump-indicted.html.

the grand jury proceedings. Moreover, as I have noted previously, the Road Map has been described extensively in various public proceedings and memoirs.

27. Therefore, I am quite comfortable in concluding that retaining the Road Map under seal would not protect any of the interests underlying the general presumption of grand jury secrecy. By contrast, promptly unsealing and releasing the Road Map would promote important public interests.

### 

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 29, 2018, in Baltimore, Maryland.


Philip Allen Lacovara

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: PETITION OF BENJAMIN  )
WITTES, JACK GOLDSMITH &      )
STEPHEN BATES                 )
                              )
                              )    Misc. Case No. _____
                              )
                              )
                              )
                              )
                              )
                              )
                              )
                              )
                              )

## DECLARATION OF BENJAMIN WITTES

I, Benjamin Wittes, hereby declare as follows:

1. I am editor-in-chief of *Lawfare* and a Senior Fellow in Governance Studies at the Brookings Institution. I write about issues related to American law and national security. I submit this declaration to support the above-captioned petition to unseal material relating to President Richard Nixon that Watergate Special Prosecutor Leon Jaworski transmitted to the House Judiciary Committee with authorization from the federal district court for the District of Columbia in 1974 (the "Road Map").

2. I am a Senior Fellow in Governance Studies at the Brookings Institution, where I serve as the Research Director in Public Law.

3. I am co-founder and editor-in-chief of *Lawfare*, a website devoted to the discussion of U.S. national security law and policy. *See* https://www.lawfareblog.com.

1

4. I have more than 20 years of experience studying these issues as a journalist, scholar, writer, and public commentator. Relatedly, I am a legal analyst on MSNBC.

5. Between 1997 and 2006, I served as an editorial writer for *The Washington Post* specializing in legal affairs. In that capacity, I wrote extensively about the Kenneth Starr investigation of Bill Clinton and the resulting impeachment of President Clinton. I also wrote extensively about national security legal matters.

6. Prior to joining the editorial page staff of *The Washington Post*, I covered the Justice Department and federal regulatory agencies as a reporter and news editor at *Legal Times*. In that capacity, I wrote extensively about national security legal matters.

7. I have authored five books, including *Starr: A Reassessment*, which examines Kenneth Starr's tenure as Independent Counsel in the investigation of President Clinton, and includes a discussion of the Road Map.

8. Additionally, I have served as editor for three books and written a number of reports on issues regarding national security. My writing has appeared in a wide range of journals and magazines including *The Atlantic, Slate, The New Republic, The Wilson Quarterly, The Weekly Standard, Policy Review,* and *First Things*.

9. I am a frequent speaker on topics of detention, interrogation, national security, and investigations involving the presidency before academic, government, policy, and military audiences.

10. The *Lawfare* site in 2017 received more than 11.4 million visits, constituting more than 15 million pageviews from 6.4 million unique visitors.

11. This declaration is based on my significant study and writing about the history of criminal investigations of presidents, and specifically the history of impeachment

referrals to Congress related to presidential conduct. I have studied the accounts of the Road Map in both Leon Jaworski's and Jim Doyle's memoirs.[1] I have also conducted several interviews with Stephen Bates, Associate Independent Counsel who helped draft the Starr Report. Lastly, I have done in-depth research on legislative history of the independent counsel law.

12. This declaration has several objectives. *First*, it provides an overview of my understanding of the Road Map. *Second*, it recounts the continued contemporary interest in the Road Map. *Third*, it articulates why releasing the Road Map is important to the public's understanding of the investigation currently underway by Special Counsel Robert Mueller.

## OVERVIEW OF THE ROAD MAP

13. The 55-page Road Map drafted by Watergate Special Prosecutor Leon Jaworski provided factual information regarding the investigation into President Nixon's involvement in the break-in and cover-up, with supporting documents but very limited legal conclusions.

14. As I noted in a *Lawfare* article recently, Judge John Sirica stated in his decision that the Road Map contained "no accusatory conclusions[,] . . . no recommendations, advice or statements that infringe on the prerogatives of other branches of government . . . [and] no moral or social judgments." Benjamin Wittes, *et al.*, *How White House Threats Condition Mueller's Reality*, Lawfare (July 21, 2017).

