**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: PETITION OF | ) |
| | ) |
| | ) |
| BENJAMIN WITTES | ) |
| Lawfare | ) |
| 1509 Sixteenth Street, NW | ) Misc. Case No. _____ |
| Washington DC 20036; | ) |
| | ) |
| JACK GOLDSMITH | ) |
| 1563 Massachusetts Avenue | ) |
| Cambridge, MA 02138; | ) |
| | ) |
| and | ) |
| | ) |
| STEPHEN BATES | ) |
| 269 Canyon Spirit Dr. | ) |
| Henderson, NV 89012. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION TO ORDER DISCLOSURE OF THE "ROAD MAP" TRANSMITTED BY
WATERGATE GRAND JURY TO THE HOUSE JUDICIARY COMMITTEE IN 1974**

**TABLE OF CONTENTS**

**INTRODUCTION**                                                                1

**FACTUAL BACKGROUND**                                                          2

**I.    THE ROAD MAP'S PLACE IN WATERGATE HISTORY.**                            2

    A.    The Genesis of the Road Map and Its Disclosure to the House
          Judiciary Committee.                                                  2

    B.    The Extensive Watergate Historical Record.                            5

**II.   THE ROAD MAP'S RELEVANCE TO THE CURRENT DEBATE ON
        SPECIAL COUNSEL MUELLER'S FRAMEWORK FOR REPORTING
        HIS FINDINGS.**                                                         8

**ARGUMENT**                                                                    10

**I.    THIS COURT HAS INHERENT AUTHORITY TO ORDER DISCLOSURE
        OF THE ROAD MAP.**                                                      10

    A.    The District Court Has Inherent Authority to Order Disclosure of Grand
          Jury Material Where Appropriate and That Authority Is Consistent
          with Rule 6(e).                                                       10

    B.    Rule 6(e)'s History and Text Support the District Court's Inherent
          Authority to Order Disclosure of Grand Jury Material.                 14

**II.   SPECIAL CIRCUMSTANCES JUSTIFY DISCLOSURE OF THE
        ROAD MAP.**                                                            15

    A.    The Interests in Public Access to the Road Map Militate Strongly in
          Favor of Authorizing Disclosure.                                      17

          1.    Petitioners' reasons for seeking disclosure weigh in favor of
                releasing the Road Map.                                         17

          2.    Petitioners' identities weigh in favor of disclosure.           21

          3.    The narrow scope of Petitioners' request weighs in favor        23
                of disclosure.

B.     Any Remaining Secrecy Interests in the Road Map Are Minimal and Outweighed by the Compelling Interest in the Road Map's Release.    23

1.   The passage of forty-four years and the death of President Nixon greatly reduce any secrecy interest in the Road Map.   24

2.   The current status of Watergate principals and the privacy interests of grand jury witnesses do not justify continued secrecy.   24

3.   The extent to which the Road Map and its contents have been previously made public diminishes any remaining secrecy interest.   28

**III.    DISCLOSURE IS ALSO WARRANTED UNDER RULE 6(E).**   28

**CONCLUSION**   30

# **TABLE OF AUTHORITIES**

Cases

*Carlson v. United States*, 837 F.3d 753 (7th Cir. 2016) ................................................12, 14, 15

*Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211 (1979)................................................. 10, 11

*Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974)................................................................ 4, 13

*In re Application to Unseal Dockets Related to Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314 (D.D.C. 2018)........................................13, 14, 16, 19

*In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138 (D.C. Cir. 2006) ..................... 10, 29

*In re Hastings*, 735 F.2d 1261 (11th Cir. 1984)................................................................... 12, 15

*In re Nat'l Sec. Archive for Order Directing Release of Grand Jury Minutes*, No. 08 Civ. 6599, 2008 WL 8985358 (S.D.N.Y. Aug. 26, 2008) ...................................................................... 24

*In re Petition of Am. Historical Ass'n*, 49 F. Supp. 2d 274 (S.D.N.Y. 1999)...................... passim

*In re Petition of Bruce Craig for Order Directing Release of Grand Jury Minutes*, 131 F.3d 99 (2d Cir. 1997) ........................................................................................................................ passim

*In re Petition of Stanley Kutler*, 800 F. Supp. 2d 42 (D.D.C. 2011) .................................. passim

*In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219 (D.D.C. 1974).................3, 4, 13, 25

*In re Tabac*, No. 3:08-mc-0243, 2009 WL 5213717 (M.D. Tenn. Apr. 14, 2009)...................... 24

*McKeever v. Sessions*, No. 17-5149 (D.C. Cir. filed June 26, 2017) ......................................... 13

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959).................................10, 11, 12

*United States v. Mitchell*, Crim. No. 74-110 (D.D.C. indictment filed March 1, 1974) ............... 4

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................................... 5

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ................................................ 11

Statutes

28 C.F.R. § 600.1 *et seq.*........................................................................................................... 9

28 U.S.C. § 595(c).................................................................................................................... 9

Rules

Fed. R. Crim. P. 57(b)............................................................................................................... 14

Fed. R. Crim. P. 6(e).................................................................................................................. 11

Fed. R. Crim. P. 6(e), Advisory Committee's Notes (1944)................................................ 12, 13

Other Materials

A GUIDE TO WATERGATE IN COURT (Univ. Publications of America 1975) ................................. 7

ARTICLES OF IMPEACHMENT ADOPTED BY THE HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY (July 27, 1974) .................................................................................................. 5

Benjamin Wittes & Quinta Jurecic, *Will We Ever Learn What Bob Mueller Knows?*, LAWFARE (Mar. 21, 2018)........................................................................................................................ 21

Benjamin Wittes, *How Can the President Obstruct Justice?*, LAWFARE (Dec. 5, 2017)............. 20

Daniel J. Hemel & Eric A. Posner, *Presidential Obstruction of Justice*, 106 CAL. L. REV. 1277 (2018)....................................................................................................................................... 20

HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY: AUTHORITY TO ISSUE FINAL REPORT BY SPECIAL PROSECUTOR (Jan. 30, 1975)................................................................. 29

JAMES DOYLE, NOT ABOVE THE LAW (1977).............................................................................. 2

James M. Naughton, *38 in House Begin to Hear Evidence on Impeachment*, N.Y. TIMES
(May 10, 1974) ...................................................................................................................5

Josh Blackman, *Obstruction of Justice and the Presidency: Part I*, LAWFARE
(Dec. 5, 2017) ..................................................................................................................20

Josh Blackman, *Obstruction of Justice and the Presidency: Part II*, LAWFARE
(Dec. 12, 2017) ................................................................................................................20

Mem. of Law in Supp. of Petition, *In re Petition of Stanley Kutler*, 1:10-mc-00547
(D.D.C. filed Sept. 13, 2010) .....................................................................................25, 26

PETER W. RODINO, FOREWORD TO STATEMENT OF INFORMATION: BOOK I – EVENTS PRIOR TO THE
WATERGATE BREAK-IN, HEARINGS OF THE HOUSE JUDICIARY COMMITTEE ON RESOLUTION TO
IMPEACH PRESIDENT NIXON (H. RES. 803) ...........................................................................5

PETER W. RODINO, IMPEACHMENT OF RICHARD M. NIXON, PRESIDENT OF THE UNITED STATES,
H.R. REP. NO. 93-1305 (1974) ...........................................................................................6

Reply Br. for Court-Appointed *Amicus Curiae* in Supp. of Appellant, *McKeever v. Sessions*, No.
17-5149 (D.C. Cir. filed June 25, 2018) .............................................................................14

RICHARD M. NIXON'S RESIGNATION LETTER (Aug. 9, 1974) ....................................................5

THE FINAL REPORT OF THE SENATE SELECT COMMITTEE ON PRESIDENTIAL CAMPAIGN ACTIVITIES,
S. REP. NO. 96-981 (June 1974) ..........................................................................................7

WATERGATE SPECIAL PROSECUTION FORCE: REPORT, U.S. GOVERNMENT PRINTING OFFICE
(Oct. 16, 1975) ...................................................................................................................6

## INTRODUCTION

`       Petitioners seek disclosure of the report transmitted by the grand jury investigating

President Richard Nixon to the House Judiciary Committee in 1974.  That report, which

summarized grand jury material potentially relevant to the Judiciary Committee's consideration

of possible articles of impeachment, has become known as the "Road Map."  Disclosure of the

Road Map would provide the public with vital historical information relating to the Watergate

grand jury's ability to investigate potential criminal conduct by a sitting president and transmit

its investigative materials to Congress – a matter of intrinsic historical interest that has

extraordinary significance as a historical precedent bearing on matters of urgent public interest.

