## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: PETITION OF BENJAMIN ) 
WITTES, JACK GOLDSMITH & ) 
STEPHEN BATES ) 
                                                ) 
                                                )      Misc. Case No. _____
                                                  ) 
                                                  ) 
_____ )

### DECLARATION OF STEPHEN BATES

I, Stephen Bates, hereby declare as follows:

1. I am an Associate Professor at the Hank Greenspun School of Journalism and Media Studies at the University of Nevada, Las Vegas (UNLV). I joined the faculty in August 2006. I also co-teach a course on law and technology at UNLV's Boyd School of Law. The focus of my teaching and writing has been political communication and the intersection of politics with the press and the First Amendment. I also have taught and written about law and technology, privacy, libel, reporter's privilege, and other subjects.

2. Before entering academia, I served as literary editor of the *Wilson Quarterly* and published articles as a freelance journalist. I obtained my J.D. from Harvard Law School in 1987 and my A.B. from Harvard College in 1982.

3. From 1995 to 1999, I worked on the staff of the Office of Independent Counsel (OIC) under Independent Counsel Kenneth W. Starr. One of my tasks was to help draft the OIC's referral to the House of Representatives, which, pursuant to 28 U.S.C. § 595(c) (now lapsed), summarized substantial and credible information that could constitute grounds for the impeachment of President Clinton. The referral, which the OIC submitted

1

to the House of Representatives on September 9, 1998, came to be known as the Starr

Report.

4.   While on the OIC staff, I researched two issues raised by Section 595(c): first, what sort

of allegations could give rise to the impeachment of a president under the Constitution;

and, second, how the OIC could best convey evidence supporting such allegations to the

House of Representatives for consideration as possible grounds for an impeachment. In

the course of the research, I examined the publications of the House Judiciary Committee

as it considered the impeachment of President Nixon, the reports of the Watergate Special

Prosecution Force (WSPF), court cases litigated by the WSPF, autobiographies and

biographies of those involved in the Watergate scandal, and historical accounts and

contemporaneous press coverage of Watergate, as well as historical accounts of other

impeachment inquiries and the legislative history of Section 595(c). I also consulted with

Sam Dash, the former Chief Counsel for the Senate Watergate Committee, who was an

adviser to the OIC. In addition, I examined archival materials, as detailed below.

5.   Since leaving the OIC in 1999, I have continued to research Watergate-related topics. In

*Slate* in 2001, I published an article on a libel lawsuit brought by one Watergate figure,

G. Gordon Liddy.[1]

6.   I currently plan to write one or more articles related to the Road Map and Special

Prosecutor Jaworski's transmittal of evidence to the House of Representatives.

7.   This declaration is based on my experience as a scholar, professor, writer, and Associate

Independent Counsel.

8.   In this declaration, I seek to provide, *first*, an overview of the Road Map, my interest in it,

and my unsuccessful efforts to obtain it; *second*, information regarding the historical

---

[1] Stephen Bates, *Flipping His Liddy*, Slate (Feb. 5, 2001).

importance of the Road Map; *third*, an explanation of the importance of the Road Map in
the context of Special Counsel Robert Mueller's current investigation; and, *finally*, an
analysis of the attenuated privacy interests in the Road Map.

OVERVIEW OF THE ROAD MAP

9. In the course of my research at OIC in preparation for drafting a referral to the House of
Representatives, I obtained material relating to Watergate from the Records of the WSPF
at the National Archives and the Leon Jaworski Papers in the Texas Collection at Baylor
University. In the years since, I have acquired additional Watergate-related material from
the William S. Cohen Papers at the University of Maine and the John J. Sirica Papers at
the Library of Congress. I have also consulted archivists about the Elizabeth Holtzman
Papers at Harvard's Schlesinger Library, the Howard Fields Papers at Duke University's
Goodson Law Library, and the Albert E. Jenner Papers at the Chicago History Museum.

10. One document I have been unable to examine is the so-called Road Map, which the
WSPF prepared as an index to evidence transmitted to the Judiciary Committee of the
House of Representatives for use in the Nixon impeachment inquiry.

11. My understanding of the Road Map is based on memoirs by Judge John J. Sirica,
Watergate Special Prosecutor Leon Jaworski, WSPF prosecutors Richard Ben-Veniste
and George Frampton, Jr., and Special Assistant to Watergate Prosecutors James Doyle,
as well as a court transcript from the Sirica Papers, published opinions by Judge Sirica
and the D.C. Circuit, and accounts by journalists, particularly United Press International
reporter Howard Fields, and historians.

12. From those sources, I understand that the House Judiciary Committee sought access to
evidence gathered by WSPF prosecutors working with the grand jury, and that WSPF

prosecutors wanted to provide the evidence. Special Prosecutor Jaworski had concluded that a sitting president could not be indicted; impeachment by the House and removal by the Senate were the only remedies for criminal acts by a president. At the same time, the WSPF had obtained important evidence through the grand jury, which the House Judiciary Committee had not obtained. It seemed possible that the WSPF possessed the evidence but not the constitutional authority to use it, whereas the House possessed the constitutional authority but not the evidence.