---

[1] Leon Jaworski, *The Right and the Power: The Prosecution of Watergate* 102 (Reader's Digest Press, 1976); James Doyle, *Not Above the Law: The Battles of Watergate Prosecutors Cox and Jaworski — A Behind-the-Scenes Account* (Morrow, 1977).

15. My understanding of the Road Map is based in part on James Doyle's book on the Watergate investigation, *Not Above the Law*. Doyle served as Special Assistant to the Watergate Special Prosecutors. In his book, Doyle provides a description of what the Road Map consisted of:

> It was a simple document, fifty-five pages long, with only a sentence or two on each of the pages. Each page was a reference to a piece of evidence—sentences from one of the tape recordings, quotations from grand jury testimony . . . .

> This is how the road map worked. One page might say, "On March 16, 1973, E. Howard Hunt demanded $120,000." Then it would list page references to grand jury testimony from witnesses who saw Hunt's blackmail note and references to the tapes where Hunt's demand was discussed. The grand jury transcripts and the tape transcripts would be included . . . .

> The strength of the document was its simplicity. An inexorable logic marched through its pages. The conclusion that the President of the United States took part in a criminal conspiracy became inescapable.

Doyle at 290.

16. The Road Map became the template for the provision of law requiring independent counsels to file impeachment referrals when the independent counsel develops evidence that "that may constitute grounds for an impeachment." *See* 28 U.S.C. § 595. It thus represented the only model even theoretically available to Independent Counsel Kenneth Starr when he referred impeachment material to Congress in 1998—though as Stephen Bates makes clear in his declaration in this matter, it was not in fact available to the Office of Independent Counsel when sought. Congress appears to have given very little thought to the question of how to enshrine in law a requirement for a Road Map-like referral, leaving open the possibility that independent counsels would take very different approaches to referring impeachment material to the legislature.

<u>THE ROAD MAP'S RELEVANCE TO CURRENT QUESTIONS OF URGENT PUBLIC CONCERN</u>

17. I have written extensively regarding Robert Mueller's current investigation of President

Trump. Between 2017 and the present, I have written dozens of articles on the subject,

which have been published on *Lawfare*,[2] *The Atlantic*,[3] and *Foreign Policy*.[4] I have been

interviewed on the topic regularly, including appearances on MSNBC[5] and NPR,[6] and

have been quoted in articles by the New York Times[7] and the Washington Post.[8]

18. In an article I recently co-wrote regarding Mueller's ongoing investigation of President

Trump, I argued that the sort of report Muller submits on the results of his investigation

will be determined by how he "imagines his role as special counsel." Benjamin Wittes

---

[2] *See, e.g.*, Benjamin Wittes, *An Old OLC Opinion on Whether the President Can Be Subpoenaed*, Lawfare (Aug. 12, 2018); Benjamin Wittes and Susan Hennessey, *Seven Frequently Asked Mueller Indictment Questions for Which We Don't Have the Answers*, Lawfare (Oct. 28, 2017); Benjamin Wittes and Susan Hennessey, *Robert Mueller's Show of Strength: A Quick and Dirty Analysis*, Lawfare (Oct. 30, 2017).

[3] *See, e.g.*, Benjamin Wittes, *The Most Damaging Thing That's Happened to Trump*, The Atlantic (Aug. 22, 2018); Benjamin Wittes, *The Flaw in Trump's Obstruction-of-Justice Defense*, The Atlantic (June 4, 2018); Quinta Jurecic and Benjamin Wittes, *Is America on the Verge of a Constitutional Crisis?*, The Atlantic (Mar. 17, 2018).

[4] *See, e.g.*, Benjamin Wittes and Susan Hennessey, *Congressional Republicans Are Pulling a Bait-and-Switch in the Trump-Russia Investigation*, Foreign Policy (Dec. 22, 2017); Benjamin Wittes and Susan Hennessey, *The Unsolved Mystery of Michael Flynn's Plea Deal*, Foreign Policy (Dec. 8, 2017); Benjamin Wittes and Susan Hennessey, *Congress Is Dropping the Ball on Trump's Obstruction of Justice*, Foreign Policy (Oct. 6, 2017).