The Court possesses inherent authority to unseal grand jury records when the

considerations normally justifying secrecy are outweighed by special circumstances favoring

disclosure.  This petition raises a paradigmatic case for the appropriate exercise of that authority.

The release of the Road Map – a spare document summarizing information that, over the last 40-

plus years, has largely become public – would not burden the interests typically served by grand

jury secrecy.  The individuals implicated by the grand jury's work are almost all deceased and

the underlying investigative material has overwhelmingly become public in the decades since

Watergate.  Permitting the public access to the Road Map, however, would inform public debate

over the appropriate legal and institutional mechanisms for addressing investigations of

potentially unlawful conduct by a sitting President.  Petitioners in this case, leading scholars and

public intellectuals who have examined many of those complex questions, are extraordinarily

well suited to ensure that release of the Road Map would illuminate the public's understanding.

For the reasons explained in detail below, this Court should allow petitioners and the public to

access the Road Map, perhaps the last major piece of Watergate history that remains blocked

from public view.

## FACTUAL BACKGROUND

I.      **THE ROAD MAP'S PLACE IN WATERGATE HISTORY**.

      A.      **The Genesis of the Road Map and Its Disclosure to the House Judiciary Committee.**

Few events in modern U.S. history are as well chronicled, studied, and cited as the

Watergate scandal.  While the public historical record contains thousands of pages of testimony,

tape recordings, interviews, reports, and notes, there is one critical document in Watergate

history that has never been released to the public.  That is the Road Map.

The Road Map is a document containing "a series of short statements setting forth

documented facts" that the Special Prosecutor's Office (officially termed the Watergate Special

Prosecution Force) uncovered in its investigation of President Nixon's involvement in the

Watergate break-in and cover-up.  Ben-Veniste Decl. ¶ 11; Lacovara Decl. ¶ 15.  Each statement

is followed by references to the evidence supporting that statement, including the grand jury

testimony of various individuals and secret tape recordings of conversations in the White House

that the Special Prosecutor had obtained by grand jury subpoena.  Ben-Veniste Decl. ¶¶ 9, 11;

Lacovara Decl. ¶ 15.  The Road Map has been described as "a simple document, fifty-five pages

long, with only a sentence or two on each of the pages.  Each page was a reference to a piece of

evidence—sentences from one of the tape recordings, quotations from grand jury testimony…."

*See* Wittes Decl. ¶15 (quoting JAMES DOYLE, NOT ABOVE THE LAW (1977)).[1]  The Road Map

---

[1] The Road Map was accompanied by about 800 pages of documents and 13 tape recordings. *See* Goldsmith Decl. ¶ 17.  This petition seeks only the Road Map and not the accompanying records.

"draws no accusatory conclusions" and "contains no recommendations." *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219, 1226 (D.D.C. 1974). Its purpose was not to indict, but rather to "assist the Judiciary Committee, helping it reassemble the individual pieces of… evidence into a coherent narrative as [the Special Prosecutor's Office] and the [grand] jury saw it." Ben-Veniste Decl. ¶ 11.

The genesis of the Road Map was itself history-making. By that point in its investigation, the Special Prosecutor's Office had amassed substantial evidence that President Nixon had violated various criminal statutes, including by participating in a conspiracy to obstruct the Watergate investigation. Lacovara Decl. ¶¶ 16-17; Ben-Veniste ¶ 11. The Special Prosecutor's authority to indict a sitting president, however, was far from clear. *See* Lacovara Decl. ¶ 16; Goldsmith Decl. ¶¶ 15-16. Meanwhile, the House Judiciary Committee, pursuant to its jurisdiction over possible impeachments, was conducting an inquiry into whether President Nixon had committed "high crimes and misdemeanors." Lacovara Decl. ¶ 17. Its authority to obtain the same evidence the Special Prosecutor had gathered, however, was limited. *See* Bates Decl. ¶ 12.

Although his legal team concluded that the president has no special immunity from indictment while in office, Special Prosecutor Jaworski opposed both indicting President Nixon and transmitting a presentment charging him with crimes to the House Judiciary Committee. *See* Lacovara Decl. ¶ 16; Goldsmith Decl. ¶ 16; Bates Decl. ¶¶ 12-13. After considerable deliberation among the prosecution team, Special Prosecutor Jaworski resolved to advise the grand jury that it could name President Nixon as an unindicted co-conspirator in the indictment charging his aides with criminal activity, while seeking the permission of the federal district

court to transmit the evidence it had gathered about President Nixon's conduct, in an organized form, to the House Judiciary Committee.  Lacovara Decl. ¶ 17; *see also* Ben-Veniste Decl. ¶¶ 9-10; Goldsmith Decl. ¶ 17; Bates Decl. ¶ 13.  The grand jury voted 19-0 to take that course of action.  Ben-Veniste Decl. ¶ 11.

On March 1, 1974, the Watergate grand jury issued an indictment charging several of Nixon's aides with obstruction of justice and conspiracy to obstruct justice and naming President Nixon as an unindicted co-conspirator in *United States v. Mitchell*, Crim. No. 74-110 (D.D.C. indictment filed March 1, 1974).  That same day, the grand jury presented Chief Judge John J. Sirica, who was supervising all grand jury matters, with a sealed report that consisted of the Road Map, a collection of evidence cited therein, and a two-page transmittal memorandum that "strongly" recommended that Judge Sirica transmit the materials to the House Judiciary Committee.  *In re Report & Recommendation*, 370 F. Supp. at 1221.  While several indicted defendants objected to any disclosure of the sealed report, President Nixon did not object to its transmittal of the House.  *Id.* at 1229.  Judge Sirica ruled that "delivery to the Committee is eminently proper, and indeed, obligatory." *Id.* at 1227.  Specifically, he concluded that the grand jury had the authority to create the sealed report and that the court had the authority to disclose the report to the House consistent with the "principles of grand jury secrecy," *id.* at 1230, embodied in Rule 6(e) of the Federal Rules of Criminal Procedure.  *See also id.* at 1222-30.  The U.S. Court of Appeals for the D.C. Circuit upheld Judge Sirica's decision, noting "general agreement with his handling of these matters" and "no necessity to expand his discussion." *Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974).

The transmission of the Road Map and its accompanying materials to the House Judiciary Committee marked a major turning point in the Watergate investigation.  It provided the

Committee with the basis to summon witnesses and subpoena additional evidence and prevented President Nixon from keeping additional tape recordings from Congress.  *See* Ben-Veniste Decl. ¶ 13.  On May 9, 1974, the House Judiciary Committee initiated impeachment hearings.[2]  In late July, it adopted three articles of impeachment against President Nixon for obstruction of justice, abuse of power, and contempt of Congress.[3]  Before the House could vote on the impeachment resolutions, President Nixon made public one final tape recorded conversation, known as the "smoking gun" tape, under order of the Supreme Court in *United States v. Nixon*, 418 U.S. 683 (1974).  Lacovara Decl. ¶ 16.  His complicity in the cover-up now clear, Nixon lost most of his remaining political support and resigned from office on August 9, 1974.[4]

**B.     The Extensive Watergate Historical Record.**

In the forty-four years since the Watergate investigation's culmination, the details of the Watergate story have been revealed to the public through a variety of sources.  The articles of impeachment, of course, are the public record that describes the key revelations about President Nixon's conduct that would be found in the Road Map.  Before issuing the articles of impeachment, the House Judiciary Committee publicly released a trove of records from its ongoing impeachment proceedings.[5]  Among them were the Statements of Information and

---

[2] James M. Naughton, *38 in House Begin to Hear Evidence on Impeachment*, N.Y. TIMES (May 10, 1974), *available at* https://www.nytimes.com/1974/05/10/archives/38-in-house-begin-to-hear-evidence-on-impeachment-leaders-of.html.

[3] ARTICLES OF IMPEACHMENT ADOPTED BY THE HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY (July 27, 1974), *available at* http://www.presidency.ucsb.edu/ws/?pid=76082.

[4] RICHARD M. NIXON'S RESIGNATION LETTER (Aug. 9, 1974), available at https://www.archives.gov/historical-docs/todays-doc/?dod-date=809.