13. The prosecutors believed that, in addition to the raw evidentiary materials, the House Judiciary Committee would benefit from an explanatory overview of the evidence, to be prepared by the prosecutors. Special Prosecutor Jaworski believed that Judge Sirica would not authorize transmittal of an accusatory document. As a result, prosecutors prepared a neutral, non-accusatory index to the evidence, which came to be known as the Road Map. The Road Map was adopted by the grand jury, and Judge Sirica and the D.C. Circuit authorized transmittal of the Road Map and pertinent evidence to the Judiciary Committee, under seal.

14. In July 1974, the House Judiciary Committee published extensive records of its impeachment proceedings.[2]  Included among the thousands of pages of documents were the Statements of Information that the House Judiciary Committee's impeachment inquiry staff presented at the impeachment hearings from May to July 1974, setting forth the evidence relating to the Watergate break-in and cover-up.[3]  According to several sources, the impeachment inquiry staff's presentation was modeled on the Road Map in

---

[2] Hearings before the House Judiciary Committee on Resolution to Impeach President Nixon (H. Res. 803), *available at* https://archive.org/details/WatergateHearingsBeforeTheHouseCommitteeOnTheJudiciary.
[3] *Id.* (see Statement of Information, Book I-Book IV).

that it presented factual statements, with citations to the evidence, while abstaining from

conclusions so that each Judiciary Committee member could draw his or her own

conclusion.  Significantly, the published Statements of Information quoted the grand jury

testimony of many witnesses, citing the evidence provided by the Watergate grand jury as

the source.  They also reprinted pages from the grand jury transcripts.  Individuals whose

excerpted grand jury testimony appears in these published materials include John Dean,

Fred LaRue, Jeb Magruder, L. Patrick Gray, John Ehrlichman, H. R. Haldeman, Richard

Kleindienst, E. Howard Hunt, Egil Krogh, Ronald Ziegler, Henry Petersen, and Charles

Colson, among others. The Statements of Information are important for two reasons.

First, in form and substance, they demonstrate the historic importance of the Road Map

and the evidence transmitted with it. Second, in extensively citing, quoting, and

reprinting grand jury transcripts, the Statements of Information indicate that

confidentiality concerns surrounding the Road Map have diminished.

15. I initially wanted to look at the Road Map while on the staff of the OIC. Under Section

595(c), the OIC could transmit evidence to the House of Representatives without the

authorization of the judge supervising the grand jury, so the particular concern that

animated the Watergate prosecutors, in seeking Judge Sirica's authorization, did not

apply. Nonetheless, I believed that the Road Map might constitute a model worthy of

consideration by Independent Counsel Starr and his staff. Although the Road Map was

not necessary to the OIC as a legal precedent, I was interested in it as a historical

precedent.

16. When I asked, however, an archivist at the National Archives told me in 1997 that I could

not see the Road Map, because it was still under the seal imposed by Judge Sirica.

17. I have remained interested in Watergate in general and the Road Map in particular since I left the OIC. In connection with an article I am preparing to write, I requested the Road Map again on July 10, 2018, via the Freedom of Information Act. On July 26, Christopher Abraham, an archivist with the Special Access and FOIA Branch of the National Archives, informed me that "[t]he report is sealed to preserve the secrecy of grand jury proceedings per 5 USC 552 (b)(3), pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure." I have been unable to find a copy of the Road Map through the other archival collections noted above.

18. I believe that the Road Map constitutes an important part of the historical record of Watergate, that it has relevance to current and future federal investigations of a sitting president, and that its public revelation would not impinge substantially on privacy interests.

## THE ROAD MAP'S HISTORICAL IMPORTANCE

19. Watergate represents a unique episode in the history of American politics. Never before or since has an American president, facing the likelihood of impeachment by the House of Representatives, resigned. In 2011, a court, in releasing President Nixon's grand jury testimony, noted that "Watergate's significance in American history cannot be overstated. Nearly forty years later, Watergate continues to capture both scholarly and public interest." *In re Petition of Stanley Kutler*, 800 F. Supp. 2d 42, 48 (D.D.C. 2011).

20. People ascribe President Nixon's downfall to various factors, including the Senate Watergate investigation, the revelations by former White House counsel John Dean, and the investigative reporting by *The Washington Post* and other newspapers. The historical significance of the WSPF's Road Map, in my view, has been neglected.

21. I intend to write an article about the WSPF's transmittal of materials to the House Judiciary Committee. The Road Map is a key part of the story, and it would be enormously helpful for me to be able to consult it in my research.

### THE ROAD MAP'S RELEVANCE TO CURRENT QUESTIONS OF URGENT PUBLIC CONCERN

22. In *The Washington Post*, I recently wrote about Special Counsel Mueller's ongoing investigation of President Trump.[4] I argued that the Special Counsel has the constitutional authority to subpoena President Trump to testify before the grand jury, but that as a prudential matter, he should not exercise it.