[5] *See, e.g.*, *Full Wittes Interview: Mueller Investigating 'Three or Four' Kinds of Crimes*, MSNBC (Jan. 23, 2018); *Is the Country Moving to a Constitutional Crisis?*, MSNBC (Mar. 19, 2018); *Ben Wittes: "Robert Mueller Clearly Has His Eye on Issue of Collusion"*, MSNBC (Mar. 1, 2018).

[6] *See e.g.*, *Russia Probe: Is the White House Trying to Discredit Mueller?*, NPR (July 24, 2017); *'White House Is Wrong' on Manafort Indictment, Legal Expert Says*, NPR (Oct. 31, 2017); *What a Grand Jury Means for the Russia Investigation*, NPR (Aug. 4, 2017).

[7] Peter Baker, *Mueller Is Gaining Steam. Should Trump Worry?*, N.Y. Times (Feb. 24, 2018).

[8] David Nakamura and Josh Dawsey, *Trump Gears Up to Strip More Clearances from Officials Tied to Russia Investigation*, Wash. Post (Aug. 17, 2018).

and Quinta Jurecic, *Will We Ever Learn What Bob Mueller Knows?*, Lawfare (Mar. 21,

2018).

19. As my co-author and I discuss in that article, Mueller could see himself as a traditional

prosecutor and follow an orthodox path where the public will only learn about what he

knows if indictments occur. *Id.* Alternatively, we argued, Muller could also take the path

that Watergate Special Prosecutor Jaworski took, transmitting to Congress something

akin to the Road Map. Such a document might include only "bare-bones factual

information intended to point committee members to the relevant evidence so [members

of Congress] could draw their own conclusions." *Id.* A third alternative available to

Mueller would be the not-so-popular path that Kenneth Starr took in the President

Clinton investigation of "grandiose...truth-reporting." *Id.*

20. In short, our article posits that whether to provide an elaborate narrative report, or a Road

Map-style report, may represent a decisive fork in the road for Mueller.

21. Given this potential dilemma, it is particularly striking that the Road Map — in stark

contrast to the Starr Report — remains secret. There are, in effect, two models of

independent prosecutors transmitting grand jury material to enable Congress's

consideration of potentially unlawful action by a president. One of those, the Starr report,

is well-understood and generally regarded in a negative light. The other, Jaworksi's Road

Map, is widely understood to have represented an appropriate course, yet its details

remain secret more than 40 years after its transmission to Congress.

22. In light of the Road Map's high potential relevance to the public's understanding of the

historical and legal frameworks relating to the Mueller investigation, its continued

secrecy deprives the public of information regarding a vital historical precedent. As an

expert closely following and contributing to these contemporary debates — in my capacities as a scholar, writer, and editor-in-chief of *Lawfare* — I believe that releasing the Road Map would significantly enrich the public's understanding.

23. Based on my work on the independent counsel law's history, on the Starr investigation and its impeachment referral, and on the ongoing Mueller investigation, I believe that the Road Map has significant contemporary relevance to public and press understanding of the investigation of President Trump. If the many press accounts that Mueller is preparing "a report" are accurate, the Road Map provides one foundational model of what sort of report he might be contemplating. It is a model very different from what many commentators and journalists appear to be expecting. Yet it is a model that history has treated kindly. It is also a model about which, because it remains under seal, our understanding is extremely limited. In my professional opinion, it is time for that to change.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2018.

Benjamin Wittes

7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE: PETITION OF BENJAMIN WITTES, JACK GOLDSMITH & STEPHEN BATES | ) ) ) ) ) |

Misc. Case No. _____

## <u>ORDER</u>

Upon consideration of the petition for an order directing disclosure of the impeachment referral report known as the "Road Map" that the Watergate grand jury transmitted to the House Judiciary Committee in 1974,

It is hereby this ____ day of _____, 2018,

ORDERED that the petition is GRANTED.

SO ORDERED.

_____
Honorable
United States District Judge for the
District of Columbia