[5] PETER W. RODINO, FOREWORD TO *STATEMENT OF INFORMATION: BOOK I – EVENTS PRIOR TO THE WATERGATE BREAK-IN*, *HEARINGS OF THE HOUSE JUDICIARY COMMITTEE ON RESOLUTION TO IMPEACH PRESIDENT NIXON* (H. RES. 803), at III-IV (describing the Committee's vote to "make public the initial presentation including substantially all of the supporting material presented at the hearings," as well as the President's response), *available at* https://archive.org/stream/WatergateHearingsBeforeTheHouseCommitteeOnTheJudiciary/Judici

5

supporting evidentiary material that its impeachment inquiry staff presented to the Committee

between May and July 1974.[6]  *See* Bates Decl. ¶ 14.  Summarizing thousands of pages of

evidence relating to the Watergate break-in and cover-up, the Statements of Information

expressly drew from materials that the Watergate grand jury furnished to the Committee,

including excerpts of numerous grand jury witnesses' testimony accompanying the Road Map.[7]

*Id.*  According to several sources, the impeachment inquiry staff modeled the Statements of

Information after the Road Map, setting forth factual statements while abstaining from

conclusions.  *Id.*

Subsequently, the government issued a number of comprehensive reports of the various

Watergate investigations.  On October 16, 1975, the Watergate Special Prosecution Force

published a report totaling 277 pages ("WSPF Report").[8]  The WSPF Report contains a

comprehensive list of indictments, informations, plea agreements, convictions, sentences, fines,

acquittals, and appeals, in Watergate-related matters through October 1975.  *See* WSPF Report at

155-70.  On August 20, 1974, the House Judiciary Committee published its final report totaling

528 pages.[9]  And on June 27, 1974, the Senate Select Committee on Presidential Campaign

---

ary%20Committee%20Hearings-%20Statement%20of%20Information%2C%20Book%20I%20-
%20Events%20Prior%20to%20the%20Watergate%20Break-In#page/n1.

[6] *Id.* at IV-V (describing Books I through IV of Statements of Information).

[7] *Id.* at XI (stating in the Introductory Note that supporting material included "information furnished to the Committee by the Grand Jury of the District of Columbia and by other grand juries").  Individuals whose excerpted grand jury testimony appear in House Judiciary Committee documents pertaining to Watergate include John Dean, Fred LaRue, Jeb Magruder, L. Patrick Gray, John Ehrlichman, H. R. Haldeman, Richard Kleindienst, E. Howard Hunt, Egil Krogh, Ronald Ziegler, Henry Petersen, and Charles Colson, among others.

[8] WATERGATE SPECIAL PROSECUTION FORCE: REPORT, U.S. GOVERNMENT PRINTING OFFICE (October 16, 1975)*, available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015005491082;view=1up;seq=7.

[9] PETER W. RODINO, IMPEACHMENT OF RICHARD M. NIXON, PRESIDENT OF THE UNITED STATES, H.R. REP. NO. 93-1305 (1974).

Activities issued its final report totaling 1,250 pages.[10]  This report detailed the Committee's investigation into the Watergate break-in and coverup, as well as issues surrounding President Nixon's campaign financing.  It included transcripts of the testimony that key Watergate witnesses gave publicly under oath before the Committee, which were also published in A GUIDE TO WATERGATE IN COURT (Univ. Publications of America 1975).

In addition, the key evidence directly relating to President Nixon is a matter of public record.  On July 24, 1974, the U.S. Supreme Court ordered Nixon to release the 64 tape recordings that he had withheld from prosecutors.  *Nixon*, 418 U.S. 683.  He released the tapes on August 5, 1974.  In 2011, as a result of a petition by Watergate historians and historical societies, Judge Lamberth ordered the disclosure of President Nixon's grand jury testimony and certain associated grand jury materials.  *In re Petition of Stanley Kutler*, 800 F. Supp. 2d 42 (D.D.C. 2011).  Cumulatively, the public record includes, among other things, "the articles of impeachment, the Watergate Special Prosecution Force's report, the House Judiciary Committee's report, transcripts and materials relating to the House Judiciary Committee's impeachment hearings, the Senate Select Committee on Presidential Campaign Activities' report, published transcripts of compendiums of the White House tapes, and the records of the public trials of President Nixon's co-conspirators."  Ben-Veniste Decl. ¶ 14.

Not only have these primary sources populated the Watergate public historical record, the Watergate story has been revealed through countless reports of investigative journalism, primarily contemporaneous reports in *The Washington Post*, and articles and books by Watergate participants, investigators, and others close to the events.  These include Samuel Dash, chief

---

[10] THE FINAL REPORT OF THE SENATE SELECT COMMITTEE ON PRESIDENTIAL CAMPAIGN ACTIVITIES, S. REP. NO. 96-981 (June 1974), *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015011697870;view=1up;seq=7.

counsel for the Senate Watergate Committee; John Dean, White House Counsel to President

Nixon; H.R. Haldeman, White House Chief of Staff to President Nixon; Leon Jaworski,

Watergate special prosecutor; Jeb Stuart Magruder, a Nixon official who pled guilty to

Watergate-related charges; James W. McCord, an electronics expert involved in the Watergate

burglaries; Lawrence F. O'Brien, an electoral strategist whose office in the Watergate complex

was burglarized; Raymond Price, the chief speechwriter for President Nixon; John J. Sirica, the

Chief Judge for the U.S. District Court for the District of Columbia, who presided over several

key Watergate trials.[11]

## II.   THE ROAD MAP'S RELEVANCE TO THE CURRENT DEBATE ON SPECIAL COUNSEL MUELLER'S FRAMEWORK FOR REPORTING HIS FINDINGS.

Special Counsel Robert Mueller's current investigation has several parallels to Special

Prosecutor Jaworski's Watergate investigation.  *See, e.g.*, Dean Decl. ¶ 12; Goldsmith Decl. ¶¶

23-30.  Both investigations include an inquiry into whether the president has participated in a

criminal conspiracy and whether he has obstructed or attempted to obstruct justice.  Both raise

legal questions, which are actively being debated today, about whether a federal prosecutor has

the power to indict a sitting president and whether a president's obstruction of justice would

amount to a crime or merely an impeachable offense.  *See* Lacovara Decl. ¶ 22 & nn. 1-3;

Goldsmith Decl. ¶ 29.  And finally, both have generated debate about the extent to which the

Office of the Special Prosecutor/Counsel can share the fruits of its investigation with the House

Judiciary Committee for consideration of impeachment – a debate that becomes all the more

pressing if, as the Department of Justice has opined, a sitting president cannot be indicted.

---

[11] For citations to these and other relevant publications, see footnote 17, *infra*.

Goldsmith Decl. ¶¶ 15-17, 26-27; Bates Decl. ¶¶ 23-25; Wittes Decl. ¶¶ 16, 18-20; Lacovara

Decl. ¶¶ 16-17; Dean Decl. ¶ 11.

     According to some scholars, the Special Counsel's ability to report his findings beyond

the Attorney General is an open question because the regulations governing the Special

Counsel's Office (28 C.F.R. § 600.1 *et seq.*), like those governing Watergate Special

Prosecutor's Office, do not specifically address transmittal of a report to the House Judiciary

Committee or to the public.  Bates Decl. ¶ 23.  By contrast, the statute governing the Office of

Independent Counsel, which under Kenneth Starr investigated President Clinton during his

second term, specifically required the Independent Counsel to advise the House of

Representatives of "any substantial and credible information . . . that may constitute grounds for

an impeachment."  28 U.S.C. § 595(c) (now lapsed); Bates Decl. ¶¶ 3, 23.  In the silence left by

Congress, Special Counsel Mueller's Office, like the Watergate Special Prosecutor's Office,

must navigate difficult questions of separation of powers, individual rights, and executive power,

in deciding what type of report, if any, to provide Congress.  Goldsmith Decl. ¶¶ 27-29; *see also*

Bates Decl. ¶ 25.

     Because few judicial precedents expressly apply to these issues, legal analysts have

turned to historical precedent to "inform both legal meanings and proper government practice."

Goldsmith Decl. ¶ 26; *see also* Bates Decl. ¶ 24.  Two precedents can be found in modern U.S.

history.  The first is the Road Map, a spare and non-accusatory recitation of facts intended to

point the House Judiciary Committee to the evidence to draw its own conclusion.  The second is

Kenneth Starr's report on the results of his Clinton investigation (known as the "Starr Report"), a

comprehensive, detailed, and evaluative narrative that both revealed the investigation's findings

and evaluates them against the law.  Goldsmith Decl. ¶ 26; Wittes Decl. ¶ 19.  While the Starr

Report is public, the Road Map remains under seal.  Amid widespread news reports that Special

Counsel Mueller is drafting a report of his findings, the debate over the appropriate framework

for Special Counsel Mueller to report any findings to Congress has drawn increasing public

interest.  *See* Goldsmith Decl. ¶¶ 22-27; Wittes Decl. ¶¶ 18-20.