23. For another article, I have been researching the regulations governing reports by Special Counsel Mueller. In my view, the regulations make no provision for transmittal of grand jury information to the House of Representatives, either directly by the Special Counsel or indirectly, through the Attorney General (or acting Attorney General). Because Section 595(c) has lapsed, it appears that the Special Counsel cannot follow the approach that the OIC took in 1998 with its referral. Instead, the Special Counsel apparently must seek the authorization of the district judge supervising the grand jury, as in Watergate. Although I focus here on investigations of a president by a special counsel, the same arguments would apply to any federal prosecutor, such as a United States Attorney, in possession of evidence that could constitute grounds for the impeachment of the president.

24. In seeking judicial authorization to transmit grand jury evidence to the House of Representatives, the Special Counsel may find it helpful to consider the approach of the WSPF Road Map from 1974, just as I had hoped to consider it in 1997 and 1998. Indeed,

---

[4] Stephen Bates, *Mueller Could Subpoena Trump. But It's Not Worth the Chaos That Would Follow*, Wash. Post. (July 13, 2018).

the value of the Road Map as precedent may be much greater for Special Counsel

Mueller today than it was for the OIC in 1997 and 1998. To reiterate, the OIC under

Section 595(c) could transmit grand jury material to the House directly; my

understanding is that Special Counsel Mueller, like Special Prosecutor Jaworski, cannot

do so without judicial authorization. The Road Map thus may represent important legal as

well as historical precedent for Special Counsel Mueller.

25. Beyond the Special Counsel, the public would benefit from disclosure of the Road Map,

as a model of a report summarizing evidence relating to a president, prepared by a

prosecutor and transmitted to the House of Representatives. Disclosure of the Road Map

would also help clarify, in the public mind, the distinction between the Department of

Justice, acting as the entity charged with enforcing federal criminal law, and the House of

Representatives, acting as the entity charged with determining whether the impeachment

of a president is warranted. Some commentators now appear to harbor the misconception

that the Special Counsel and the House collaborate in investigating a president. The

Watergate example shows that they exercise very different functions and that, at least

with regard to grand jury evidence, collaboration is prohibited. The Watergate example,

in fact, demonstrates that a prosecutor can share grand jury information with the House of

Representatives only with permission of the court.

26. The impeachment inquiry staff of the House Judiciary Committee in 1974 may have

relayed the most important factual revelations from the Road Map in the Statements of

Information, which are already public. Similarly, the articles of impeachment probably

include the key facts from the Road Map. One might argue, accordingly, that the Road

Map holds only modest importance as a historical document. That conclusion, however,

is misguided. Even if the Road Map proves to contain nothing new in the way of
allegations or evidence, its importance is great. Outside of the now-lapsed procedure set
forth in Section 595(c), the Road Map provides a model — the only such model — for a
special counsel to transmit grand jury evidence and an explanatory overview to the House
of Representatives. In this respect, the Road Map's form may well be more important
than its substance. In Special Counsel Mueller's investigation and in any future
investigation, the Road Map will provide valuable guidance if a grand jury uncovers
evidence that may constitute grounds for a presidential impeachment.

27. In light of the Road Map's relevance to the historical and legal frameworks relating to
Special Counsel Mueller's investigation, its continued secrecy deprives the public of
information regarding a vital precedent.  As a former lawyer on the OIC staff and as a
scholar following and contributing to today's debates, I believe that releasing the Road
Map would significantly enrich the public's understanding.

## PRIVACY CONCERNS ARE ATTENUATED

28. In 1974, President Nixon did not object to transmittal of the Road Map and
accompanying evidence to the House of Representatives. Two defendants in upcoming
Watergate trials did object. H. R. Haldeman and Gordon C. Strachan sought writs of
prohibition or mandamus barring Judge Sirica from transmitting the materials to the
House.

29. The D.C. Circuit rejected the petitions and allowed Judge Sirica to transmit the materials.
In reaching its conclusion, the D.C. Circuit stated: "We think it of significance that the
President of the United States, who is described by all parties as the focus of the report
and who presumably would have the greatest interest in its disposition, has interposed no

objection to the District Court's action." *Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C. Cir. 1974).

30. The D.C. Circuit thus suggested that the Road Map impinged on the interests of President Nixon above all, and that its impact on the interests of other individuals was secondary. The court's conclusion matches the intent underlying the Road Map: to summarize evidence of wrongdoing on the part of President Nixon, not on the part of anyone else.

31. As long as the Road Map remains sealed, one cannot say definitively that its revelation would have no significant effect on privacy interests. But that conclusion seems likely, given President Nixon's decision not to object in 1974, combined with the deaths in the subsequent forty-four years of President Nixon (in 1994) and many others involved in the Watergate investigation.

32. The government itself has probably disclosed the most important contents of the Road Map. In addition to the impeachment materials released by the House Judiciary Committee, the other government reports of the Watergate investigation, and the memoirs by those involved in the investigation, the Road Map is quoted in the book *High Crimes and Misdemeanors* (1978) (quoting the Road Map on pages 129-30), by a United Press International journalist, Howard Fields. In an email to me dated September 7, 2018, Mr. Fields confirmed that he had access to at least parts of the Road Map while writing his book.  It is time for the public to have access as well.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 12, 2018, in Prague, Czech Republic.

Stephen Bates