## ARGUMENT

**I.    THIS COURT HAS INHERENT AUTHORITY TO ORDER DISCLOSURE OF THE ROAD MAP.**

**A.    The District Court Has Inherent Authority to Order Disclosure of Grand Jury Material Where Appropriate and That Authority Is Consistent with Rule 6(e).**

District courts maintain inherent authority to permit the release of grand jury material

under appropriate circumstances.  That discretion, however, must be exercised in light of the

long tradition of keeping grand jury proceedings, and records of those proceedings, from public

view.  *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959).  The Supreme

Court has identified the following reasons for grand jury secrecy:  preventing those about to be

indicted from fleeing, ensuring the "utmost freedom" and security of the grand jury in its

deliberations, encouraging witnesses to testify "fully and frankly," preventing perjury by or

tampering with grand jury witnesses, and ensuring that "persons who are accused but exonerated

by the grand jury will not be held up to public ridicule." *Douglas Oil Co. v. Petrol Stops Nw.*,

441 U.S. 211, 219 & n.10 (1979) (citations omitted).

"Grand jury secrecy is not unyielding, however."  *In re Grand Jury Subpoena, Judith

Miller*, 438 F.3d 1138, 1140 (D.C. Cir. 2006).  Equally part of the tradition is the discretion of

trial courts to order disclosure of grand jury material where appropriate.  *See Douglas Oil Co.*,

441 U.S. at 223 ("[W]e emphasize that a court called upon to determine whether grand jury

transcripts should be released necessarily is infused with substantial discretion."); *Pittsburgh*

*Plate Glass*, 360 U.S. at 399 (noting that the federal courts "have been nearly unanimous in

regarding disclosure [of grand jury material] as committed to the discretion of the trial judge");

*In re Petition of Am. Historical Ass'n*, 49 F. Supp. 2d 274, 286 (S.D.N.Y. 1999) (stating that

"federal courts historically have exercised supervisory power in this area to develop exceptions

to the rule of secrecy when appropriate").  In upholding such exercise of discretion, the Supreme

Court has recognized that the public interest in grand jury secrecy may, in some circumstances,

be outweighed by the competing need for disclosure of grand jury material.  *See Douglas Oil*

*Co.*, 441 U.S. at 223 (noting that "disclosure is appropriate only in those cases where the need

for it outweighs the public interest in secrecy"); *see also United States v. Socony-Vacuum Oil*

*Co.*, 310 U.S. 150, 233–34 (1940) ("Grand jury testimony is ordinarily confidential.  But after

the grand jury's functions are ended, disclosure is wholly proper where the ends of justice

require it." (citation omitted)).

     Federal Rule of Criminal Procedure 6(e) codifies the general rule of grand jury secrecy,

as well as several exceptions to the rule that have developed over time.  Subpart (e)(2)(B)

imposes a non-disclosure obligation on specific categories of persons privy to grand jury

proceedings: "(i) a grand juror; (ii) an interpreter; (iii) a court reporter; (iv) an operator of a

recording device; (v) a person who transcribes recorded testimony; (vi) an attorney for the

government; or (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)."

Fed. R. Crim. P. 6(e)(2)(B)(i)-(vii).  Notably, courts are not included among those bound by the

secrecy obligation.  Subpart (e)(3) enumerates several exceptions to the non-disclosure

obligation, with subpart (e)(3)(E) specifically addressing when a court may authorize disclosure

of a grand jury matter.  Fed. R. Crim. P. 6(e)(3)(E).  In promulgating Rule 6(e), the Advisory

Committee made clear that codification of the tradition of grand jury secrecy preserved the

district court's power to permit disclosure.  *See* Fed. R. Crim. P. 6(e), Advisory Committee's Notes (1944) ("This rule continues the traditional practice of secrecy on the part of members of the grand jury, except when the court permits a disclosure" (citations omitted)).  The Supreme Court likewise has reaffirmed such power since the advent of Rule 6(e).  *See Pittsburgh Plate Glass*, 360 U.S. at 399 (stating that "Rule 6(e) is but declaratory" of the principle that disclosure of grand jury material is committed to the discretion of the trial judge).

Recognizing that Rule 6(e)(3)(E) was intended to complement, rather than displace, the courts' inherent disclosure authority, three circuit courts have expressly held that district courts may order disclosure of grand jury records in special circumstances that fall outside the exceptions expressly enumerated in Rule 6(e)(3)(E).  *See Carlson v. United States*, 837 F.3d 753, 763 (7th Cir. 2016) (holding that "[t]he text and history of the Rules indicate that Rule 6(e)(3)(E) is permissive, not exclusive, and it does not eliminate the district court's long-standing inherent supervisory authority to make decisions as needed to ensure the proper functioning of a grand jury"); *In re Petition of Bruce Craig for Order Directing Release of Grand Jury Minutes*, 131 F.3d 99, 103 (2d Cir. 1997) (concluding that "permitting departures from Rule 6(e) is fully consonant with the role of the supervising court and will not unravel the foundations of secrecy upon which the grand jury is premised"); *In re Hastings*, 735 F.2d 1261, 1268 (11th Cir. 1984) ("[I]t is certain that a court's power to order  disclosure of grand jury records is not strictly confined to instances spelled out in [Rule 6(e)].").

The D.C. Circuit has not specifically addressed the question of whether courts have inherent authority to unseal grand jury records in circumstances other than those enumerated by Rule 6(e)(3).[12]  However, its affirmance of Judge Sirica's transmission of the Road Map to the

---

[12] This question is currently pending before the D.C. Circuit.  *See McKeever v. Sessions*, No. 17–

House Judiciary Committee in *Haldeman* indicates approval of the district courts' exercise of discretion beyond the express provisions of Rule 6(e).  In Judge Sirica's decision, he rejected arguments that disclosure of the Road Map to the House Judiciary Committee was inappropriate because it fell outside Rule 6(e)'s exception for disclosures "preliminarily to or in connection with a judicial proceeding."  *In re Report & Recommendation*, 370 F. Supp. at 1227.  Citing the Advisory Committee's 1944 Notes, Judge Sirica interpreted Rule 6(e) as "cover[ing] a rather narrow area," requiring only that "secrecy must prevail during deliberations, and that any later disclosure will occur at the court's discretion."  *Id.* at 1227-28.  He therefore exercised his discretion in determining that the interests in disclosure of the Road Map to the House Judiciary Committee outweighed the interests in secrecy.  *Id.* at 1229-30.  The D.C. Circuit expressed "general agreement" with Judge Sirica's decision.  *Haldeman*, 501 F.2d at 715.

Persuaded by the opinions of other circuits and the D.C. Circuit's *Haldeman* opinion, district courts in this circuit have recognized and exercised their inherent power to release grand jury material to the public in special circumstances where no Rule 6(e) exception applies.  *See, e.g.*, *In re Application to Unseal Dockets Related to Independent Counsel's 1998 Investigation of President Clinton*, 308 F. Supp. 3d 314 (D.D.C. 2018) (exercising the district court's inherent authority outside of Rule 6(e) to disclose eleven dockets related to Ken Starr's 1998 investigation into President Clinton's business dealings and relationship with a former White House intern));[13] *Kutler*, 800 F. Supp. 2d 42 (D.D.C. 2011) (exercising the district court's inherent authority outside of Rule 6(e) to disclose President Nixon's testimony before the Watergate grand jury).  This well-founded reasoning should apply here as well.

---

5149 (D.C. Cir. filed June 26, 2017).

[13] The government's appeal of this decision is being held in abeyance pending resolution of *McKeever.*

### B.   Rule 6(e)'s History and Text Support the District Court's Inherent Authority to Order Disclosure of Grand Jury Material.

The majority view that district courts maintain inherent authority to disclose grand jury material under appropriate circumstances finds ample support in the text and history of Rule 6(e), as well as the common law that Rule 6(e) codified.

The text of the Rule reflects a recognition of the court's inherent disclosure authority.  By its plain wording, the general rule of secrecy found in Rule 6(e)(2) does not impose an obligation of secrecy on the district court.  Rule 6(e)(2) imposes a secrecy obligation, "[u]nless these rules provide otherwise," on a specific list of people privy to grand jury proceedings, including government attorneys, grand jurors, and court reporters.  Because "[t]he district court is notably absent from this list," it cannot follow that the district court needs express permission from elsewhere in Rule 6(e) to disclose grand jury records.  *See 1998 Investigation of President Clinton*, 308 F. Supp. 3d at 324-25.[14]

Moreover, Rule 6(e)(3)(E), the provision that lists circumstances where the court "may authorize disclosure," is permissive, rather than limiting.  As a matter of statutory construction, this permissive rule that contains none of the limiting language used in other subsections of Rule 6(e) "should not give rise to a negative inference that it abrogates the district court's inherent power" without a clear expression of that purpose.  *Carlson*, 837 F.3d at 762-63 (also noting that Fed. R. Crim. P. 57(b) allows a judge to "regulate practice in any manner consistent with federal law, these rules, and local rules of the district" in the absence of controlling law); *see also Craig*,

---

[14] As the *amicus curiae* in support of the appellant in *McKeever* points out, the government, in its filings in *Haldeman*, itself acknowledged the import of the district court's omission from Rule 6(e)(2)'s disclosure bar—i.e., that Rule 6(e) does not apply where disclosure by the court is involved.  *See* Reply Br. for Court-Appointed *Amicus Curiae* in Supp. of Appellant, *McKeever v. Sessions*, No. 17-5149 (D.C. Cir. filed June 25, 2018), at 7-8 & Add. 1.

131 F.3d at 101-03.

Finally, changes to Rule 6(e) over time demonstrate that it "was not designed to ossify the exceptions to the general rule of grand jury secrecy" by prohibiting district courts from exercising discretion to unseal grand jury records outside the Rule's confines. *Kutler*, 800 F. Supp. 2d at 45.  To the contrary, "exceptions to the secrecy rule" found in Rule 6(e) "have developed through conformance of Rule 6 to the 'developments wrought in decisions of the federal courts,' not vice versa." *Am. Historical Ass'n*, 49 F. Supp. 2d at 285-86 (quoting *Hastings,* 735 F.2d at 1268); *see also Kutler*, 800 F. Supp. 2d at 45-46 (noting that "as new exceptions outside of those enumerated in Rule 6(e) have gained traction among the courts, the scope of the rule has followed suit").  This evolution of the Rule is "in keeping with courts' traditional discretion regarding disclosure . . . and utterly inconsistent with the notion that Rule 6(e) limits courts' ability to disclose grand jury records to those exceptions expressly contemplated by the rule." *Kutler*, 800 F. Supp. 2d at 46 (citation omitted); *see also Carlson*, 837 F.3d at 765.  In short, Rule 6(e) was meant to allow the development of exceptions like the "special circumstances" exception, now firmly established in multiple jurisdictions.

## II.  SPECIAL CIRCUMSTANCES JUSTIFY DISCLOSURE OF THE ROAD MAP.

This petition presents a paradigmatic case for the court to exercise its inherent authority to disclose grand jury materials.  In evaluating whether to disclose the Road Map, the court should weigh the interest in disclosure against the need to maintain secrecy.  Several courts have applied the Second Circuit's formulation of the "special circumstances" exception in *Craig*, which provides a non-exhaustive list of factors for balancing the interests in disclosure against the need to maintain secrecy:

> (i) the identity of the party seeking disclosure; (ii) whether the defendant to the grand jury proceeding or the government opposes the disclosure; (iii) why

disclosure is being sought in the particular case; (iv) what specific information is being sought for disclosure; (v) how long ago the grand jury proceedings took place; (vi) the current status of the principals of the grand jury proceedings and that of their families; (vii) the extent to which the desired material—either permissibly or impermissibly—has been previously made public; (viii) whether witnesses to the grand jury proceedings who might be affected by disclosure are still alive; and (ix) the additional need for maintaining secrecy in the particular case in question.

*Craig*, 131 F.3d at 106.  *See also 1998 Investigation of President Clinton*, 308 F. Supp. 3d at 327; *Kutler*, 800 F. Supp. 2d at 48; *Am. Historical Ass'n*, 49 F. Supp. 2d at 284.  While the assessment is fact-specific, generally courts authorizing disclosure of grand jury material have found that the material has great historical significance to matters of public interest and that the traditional justifications for secrecy have waned due to the passage of time and the deaths or public disclosures of grand jury principals and witnesses.  *See, e.g.*, *1998 Investigation of President Clinton*, 308 F. Supp. 3d at 330-31; *Kutler*, 800 F. Supp. 2d at 50; *Am. Historical Ass'n*, 49 F. Supp. 2d at 283.

This petition presents an extraordinarily compelling interest in disclosure arrayed against a vanishingly small countervailing interest.  Not only does the Road Map carry immense historical significance in understanding the Watergate investigation, it provides a key precedent for assessing the appropriate framework for Special Counsel Mueller to report to Congress any findings of potentially unlawful conduct by President Trump.  Petitioners, moreover, are well positioned to analyze the importance of the Road Map in furthering the public understanding of both Watergate history and of any action Special Counsel Mueller may take with respect to disclosing his investigation's findings.  On the other side of the scales, none of the traditional secrecy interests are implicated by disclosure of the Road Map.

**A.      The Interests in Public Access to the Road Map Militate Strongly in Favor of Authorizing Disclosure.**

The three *Craig* factors relevant to the "interests in disclosure" side of the scales – (1) "why disclosure is being sought" (the third *Craig* factor) (2) "the identity of the party seeking disclosure" (the first *Craig* factor) and (3) "what specific information is being sought" (the fourth *Craig* factor), *Craig*, 131 F.3d at 106 – weigh heavily in favor of releasing the Road Map. These factors are discussed in turn below.

**1.      Petitioners' Reasons for Seeking Disclosure Weigh in Favor of Releasing the Road Map.**

Petitioners seek disclosure of the Road Map for two reasons. First, the Road Map has inherent historical value as a critical missing piece of the Watergate story, which itself would be independently sufficient to justify disclosure. And second, the Road Map illuminates a current debate of extraordinary national importance.

The historical significance of Watergate generally, and of the Road Map specifically, justifies release of the Road Map. As the court in *Kutler* found, "Watergate's significance in American history cannot be overstated. Nearly forty years later, Watergate continues to capture both scholarly and public interest." 800 F. Supp. 2d at 48. Special Prosecutor Jaworski's decision to create the Road Map, in particular, is a pivotal part of Watergate history. The idea of the Road Map originated through intensive discussions within the Special Prosecutor's Office about how to hold President Nixon accountable for alleged crimes uncovered through the investigation, where authority to indict a sitting president was unclear, doing so could impair the prosecution of other principals, and the president's individual rights were at stake. *See* Lacovara Decl. ¶¶ 16-17; Ben-Veniste Decl. ¶¶ 11-12; Goldsmith Decl. ¶¶ 15-17. The Special Prosecutor's Office faced an unprecedented question of how to transmit evidence of the

17

President's unlawful conduct to House of Representatives, a separate branch of government with the authority to impeach but insufficient evidence to move forward with its investigation. *See* Bates Decl. ¶¶ 12-13. The Road Map's format and content, therefore, were the subject of careful deliberation, described in great detail in the Watergate historical literature. *See*, *e.g.*, Ben-Veniste Decl. ¶ 12 & Ex. A. Nonetheless, the document itself remains sealed, depriving the public of a full understanding of the many weighty considerations the Special Prosecutor's Office faced in creating the Road Map.

The continued secrecy of the Road Map also deprives the public of a full understanding of how the House Judiciary Committee arrived at its decision to draft articles of impeachment against President Nixon. Members of the Watergate Special Prosecution Force understand the Road Map to have played an integral role in spurring the House's investigation and decision to impeach. Ben-Veniste Decl. ¶ 13; Lacovara Decl. ¶ 18. Yet precisely what information the House drew upon at that critical turning point in Watergate history remains unknown.

Like President Nixon's grand jury testimony, the Road Map should be released to "enhance the existing historical record, foster further scholarly discussion, and improve the public's understanding of a significant historical event." *Kutler*, 800 F. Supp. 2d at 48. As courts have recognized, "[t]he public must acquire, at an appropriate time, a significant, if not compelling, interest in ensuring the pages of history are based upon the fullest possible record." *Am. Historical Ass'n*, 49 F. Supp. 2d at 295; *see also Kutler*, 800 F. Supp. 2d at 48. That time has come for Watergate history.

The historical interest in filling gaps is fortified where, as here, the "case fosters vigorous and sustained debate not only about the case itself, but also about broader issues concerning fundamental and, at times, countervailing aspects of our democracy." *Am. Historical Ass'n*, 49

F. Supp. 2d at 295.  Here, disclosure of the Road Map not only enhances the public's understanding of the historical facts of Watergate, but also our nation's self-reflection on governmental investigative power, separation of powers, the individual rights of a sitting president, and the role and function of special prosecutors and grand juries themselves.  The history of the Road Map reveals tensions in our democracy concerning the extent of presidential power and immunity, the oversight power of Congress over the executive branch, how that oversight role relates to the role of the special prosecutor, and the limits of the special prosecutor's power.  Goldsmith Decl. ¶ 26; Bates Decl. ¶ 12; Dean Decl. ¶¶ 11-12.  The public interest in such a document is substantial.  *See 1998 Investigation of President Clinton*, 308 F. Supp. 3d at 327 (noting the "substantial public interest in learning more about what led to the impeachment proceedings against President Clinton and in better understanding past interactions between independent prosecutors and the Executive Branch" (quoting CNN Resp. Status Rep. at 2)).

Unlike in previous cases demonstrating a substantial historical interest in grand jury material, however, Petitioners can also demonstrate an urgent need for this specific document to inform one of the most pressing debates taking place in our nation today:  how Special Counsel Mueller can or should share with Congress any evidence he may uncover of potentially unlawful or improper conduct by President Trump.  Because there are few judicial precedents that expressly govern those issues, "the past practices of government actors inform both legal meanings and proper government practice."  Goldsmith Decl. ¶ 26; *see also* Wittes Decl. ¶ 21. The experience of Petitioner Stephen Bates, who attempted to consult the Road Map while working in the Office of Independent Counsel under Ken Starr, but was unable to because it remained subject to grand jury secrecy, underscores this point.  Bates Decl. ¶¶ 15-16.   In

addition to providing Special Counsel Mueller with a crucial precedent as he operates in largely uncharted territory, the Road Map may inform the public's understanding of whatever action he ultimately takes.  Disclosure of the Road Map would provide "a vital touchstone for the public and Congress to assess his actions."  Goldsmith Decl. ¶ 27.  If Special Counsel Mueller decides to send a report to Congress, the Road Map will help the public assess the propriety of his actions.  *Id.*; *see also* Bates Decl. ¶¶ 24-25.  If he does not send a report, the public again will have a basis of comparison for assessing that course of action.  Goldsmith ¶ 28.  Simply put, the Road Map has extraordinary relevance to the ongoing discourse about how Special Prosecutor Mueller may proceed.  *See* Goldsmith Decl. ¶ 30; Wittes Decl. ¶¶ 18-23; Bates Decl. ¶ 24; Lacovara Decl. ¶ 21; Ben-Veniste Decl. ¶ 17.

Finally, the Road Map will speak to the ongoing debate on the legal questions of whether the President can violate a federal obstruction of justice statute in the discharge of his duties as chief executive.  Goldsmith Decl. ¶ 29.  Academics and commentators have arrived at different conclusions on that question.[15] Because many of President Trump's actions that his critics say constitute obstruction of justice had parallels in the Nixon presidency, whether or not Special Prosecutor Jaworski cited to such actions in the Road Map is a relevant data point.  *Id.*  For this reason and the several others described above, the compelling public interest in the Road Map justifies disclosure.

---

[15] *See, e.g.,* Daniel J. Hemel & Eric A. Posner, *Presidential Obstruction of Justice*, 106 CAL. L. REV. 1277 (2018); Benjamin Wittes, *How Can the President Obstruct Justice?,* LAWFARE (Dec. 5, 2017), https://www.lawfareblog.com/how-can-president-obstruct-justice; Josh Blackman, *Obstruction of Justice and the Presidency: Part I*, LAWFARE (Dec. 5, 2017), https://www.lawfareblog.com/obstruction-justice-and-presidency-part-i; Josh Blackman, *Obstruction of Justice and the Presidency: Part II*, LAWFARE (Dec. 12, 2017), https://www.lawfareblog.com/obstruction-justice-and-presidency-part-ii.

### 2.      Petitioners' identities weigh in favor of disclosure.

The identity of the Petitioners carries great weight in the *Craig* analysis, *Craig*, 131 F.3d

at 106, and substantially favors disclosure of the Road Map.  Petitioners are extremely well

positioned to analyze the Road Map's historical significance as well as its import to today's

debate about the nature of a potential Mueller report, the propriety of Mueller's actions, and the

sensitive issues of executive power, separation of powers, and individual rights attendant to

Special Counsel Mueller's investigation and any report he releases.  They are also extremely

well suited to deliver that analysis to a broad and engaged public audience.

Petitioner Benjamin Wittes is the editor-in-chief of *Lawfare* and Senior Fellow in

Governance Studies at the Brookings Institution.  Wittes Decl. ¶ 1.  In addition to writing

regularly on *Lawfare* – which in 2017 received more than 15 million page views by more than

6.4 million unique visitors, *id.* ¶ 10 – he contributes regularly to major news publications and

television news programs.  *Id.* ¶¶ 8-9.  He also authored a book on Starr's tenure as independent

counsel.  *Id.* ¶ 7.  Since 2017, he has written dozens of articles and essays on the legal and

institutional contours of Special Counsel Mueller's investigation in leading publications.  *Id.* ¶

17.  In a March 2018 essay on *Lawfare*, he specifically analyzed the significance of the Road

Map as a potentially salient historical precedent for understanding the range of options available

to Special Counsel Mueller.  *Id.* ¶¶ 18-19 (citing Benjamin Wittes & Quinta Jurecic, *Will We

Ever Learn What Bob Mueller Knows?*, LAWFARE (Mar. 21, 2018)).

Petitioner Jack Goldsmith is a professor at Harvard Law School.  During the presidency

of George W. Bush, Goldsmith was the Assistant Attorney General for the Office of Legal

Counsel, where he advised the White House, the Attorney General, and federal agencies on

constitutional, federal statutory and treaty issues.  *Id.* ¶ 6.  As a scholar, he has written

extensively about presidential power and the office of the presidency.  *Id.* ¶¶ 2-4, 7.  Among

other things, he has written two books on the topic of the presidency, presidential power, and

presidential history, published scholarly articles in the nation's leading law reviews on those

topics, and published commentary on similar themes numerous leading news publications.  *Id.* ¶

3.  Goldsmith also recently published an essay exploring the extent of Special Counsel Mueller's

authority to issue a report to Congress in which he cited the Road Map as an instructive historical

precedent.  *Id.* ¶¶ 23-24.

As a former OIC staff member who participated in drafting the report submitted to

Congress by Independent Counsel Ken Starr, Petitioner Bates provides a singular perspective on

what the Road Map means for Special Counsel Mueller's investigation.  In 1997, while

researching how the OIC should convey evidence supporting allegations of impeachable offenses

to the House of Representatives, Bates sought to examine the Road Map as a relevant historical

precedent.  Bates Decl. ¶¶ 4, 15.  A national archivist denied him access because the Road Map

was still under seal.  *Id.* ¶ 16.  Bates is preparing to write an article comparing the currently-in-

effect Special Counsel regulations to Section 595(c), which permitted the OIC to transmit the

Starr Report directly to Congress.  *Id.* ¶ 23.  In Bates' view, "the value of the Road Map as

precedent may be much greater for Special Counsel Mueller today than it was for the OIC in

1997 and 1998" because of how similarly situated Special Counsel Mueller is to Special

Prosecutor Jaworski.  *Id.* ¶ 24.  In conducting research for his article, Bates again sought (this

time through a Freedom of Information Act request) and was denied access to the Road Map by

the National Archives.  *Id.* ¶ 17.

### 3.     The narrow scope of Petitioners' request weighs in favor of disclosure.

Petitioners have narrowly tailored their request to the purpose of their petition.  They

seek disclosure of only the 55 pages of sparse factual statements that the Watergate grand jury

transmitted to the House.  This document focuses on the key evidence of President Nixon's

involvement in a criminal conspiracy, rather than evidence against other Watergate subjects or

the various offshoots of the investigation.  Ben-Veniste ¶ 11.  Petitioners do not seek the

voluminous documents that accompanied and were referenced in the Road Map.  Because

Petitioners seek no more than is necessary to further the important public interests outlined

above, this factor, too, should weigh in favor of disclosure.  *See Kutler*, 800 F. Supp. 2d at 48-9

(granting petition that sought disclosure of only the transcript of President Nixon's grand jury

testimony and certain associated materials).

### B.     Any Remaining Secrecy Interests in the Road Map Are Minimal and Outweighed by the Compelling Interest in the Road Map's Release.

On the other side of the scales, the court must weigh the secrecy interests in the Road

Map.  The relevant considerations are (1) the passage of time and the defendant's position on

disclosure (the second and fifth *Craig* factors); (2) the current status of the principals of the

grand jury proceedings and the privacy interests of grand jury witnesses who might be affected

by disclosure (the sixth and eighth *Craig* factors); and (3) the extent to which the desired

material – either permissibly or impermissibly – has been previously made public (the seventh

*Craig* factor).  *Craig*, 131 F.3d at 106.  As shown below, each of these factors weighs in favor of

disclosure.

1.     **The passage of forty-four years and the death of President Nixon greatly reduce any secrecy interest in the Road Map.**

In the analysis of whether special circumstances warrant disclosure, the "timing of the request remains one of the most crucial elements" because "the passage of time erodes many of the justifications for continued secrecy." *Craig*, 131 F.3d at 107.  Here, forty-four years have elapsed since the Road Map's transmission to the House, and the Watergate investigations have long closed.  President Nixon, moreover, passed away in 1994.  Eight years ago, these facts were enough to persuade the court in *Kutler* that the traditional objectives justifying grand jury secrecy were not implicated in a petition seeking the release of President Nixon's testimony.  800 F. Supp. 2d at 48-49.  Other courts have drawn the same conclusion when faced with requests for decades-old grand jury material.  *See, e.g., Am. Historical Ass'n*, 49 F. Supp. 2d at 277 (finding no national security or privacy interests implicated by 50-year-old grand jury testimony related to the investigation of Alger Hiss); *In re Nat'l Sec. Archive for Order Directing Release of Grand Jury Minutes*, No. 08 Civ. 6599, 2008 WL 8985358, at *1 (S.D.N.Y. Aug. 26, 2008) (ordering disclosure of 57-year-old testimony related to Julius and Ethel Rosenberg grand jury, in part because witnesses had died or otherwise could not be located); *In re Tabac*, No. 3:08-mc-0243, 2009 WL 5213717, at *1 (M.D. Tenn. Apr. 14, 2009) (ordering disclosure of 46-year-old grand jury testimony related to indictment of Jimmy Hoffa).  The secrecy interests are at least as negligible here.

2.     **The current status of Watergate principals and the privacy interests of grand jury witnesses do not justify continued secrecy.**

As an initial matter, the very secrecy interests at stake here were previously found to be surmountable in 1974, when Judge Sirica allowed the limited disclosure of the Road Map to the House Judiciary Committee.  Judge Sirica determined that the secrecy interests were diminished

because "the Grand Jury ha[d] ended its work," so there was no need to protect against flight

risk, witness tampering, encroachments on grand jury deliberations, or prejudice to the innocent

accused.  *In re Report & Recommendation*, 370 F. Supp. at 1229.  Moreover, the "person on

whom the Report focuses, the President of the United States, [did] not object[] to its release to

the Committee."  *Id.*  Others implicated by the Road Map, Judge Sirica found, were "involved

only indirectly" and "have already been the subject of considerable public testimony and will no

doubt be involved in further testimony, quite apart from this Report."  *Id.* at 1230.  And indeed,

although Judge Sirica was authorizing disclosure only to the House Judiciary Committee, he

noted that "these considerations might well justify even a public disclosure of the Report."  *Id.*

The secrecy interests are even less weighty today.

Given that forty-four additional years have now passed, the secrecy interests in the Road

Map have even further diminished, if not disappeared.  Not only has President Nixon passed

away, but many other Watergate principals, people with close ties to President Nixon or his

Administration, and people involved in conducting the investigations are also deceased.[16]  Dean

---

[16] The petitioners in *Kutler* advised the court in September 2010 of the following deaths of
Watergate principals and others close to the investigation: Alexander Haig (died Feb. 2010),
Herbert Miller (died Nov. 2009), Bernard Barker (died July 2009), Donald Alexander (died Feb.
2009), W. Mark Felt (died Dec. 2008), E. Howard Hunt (died Jan. 2007), L. Patrick Gray (died
July 2005), Peter Rodino (died May 2005), Rose Mary Woods (died Jan. 2005). Fred LaRue
(died July 2004), Archibald Cox (died May 2004), Samuel Dash (died May 2004), Ron Ziegler
(died Feb. 2003), Richard Helms (died Oct. 2002), Herman Talmadge (died Mar. 2002), Vernon
Walters (died Feb. 2002), James St. Clair (died Mar. 2001), Richard Kleindienst (died Feb.
2000), Elliot Richardson (died Dec. 1999), John Ehrlichman (died Feb. 1999), Charles "Bebe"
Rebozo (died May 1998), Maurice Stans (died Apr. 1998), H.R. Haldeman (died Nov. 1993),
John Connally (died June 1993), John J. Sirica (died Aug. 1992), Henry Petersen (died June
1991 ), John Mitchell (died Nov. 1988), Sam Ervin (died Apr. 1985), Leon Jaworski (died Dec.
1982), J. Fred Buzhardt (died Dec. 1978), Howard Hughes (died Apr. 1976), J. Edgar Hoover
(died May 1972). *See* Mem. of Law in Supp. of Pet'n, *Kutler*, 1:10-mc-00547 (D.D.C. filed Sept.
13, 2010), ECF No. 1, at 38-39.

The Petitioners are aware of one living Watergate participant, Gordon C. Strachan, who served

Decl. ¶ 16.  Others have no cognizable privacy interest because they themselves have publicized

their involvement in the Watergate story through writings or interviews.[17]  John Dean, perhaps

one of the individuals most likely to have privacy interests at stake, expressly consents to the

disclosure of any material relating to him that the Road Map may include.  Dean Decl. ¶ 15.

---

as H. R. Haldeman's principal political assistant and general counsel of the U.S. Information
Agency.  Strachan is unlikely to have privacy interests arising from the substance of the Road
Map because his role in Watergate has been described in detail in the House Judiciary
Committee's Statements of Information, the House Judiciary Committee's 1974 Report, and the
WSPF Report, as well as secondary accounts of Watergate.  The Statements of Information, for
instance, recount much of Strachan's testimony before the Senate Select Committee on
Presidential Campaign Activities.  *See, e.g.*, Statement of Information: Book I – Events Prior to
the Watergate Break-In, Hearings of the House Judiciary Committee on Resolution to Impeach
President Nixon (H. Res. 803), ¶¶ 8-9.  To the extent the Road Map contains any previously
undisclosed information about Strachan that implicates his legitimate privacy interests, the
appropriate course may be to redact such information.

[17] The petitioners in *Kutler* advised the court of the following publications by people involved in
the Watergate investigation:  SAMUEL DASH, CHIEF COUNSEL: INSIDE THE ERVIN COMMITTEE-
THE UNTOLD STORY OF WATERGATE (1976); JOHN DEAN, BLIND AMBITION (1976); H.R.
HALDEMAN AND JOSEPH DIMONA, THE ENDS OF POWER (1978); LEON JAWORSKI, THE RIGHT AND
THE POWER: THE PROSECUTION OF WATERGATE (1976); FRANK MANKIEWICZ, U.S. V. RICHARD
M. NIXON: THE FINAL CRISIS (1975); JEB STUART MAGRUDER, AN AMERICAN LIFE: ONE MAN'S
ROAD TO WATERGATE (1974); JAMES W. MCCORD, A PIECE OF TAPE: THE WATERGATE STORY:
FACT AND FICTION (1974); LAWRENCE F. O'BRIEN, NO FINAL VICTORIES: A LIFE IN POLITICS-
FROM JOHN F. KENNEDY TO WATERGATE (1974); RAYMOND PRICE, WITH NIXON (1977); JOHN J.
SIRICA, TO SET THE RECORD STRAIGHT: THE BREAK-IN, THE TAPES, THE CONSPIRATORS, THE
PARDON (1979); JOHN CONNALLY AND MICKEY HERSKOWITZ, IN HISTORY'S SHADOW: AN
AMERICAN ODYSSEY (1993); HARRY S. DENT, COVER-UP: THE WATERGATE IN ALL OF US (1986);
JOHN EHRLICHMAN, WITNESS TO POWER: THE NIXON YEARS (1982); SAM J. ERVIN, JR., THE
WHOLE TRUTH: THE WATERGATE CONSPIRACY (1980); MARK FELT AND JOHN O'CONNOR, A G-
MAN'S LIFE: THE FBI 'DEEP THROAT' AND THE STRUGGLE FOR HONOR IN WASHINGTON (2006);
LEONARD GARMENT, CRAZY RHYTHM: MY JOURNEY FROM BROOKLYN, JAZZ, AND WALL STREET
TO NIXON'S WHITE HOUSE, WATERGATE, AND BEYOND … (1997); H.R. HALDEMAN, THE
HALDEMAN DIARIES: INSIDE THE NIXON WHITE HOUSE (1994); RICHARD KLEINDIENST, JUSTICE:
THE MEMOIRS OF ATTORNEY GENERAL RICHARD KLEINDIENST (1985); EGIL "BUD" KROGH AND
MATTHEW KROGH, INTEGRITY: GOOD PEOPLE, BAD CHOICES, AND LIFE LESSONS FROM THE
WHITE HOUSE (2007); G. GORDON LIDDY, WILL: THE AUTOBIOGRAPHY OF G. GORDON LIDDY
(1996); WILLIAM SAFIRE, BEFORE THE FALL: AN INSIDE VIEW OF THE PRE-WATERGATE WHITE
HOUSE (2005). *See* Mem. of Law in Supp. of Pet'n, *Kutler*, 1:10-mc-00547 (D.D.C. filed Sept.
13, 2010), ECF No. 1, at nn.6, 8.

Finally, most or all of the content included in the Road Map was subsequently made public in the trial of Watergate defendants and related judicial proceedings, the House Judiciary Committee's Statements of Information, and in the reports released by the House Judiciary Committee, the Senate, and the Watergate Special Prosecutor Force.  Ben-Veniste Decl. ¶ 14; Bates Decl. ¶¶ 14, 32.  Thus, here, as in *Kutler*, "[g]iven the extent to which Watergate figures – both indicted and unindicted – have written, spoken, or testified about Watergate, privacy concerns are of limited significance."  *Kutler*, 800 F. Supp. 2d at 49.

Where the requested grand jury materials are decades old, some courts have focused on "the forward-looking interest in ensuring future grand jurors and grand jury witnesses will not be inhibited due to the possibility of subsequent disclosure of proceedings based on historical interest."  *Am. Historical Ass'n*, 49 F. Supp. 2d at 292.  As an initial matter, information related to the Watergate grand jury has largely already become public.  Moreover, the inhibiting effect of disclosing the 44-year-old Road Map is likely insignificant.  Potential grand jurors and witnesses in future investigation are unlikely to be influenced by the prospect of a court unsealing records of the proceeding decades later, "especially when compared with far more immediate potential causes of disclosure, such as leaks, general press attention, public statements by witnesses and revelations at trial."  *Id.*  In such investigations, "the often extensive contemporaneous attention given to the case is likely to magnify the importance of those more proximate causes of disclosure in the minds of potential jurors and witnesses, and make the possibility of disclosure decades hence based on historical interest seem a trifling concern, or even an inevitability."  *Id.*; *see also Kutler*, 800 F. Supp. 2d at 49.  Thus, the secrecy interest rooted in ensuring future grand jurors and grand jury witnesses' participation is not compelling here.

3.       **The extent to which the Road Map and its contents have been previously made public diminishes any remaining secrecy interest.**

The fact that the Road Map remains under seal is remarkable to those familiar with Watergate history.  *See, e.g.*, Wittes Decl. ¶ 22; Lacovara Decl. ¶ 19.  That is for two reasons. First, the Road Map's format and the story of the Road Map's origin and transmission to the House Judiciary Committee have been chronicled with vivid detail in the historical accounts of James Doyle, Richard Ben-Veniste, and others.  Wittes Decl ¶¶ 11, 13-15; Ben-Veniste Decl. ¶ 11 & Ex. A.  The Road Map is thus part of the public imagination, but not part of the public record.

Second, the grand jury material likely contained in the Road Map – that is, the evidence that incriminated President Nixon – has been revealed to the public through a variety of means over the last forty-four years.  The public record that likely covers the grand jury material in the Road Map includes President Nixon's grand jury testimony, the Nixon White House tapes, the House Judiciary Committee's final report, the WSPF Report, portions of grand jury testimony of certain Watergate figures included in published House Judiciary Committee impeachment hearings materials, and the Senate Watergate Report.  Ben-Veniste Decl. ¶ 14.  Given the extensive Watergate public record, it is hard to believe that the Road Map contains much substance that is not already known to the public.  The only remaining secret is the Road Map's structure – how the evidence was assembled, curated, and presented.

## III.   **DISCLOSURE IS ALSO WARRANTED UNDER RULE 6(E).**

Even if the court determines that it does not have the inherent supervisory power to unseal the Road Map where no Rule 6(e)(3)(E) exception applies, disclosure is still warranted under Rule 6(e) itself.  Rule 6(e)(6) pertaining to "Sealed Records" provides: "Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal *to the extent and as*

*long as necessary* to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6) (emphasis added). The D.C. Circuit has interpreted this part of the Rule to permit disclosure of grand jury material that is no longer entitled to secrecy because it is already public. *See In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1138 (D.C. Cir. 2006). In *Miller*, the court ordered disclosure, with limited redaction, of sealed pages of a judge's opinion that contained grand jury material where the grand jury had already indicted the target of the investigation because the "indictment, now part of the public record, reveal[ed] some grand jury matters, and we see little purpose in protecting the secrecy of grand jury proceedings that are no longer secret." *Id.* at 1140. The D.C. Circuit reasoned that "'[t]here must come a time . . . when information is sufficiently widely known that it has lost its character as Rule 6(e) material. The purpose in Rule 6(e) is to preserve secrecy. Information widely known is not secret.'" *Id.* (quoting *In re Oliver L. North*, 16 F.3d 1234, 1235 (D.C. Cir. 1994)).

At this point, any grand jury information referenced in the Road Map has long since become sufficiently widely known to lose its Rule 6(e) character. Ben-Veniste Decl. ¶ 16 (stating his view as a Watergate prosecutor that "the Road Map has lost its Rule 6(e) character given the public disclosures of the grand jury material contained therein"). Even in January 1975, at a hearing before a subcommittee of the House Judiciary Committee on the WSPF's authority to issue the WSPF Report, Watergate Special Prosecutors Henry Ruth and Leon Jaworski testified that the facts about President Nixon's involvement in the Watergate cover-up already had been made public.[18] As discussed in the preceding section, nothing remains secret

---

[18] HOUSE OF REPRESENTATIVES COMMITTEE ON THE JUDICIARY: AUTHORITY TO ISSUE FINAL REPORT BY SPECIAL PROSECUTOR (Jan. 30, 1975), at 3 ("To a large extent, the goal of public disclosure as to the so-called Watergate coverup has been accomplished by the impeachment hearings and conclusions of the House Judiciary Committee, the hearings of the Senate Select Committee on Presidential Campaign Activities and the information made public by the Special

about what President Nixon did to precipitate the articles of impeachment that the House of Representatives drew against him.  Accordingly, maintaining the Road Map under seal is not necessary "to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed. R. Crim. P. 6(e)(6).  Given the compelling interests in disclosure in this case, the district court should exercise its discretion to release the Road Map under Rule 6(e)(6).

## CONCLUSION

Petitioners urge the court to order the disclosure of the Road Map either pursuant to its inherent authority to disclosure grand jury material or on the grounds that the Road Map should no longer be treated as Rule 6(e) material because its contents are publicly known.  Disclosure will enhance an important public discourse at a critical moment in history, while harming none. For all of the foregoing reasons, the petition should be granted.


Dated: September 14, 2018               Respectfully submitted,


                                        LAURENCE SCHWARTZTOL (D.D.C. No. MA0007)
                                        larry.schwartztol@protectdemocracy.org
                                        DEANA EL-MALLAWANY*
                                        deana.el-mallawany@protectdemocracy.org
                                        **The Protect Democracy Project, Inc.**
                                        10 Ware Street
                                        Cambridge, MA 02138
                                        Telephone: (202) 599-0466
                                        Fax: (929) 777-8428

---

Prosecutor's Office through normal judicial channels."), *available at* https://babel.hathitrust.org/cgi/pt?id=pur1.32754077571911;view=1up;seq=1; *id.* at 10 ("[T]he testimony with respect to the Watergate coverup, as it is generally termed is complete.  I don't think you are going to find very much on that subject that hasn't been made public through the trial."); *id.* at 19-20 ("[I]n terms of the Watergate coverup . . . as to Mr. Nixon, you are just not going to find that much more.  I remember everybody wanted a smoking gun and they got the smoking gun.  We do not have 10 more smoking guns lying around our office.").

CAMERON KISTLER (D.C. Bar No. 1008922)
cameron.kistler@protectdemocracy.org
JUSTIN FLORENCE (D.C. Bar No. 988953)
justin.florence@protectdemocracy.org
**The Protect Democracy Project, Inc.**
2020 Pennsylvania Avenue NW, #163
Washington, D.C. 20006
Telephone: (202) 599-0466
Fax: (929) 777-8428

STEPHANIE LLANES*
stephanie.llanes@protectdemocracy.org
**The Protect Democracy Project, Inc.**
222 Broadway, 19th Floor
New York NY 10038
Telephone: (202) 599-0466
Fax: (929) 777-8428


* *pro hac vice* application forthcoming


*Attorneys for Petitioners*