**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE: PETITION OF BENJAMIN WITTES, JACK GOLDSMITH & STEPHEN BATES

Misc. Case No. ____________

## DECLARATION OF RICHARD BEN-VENISTE

I, Richard Ben-Veniste, hereby declare as follows:

1. I am an attorney with five decades of experience working on, among many other things, issues of accountability of individuals privileged to hold public office. I submit this declaration in support of the above-captioned petition to unseal the "Road Map" that was transferred from the first Watergate grand jury to the House Judiciary Committee in 1974.

2. From 1973 to 1975, I served as chief of the Watergate Special Prosecution Force's Watergate Task Force.

3. In addition to my role with the Watergate Special Prosecutor's office, I have held numerous positions in government and public service. From 1968 to 1973, I served as an assistant United States attorney for the Southern District of New York, where I was chief of the Official Corruption and Special Prosecutions Section. From 1976 to 1977, I served

as special outside counsel for the Senate Subcommittee on Governmental Operations. In 1984 I served as outside counsel to the Senate Judiciary Subcommittee on Prison Reform for the District of Columbia. I acted as minority chief counsel of the Senate Whitewater Committee from 1995 to 1996. From 1998-2007, I served as a presidential appointee to the Nazi War Crimes & Japanese Imperial Government Records Interagency Working Group (IWG), the largest congressionally mandated declassification effort in history. From 2003 to 2004, I served as a member of the bipartisan 9/11Commission. In 2009, I became a member of the Aspen Security Group, a task force created by the Secretary of the Department of Homeland Security to provide analysis and advice to the Secretary. From 2015 to 2017, I served on the NSA Advisory Board legal panel, providing advice to the director of NSA and its Office of General Counsel.

4. I have also spent many years handling complex civil and criminal litigation in private practice. In 1981, I co-founded Ben-Veniste and Shernoff, where I practiced for 10 years. From 1991 to 2002, I was as a partner at Weil, Gotshal and Manges. Since 2002, I have been a partner at Mayer Brown, LLP.

5. I received my J.D. from Columbia University Law School in 1967 and L.L.M. from Northwestern University School of Law in 1968 under a Ford Foundation Fellowship.

6. I have authored two books that examine the Watergate prosecution: *Stonewall: The Real Story of the Watergate Prosecution* (1977) (co-authored with George Frampton), and *The Emperor's New Clothes: Exposing the Truth from Watergate to 9/11* (2009).

7. I have spoken out and written extensively about Special Counsel Robert Mueller's investigation as it relates to issues of executive power and congressional oversight, including articles in *The Atlantic*, CNN, and the *Washington Post*. I have also given

numerous interviews on this subject on CNN, MSNBC, PBS and NPR, as well as several foreign broadcast and print publications.

8. This declaration is based primarily on my experience as chief of the Watergate Special Prosecution Force's Watergate Task Force.

9. I was part of the team that discussed whether we, as legal advisors to the first Watergate grand jury, should inform the grand jury of its right to request permission from the chief judge of the federal district court for the District of Columbia to transmit evidence it had gathered to the United States House of Representatives Judiciary Committee, which was then investigating whether to vote articles of impeachment against president Richard M. Nixon. In addition to grand jury testimony of various individuals, we had obtained through grand jury subpoena a number of secret tape-recorded conversations made in various locations in the White House under the auspices of President Nixon. Up to that point, we had treated that grand jury testimony and related documents, as well as the White House tape recordings, with the utmost secrecy, as it was our obligation to do under Rule 6(e) of the Federal Rules of Criminal Procedure. This is significant because while Congress had attempted to compel production of White House tapes, it had been rebuffed by the courts on separation of powers grounds.

10. Special Prosecutor Leon Jaworski agreed that the grand jury should be apprised of its rights in this regard, and we so advised the jurors of their options. The grand jury authorized the special prosecutor to petition the court for permission to transmit a body of evidence, including tapes and transcripts of testimony, to the House Judiciary Committee, along with an index of the material to be transmitted. The index became known by the shorthand description of "the Road Map."

11. In the book I co-authored with George Frampton, *Stonewall: The Real Story of the Watergate Prosecution*, we discuss the Road Map and the events that led to its creation and transmission to the House Judiciary Committee. Attached as Exhibit A is a true copy of an excerpt of our book. We explain that the Road Map consisted of an "index," or a series of short statements setting forth documented facts, each of which "[was] followed by a list of tapes or other evidence supporting the statement."[1] It was intended to assist the Judiciary Committee, helping it assemble the individual pieces of grand-jury testimony and other evidence into a coherent narrative as we and the jury saw it.[2] The grand jury believed Richard Nixon had participated in a criminal conspiracy to obstruct the investigation into Watergate, and voted to authorize the Special Prosecutor to name him as an unindicted co-conspirator at an appropriate later date.

12. As described in our book, the Watergate Special Prosecution Force deliberated at length over the nature and format of the Road Map.[3] Recognizing that "a report about the President would raise a unique legal question, especially if it accused the President of a crime," Jaworski sought to frame the evidence in the Road Map in a way that would not infringe on the individual rights of the President but would still be a useful guide to the House Judiciary Committee.[4]

13. I believe the Road Map played a significant role in facilitating the House Judiciary Committee investigation. Furthermore, the transmission of accompanying tapes in possession of the grand jury prevented President Nixon from keeping them from Congress, forcing him to produce his own transcripts of those tapes.

---

[1] RICHARD BEN-VENISTE AND GEORGE FRAMPTON, JR., STONEWALL: THE REAL STORY OF THE WATERGATE PROSECUTION 244 (Simon & Schuster, 1st ed. 1977).
[2] *Id* at 242-43.
[3] *Id.* at 241-244.
[4] *Id.* at 242.

14. I am familiar with the public record of Watergate. It includes, but is not limited to, the articles of impeachment, the Watergate Special Prosecution Force's report, the House Judiciary Committee's report, transcripts and materials relating to the House Judiciary Committee's impeachment hearings, the Senate Select Committee on Presidential Campaign Activities' report, published transcripts of compendiums of the White House tapes, and the records of the public trials of President Nixon's co-conspirators. It is, of course, normal and commonplace that the content of grand jury material becomes public information by reason of its use in subsequent public trials and related proceedings. All of these documents revealed material that we, at one point, treated as grand jury material subject to Rule 6(e). Based on my first-hand recollection of the structure and content of the Road Map, I can confirm that those publications viewed in their totality contained most, if not all, of the information that was referenced in the Road Map.

15. In light of the publications described in the previous paragraph, I believe that any privacy concerns relating to the release of the Road Map are minimal, and are far outweighed by widespread public interest in the document.

16. As a Watergate prosecutor bound by Rule 6(e), I believe that the Road Map has lost its Rule 6(e) character given the public disclosures of the grand jury material contained therein.

17. The historical precedent of the transmittal of the Road Map and accompanying grand jury materials under the auspices of then-Chief Judge John Sirica, pursuant to a proper exception to Rule 6(e) F.R.Cr.P., as set forth in the well-reasoned opinion of Judge Sirica and affirmed by the United States Court of Appeals for the D.C. Circuit, is particularly timely. Independent Counsel Robert Mueller will in due course conclude his

investigation and will be faced with a variety of decisions, including whether and how to share the evidence he has uncovered. The public will benefit from understanding the history and context of the Watergate Road Map.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2018.

Richard Ben-Veniste

# EXHIBIT A

# STONEWALL

THE REAL STORY
OF THE WATERGATE PROSECUTION

BY **Richard Ben-Veniste**
AND **George Frampton, Jr.**



**SIMON AND SCHUSTER**
*New York*

Bar
860
.B43

Case 1:18-mc-00125-BAH D

*Copyright © 1977 by Richard Ben-Veniste and George T. Frampton, Jr.*
*All rights reserved*
*including the right of reproduction*
*in whole or in part in any form*
*Published by Simon and Schuster*
*A Division of Gulf & Western Corporation*
*Simon & Schuster Building*
*Rockefeller Center*
*1230 Avenue of the Americas*
*New York, New York 10020*

*Designed by Irving Perkins*
*Manufactured in the United States of America*

1 2 3 4 5 6 7 8 9 10

*Library of Congress Cataloging in Publication Data*

*Ben-Veniste, Richard.*
*Stonewall.*

*1. Watergate Affair, 1972–    I. Frampton, George, joint author.  II. Title.*
*E860.B43  364.1'32'0973  76–56340*

*ISBN 0-671-22463-8*

# Contents


| | | |
|---|---|---|
| | Introduction | 11 |
| CHAPTER 1: | The First Special Prosecutor | 13 |
| CHAPTER 2: | The Script and the Players | 45 |
| CHAPTER 3: | The Case Against Richard Nixon: "If you shoot at a king . . ." | 83 |
| CHAPTER 4: | The Linchpin—John W. Dean III | 95 |
| CHAPTER 5: | The Bugging of Richard Nixon | 111 |
| CHAPTER 6: | Saturday Night Massacre or Saturday Night Suicide? | 123 |
| CHAPTER 7: | The Tapes Hearings: No More Mr. Nice Guy | 158 |
| CHAPTER 8: | Archie's Orphans Meet the Silver Fox: Jaworski Arrives | 187 |
| CHAPTER 9: | Cancer on the Presidency | 199 |
| CHAPTER 10: | Le Grand Fromage | 211 |
| CHAPTER 11: | The Indictment—"By deceit, craft, trickery . . ." | 255 |
| CHAPTER 12: | The Unindicted Co-conspirator | 264 |
| CHAPTER 13: | Resignation and Pardon: President Ford Adopts the Monkey | 291 |
| CHAPTER 14: | The Trial Begins: A Jury Is Selected | 316 |
| CHAPTER 15: | "Truth , . . T-r-u-t-h . . . Truth" | 333 |
| | Epilogue | 388 |
| | Index | 397 |

peachment inquiry. The Special Prosecutor apparently had decided to recommend to the grand jury that it send the most damaging Nixon tapes to the House Judiciary Committee. In Jaworski's thinking, the grand jury had the authority to do this, while the prosecutors did not. If the Special Prosecutor could get the grand jury to send to the House committee a "report" containing the tapes, he could leapfrog the legal barriers to our sending the tapes directly to the committee ourselves.

Beyond that, we thought that more than new tapes would be needed to get the House committee up to speed on the available evidence. The atmosphere surrounding the impeachment inquiry at that time was still avowedly partisan and political. There were quarrels about staffing, about procedures and about scheduling. The committee had even been engaged in a running battle among its members and with the White House over what constituted an "impeachable offense."

John Doar, the House Judiciary Committee's chief counsel, had launched an exhaustive staff effort to gather and cross-index every fact, however insignificant, that related to the committee's inquiry. In an ideal world and with infinite time this endeavor could have proved useful. Under the circumstances, however, it precluded immediate action to what was most urgently needed: an attempt to summarize the most *important* evidence against the President in a meaningful way, so that it could be readily understood and assessed by Congress and the public. In the meantime the President, seeing the Judiciary Committee's slow start and realizing he could win easily if the issue were brought to a head soon, was calling for a quick vote on impeachment. If the President succeeded in forcing a vote before Doar's "information-gathering" machine shifted gears and began summarizing the case, or if the committee split hopelessly over preliminary procedural issues, the momentum for impeachment might be shattered no matter how strong the evidence.

The Judiciary Committee's plight convinced some of us that members of Congress from both sides of the aisle were going to have to have the significance of the evidence spelled out for them in neon letters before they would act. The Watergate Task Force believed that the grand jury should be told it could make a report to the Judiciary Committee that not only transmitted evidence but summarized and commented on it. The summary, we thought, could artic-

ulate the "theory of the case" against the President. It could show how the tapes and other evidence fit together and demonstrate that the President had been trying to hold the cover-up together in March and April of 1973. The report could also juxtapose the President's public statements denying knowledge of the cover-up with evidence from the tapes showing he really knew far more.

But the Special Prosecutor already had ruled out any analysis or summarization of evidence by the grand jury. Raw evidence, Jaworski argued to us, spoke for itself. Summarization meant the grand jury was "interpreting" the evidence. That was just as dangerous as drawing conclusions from evidence, Jaworski said. The grand jury, he claimed, could be drawn into a position vulnerable to criticism.

Something else worried Jaworski. He professed to uncertainty about Judge Sirica's reaction to an attempt by the grand jury to make a report. Sirica, then Chief Judge of the United States District Court, "presided over" all grand juries in the District, including the Watergate grand jury. All indictments were "returned" in his courtroom. Technically the Watergate grand jury would make any report on President Nixon directly to Judge Sirica. The grand jury would have to request the judge to pass the report along to the House Judiciary Committee. There were plenty of legal precedents for a grand-jury report. But a report about the President of the United States would present a unique legal question, especially if it accused the President of a crime. Jaworski seemed convinced Sirica wouldn't accept a report that was accusatory of the President.

We didn't agree with the Special Prosecutor's argument that summarizing the evidence was tantamount to accusing the President, nor did we share his concern that Judge Sirica might not honor a grand-jury request to transmit such a summary to Congress. But Jaworski would not be swayed. The task force then suggested there was a middle course. Without analyzing the evidence, the grand jury could nevertheless arrange it in a format that made its significance as clear as possible. Even better, the jury could supply the House Judiciary Committee with an "index" to the evidence showing how various pieces fitted together. The phrase we coined for this index was "the road map." We argued to the Special Prosecutor that transmission not only of raw evidence but of a road map to the evidence could avoid the drawing of formal conclusions by the jury. In truth, though, we hoped that a road map could serve as a do-it-yourself kit for the

Judiciary Committee, helping it reassemble the individual pieces of grand-jury testimony and other evidence into a coherent theory of a criminal case as we and the jury saw it.

On February 18, the four young prosecutors who had earlier urged in writing that the grand jury return a presentment met with Jaworski and Ruth, at Jaworski's invitation. They suggested transmission to Congress of a road map to accompany tapes and other evidence. The Special Prosecutor was noncommittal, but he did not rule out the idea.

Two days later, Ben-Veniste met with Jaworski to urge on him our idea of seeking grand-jury authorization now to name the President as an unindicted co-conspirator at some later time. Ben-Veniste downplayed the moral and constitutional aspects of the Nixon problem. Instead he appealed to Leon Jaworski the trial lawyer—to Jaworski's strong desire to mount an airtight prosecution against Haldeman, Ehrlichman and Mitchell—and to Jaworski the political professional, who could appreciate the insulation that grand-jury authorization would give him if he later decided to name the President in the bill of particulars. Jaworski seemed receptive to the idea of grand-jury authorization. He asked Ben-Veniste to prepare a written memorandum outlining the procedure.

Later that same afternoon the task force met with Jaworski to review the cases against several potential defendants. Jaworski brought up the subject of grand-jury authorization. He intimated that it made good sense, and said he was mulling it over. But time was getting short. We wanted to return our indictment no later than the end of February, a week and a half away, and we still had no firm decisions on Nixon.

At about noon the next day the Special Prosecutor called Ben-Veniste to his office. He had made up his mind, he said, to suggest to the grand jury that it transmit evidence about the President to the House Judiciary Committee. However, he said he had ruled out summarizing the evidence, making any accusations or drawing any conclusions. He said nothing at the meeting about naming the President as an unindicted co-conspirator.

The task force now concentrated its efforts on the concept of a "road map." Jaworski did not seem to have ruled out that possibility by his decision that the grand jury could "report" evidence to the House Judiciary Committee but must not analyze or summarize the

evidence. Frampton began to assemble all the pertinent evidence before the grand jury that we wanted to send to the House. Together with others, he began to draft a road map to go with the evidence. We wanted to be prepared with a draft if the Special Prosecutor gave us the go-ahead. Perhaps if Jaworski saw in black and white what we were contemplating he would give his consent.

The task force was scheduled to meet with Jaworski Saturday morning for final consideration of the perjury charges that we would ask the grand jury to include in the comprehensive cover-up indictment. When discussion of the perjury counts concluded we turned to the road map. Well, said the Special Prosecutor, he could go along with such a thing, but it must be scrupulously neutral—no inferences, no characterization of evidence. Frampton explained what we had in mind: a series of short statements setting forth indisputable facts, each of which would be followed by a list of tapes or other evidence supporting the statement. In using tapes, we would cite to page numbers of tape transcripts wherever possible. "Try your hand at it and let me see what you come up with," Jaworski replied. That was all the go-ahead we needed.

As the meeting broke up, Jaworski gave Ben-Veniste a typed draft of what he proposed to say to the grand jury about President Nixon. The Special Prosecutor had informed us the day before that he intended to accompany us to the courthouse and address the jurors personally first thing Monday morning. The draft advised the jurors that it would "not be responsible conduct" to indict the President, because of the uncertainty of the law, the "trauma the nation would suffer" while the legal issue was resolved, and the appropriateness of Congress rather than the grand jury dealing with the evidence against Mr. Nixon. However, Jaworski proposed to tell the jurors, they could transmit evidence to the House Judiciary Committee by way of a "report," and the prosecutors would assist in this task in any way desired by the jurors. Again, nothing was said about authorization to later name Nixon as an unindicted co-conspirator. Was this because he intended to leave this matter for later discussion with the grand jury or because he had changed his mind?

We decided that the grand jury ought to get in one sitting our total decision on how to deal with Nixon. For nearly two hours we drafted and redrafted an addition for Jaworski's proposed statement to the grand jury which included a request to the jurors to authorize

us to name President Nixon as an unindicted co-conspirator at a later date. The insertion amounted to three sentences. The question now was how to submit it to the Special Prosecutor as gently as possible.

Almost two months earlier, well before relations between the task force and Leon Jaworski had soured, we had decided to give a dinner party for the Special Prosecutor and his wife. At the time, we wanted to show our hospitality to Jaworski. A nice, relaxed social evening would be just the thing, we reasoned, to convince Jaworski that he need not feel isolated or uncomfortable with us on account of differences in age and style. Long ago, the dinner party was set for the home of Jill and Ian Volner on this very Saturday night, February 23.

While our rapport with Jaworski was now on the mend, there was still wariness and reserve on both sides. And all of us, the task force and the Special Prosecutor, were exhausted by the workload and the tension of the decisions we faced. Jaworski more so than anyone, because of the prodigious pace he maintained for a man of sixty-eight and the strain of having the Nixon problem constantly staring him in the face. Moreover, Jaworski was always his most chipper and at his best for business first thing in the morning. By late afternoon—especially at the end of a long week—he was often too tired or wound up to concentrate on new problems. He preferred to relax, reminisce, spin a few yarns. Given the events of the past month within our office, a Saturday-evening dinner party attended by the entire task force and the Special Prosecutor seemed the worst possible setting in which to approach Jaworski for the final time with the most important bit of business our office ever had to deal with. But we had little choice. In order to accommodate the schedule we would have to present our redraft to Jaworski at the party.

That night, the Special Prosecutor's Justice Department driver got hopelessly lost, delivering the Jaworskis to the party well past the appointed hour. Jaworski was his courtly and charming self, as usual, but the tension and fatigue that were affecting all of us showed on his face. During pre-dinner cocktails, the atmosphere was cordial but guarded. Jaworski appeared to assume the air—if not the physical posture—of one intent on keeping his back to the wall at all times. As casually as possible, Ben-Veniste took him aside and mentioned that we had tried our hand at redrafting a few lines in his proposed statement for the grand jury for Monday morning. Ben-Veniste pulled the papers out of his pocket and handed them to Jaworski. Glancing

at them, Jaworski told Ben-Veniste he'd think the matter over. The Jaworskis departed immediately as dinner finished, and the rest of us struggled home shortly afterwards to try for a little sleep.

Bright and early Monday morning, the Special Prosecutor came down the hall to the task force offices. His secretary had not yet arrived and he wanted one of our secretaries to type something for him. Only Frampton was in. He was surprised to see the Special Prosecutor, for Jaworski hardly ever came down to the task force offices. Frampton promised to get the material typed as soon as someone came in to do it. "It's what I'm going to tell the jury," Jaworski said, and he departed for his own office. Frampton whipped through it. The Special Prosecutor had bought our approach! The statement said that co-conspirators would be named "at a later date" and that a list of persons "including the President" would be discussed with the grand jury and their "authorization" sought to name them in the "bill of particulars."

At ten o'clock that morning, February 25, Leon Jaworski addressed the grand jurors on the subject of President Richard Nixon. The jurors besieged him with questions. Most were tough and intelligent ones. Some jurors expressed views much like those we on the task force—and the four young prosecutors who had started the whole dispute—had voiced within our office. Sitting with Jaworski in the grand-jury room, some of us could hardly suppress wry smiles. The give-and-take between the jurors and the Special Prosecutor seemed a brief but thorough reprise of the discussions within the Special Prosecutor's office that had raged over the past month. Jaworski ably defended his recommendation. It was obvious to us that the logic of his position was winning the jurors' approval.

When the Special Prosecutor had fielded the grand jury's questions, he departed. The task force remained to show the grand jurors a draft of our proposed indictment and the list of conspirators we proposed to name, arranged in alphabetical order. Then we left the jurors to digest and discuss our recommendations among themselves.

After due deliberation, grand-jury foreman Vladimir Pregelj informed us that the jury had voted 19–0 to authorize us to name each of the recommended co-conspirators. The vote was not unanimous. Twenty of the twenty-three jurors were present that day (all who remained active on the jury), but one abstained. Whether the one juror was recording a protest against our refusal to seek the Presi-

dent's indictment or whether, on the contrary, he wanted no part of accusing Mr. Nixon we were not entitled to know. One of the two regular stenographers who had taken down testimony for the grand jury throughout the investigation was summoned. Ben-Veniste "read into the record" the grand jury's authorization vote and the list of co-conspirators. When he reached "Richard M. Nixon" in the alphabetical procession, the stenographer's eyes bulged. When she finished she said to Frampton, "I guess you want this typed up right away, huh?"

Frampton and other members of the task force were now working feverishly to finish the road map and collection of evidence to be transmitted so that we could show a draft to the jury. The form already chosen for the report was a series of "statements of fact," most of which were one or a few sentences long. Each "statement of fact" was numbered. Each was followed by a list of evidence that supported the numbered statement: a tape, a few pages of recorded grand-jury testimony, a document. (Later, we were flattered by the fact that the House Judiciary Committee staff copied our format precisely for presenting all its impeachment evidence to the committee members and the public.) We wanted to be sure that everything we had gathered that contributed to the case against President Nixon was sent over to the Judiciary Committee. More important, we wanted the road map to make "perfectly clear" how each piece of evidence fit together in the overall scheme.

Jaworski himself had drafted the preamble to the report, requesting Judge Sirica to transmit the enclosed evidence to the House Judiciary Committee. As drafted, the preamble stated that the grand jury had "heard evidence relating to" the impeachment inquiry but had concluded it should "defer to" the House and let the House decide what action was warranted, if any, by this evidence. When the preamble and the road map itself were presented to the grand jurors for their consideration, they were generally pleased. There was only one major change upon which the jury insisted. The preamble, as approved by the jurors, was changed to say that they would "presently" defer to the Judiciary Committee and allow the committee to decide what should be done "at this time." This language was a none-too-subtle hint to the Congress that the jury would still be around to move against the President if the politicians faltered. Strangely, when the preamble eventually was made public, none of the media commentators remarked on these highly pregnant phrases.

From a constitutional standpoint they were perhaps the most important words in the report!

Throughout the last week of February the task force was preoccupied with presenting the indictment and report to the grand jury and with summarizing the evidence against the defendants. (The cases against the Big Three had been reviewed with the jury the previous week. Only the more difficult decisions were left for presentation the final week prior to indictment.) By Thursday afternoon we were ready to return the indictment and report. That night, Frampton and Volner packaged together the road map and the evidence—tape boxes, retyped tape transcripts and other material, all neatly numbered to coincide with the references in the road map. We had intended to put all of the evidence into two briefcases to give to the judge, but we decided to see if it would all fit in one big government-issue case. It did, barely. The last tape box had to be pounded to fit it in. For good reason, the press would call this the "bulging briefcase."

Some weeks before, Frampton had received from a friend a screaming orange anti-Nixon automobile bumper sticker that proclaimed in bold letters, "SAY GOODBY, DICK," a play on the traditional ending of the *Laugh In* television series. On Friday morning, as we were departing our offices for court and the return of our indictment, we affixed the sticker to the outside of the briefcase containing the report. Nervous but exhilarated by the imminent conclusion of our long investigation, we thought the sticker would make a good practical joke on the Special Prosecutor. With a fine irony it bespoke the months of professional restraint we believed we had exercised under siege from the Nixon forces—people who were seldom restrained by legal or ethical niceties in the way they exercised *their* power. And the sticker was perfect counterpoint to the scrupulous objectivity we had labored to bring to the grand jury's report itself. Frampton flashed the bumper sticker at Hank Ruth. Ruth laughed briefly—like a man with a bone stuck in his throat—and then started to make menacing noises. We decided it would be better not to try the prank out on Leon. The sticker came off the bulging briefcase and went into Frampton's suit pocket instead.

The grand jury had already reviewed the indictment and report in final form by Friday morning. That day, the task force and the

Special Prosecutor met with the jurors for a brief formal session in the jury room. We then proceeded together to Judge Sirica's courtroom, via the back elevator. Our office had announced there would be a "proceeding" in court that morning, following the usual practice of giving the press some short warning of official court action. Since Jaworski had earlier announced that we hoped to recommend action to the grand jury by the end of February (this was March 1) and since there had been press speculation that action would come this week, there was a huge crowd of TV newsmen and reporters on hand at the courthouse.

When Judge Sirica entered, Leon Jaworski rose to inform the judge that the grand jury had "material to be delivered" to the court. The jury foreman, Vladimir Pregelj, then came forward from the front row of spectator benches, where the entire grand jury was seated, and handed the judge two envelopes. One contained our indictment charging seven men—Mitchell, Haldeman, Ehrlichman, Colson, Mardian, Strachan and Parkinson—with conspiracy in the Watergate cover-up; the other contained what Pregelj told the judge was "a sealed report." In fact the second envelope contained the preamble to the report and road map, asking the judge to forward the evidence in the separate, bulging briefcase on to the House Judiciary Committee.

In dead silence, the rasp of his letter-opener cutting clearly through the hushed room, Judge Sirica slit open the two envelopes. He glanced at the indictment, then briefly read the preamble to himself.

As he appeared to finish it, Ben-Veniste arose and brought forward from under our counsel table the chocolate-brown bulging briefcase containing the tapes and other evidence and our road map. He asked to "hand it up" to the court. "If it please Your Honor," he said, "this is the material made reference to in the document you just read." Ben-Veniste explained that the briefcase was locked and that the key to it was contained in a sealed letter-sized envelope given to the judge along with the preamble to the report.

So far, spectators and press had learned nothing, since the judge had not read out loud either the "caption" of the indictment (revealing the names of those indicted) or the preamble to the report. The judge thanked the grand jurors, reminding them that they had fur-

Case 1:18-mc-00125-BAH Document 1-3 Filed 09/14/18 Page 20 of 20



ther business and that they should not discuss the case with anyone, and dismissed them. There was then a brief exchange between the judge and Ben-Veniste about setting the date for arraignment (the time when indicted defendants are required to surrender to the court and enter their formal pleas of guilty or not guilty). Ben-Veniste suggested that the following Saturday morning should be convenient to defendant Mitchell, since Mitchell was then permanently occupied five days a week in New York being prosecuted in the so-called Vesco case.* There was a murmur in the courtroom at Mitchell's name. It was no surprise, of course, but his was the first one mentioned. The formalities completed, we left the courthouse by the basement parking-garage exit as the press ran for the court clerk's office on the second floor of the courthouse to get their copies of the indictment.

WOULD THE WATERGATE grand jurors have indicted President Nixon if it had been left up to them? The events of March 1 suggest they would have.

On the afternoon our indictment was returned, the task force gathered with Hank Ruth and a few of the other younger prosecutors in Leon Jaworski's office. Jaworski had already left for a weekend in Texas, as much to escape reporters as anything; we too were looking forward to a few days of sleep. Totally drained by the tensions of ten months of seven-day work weeks, by the Saturday Night Massacre and by everything in its wake, we felt for the first time that something concrete had been achieved. There had been many times when it seemed that this day would never come. But the prosecution was still on track, and evidence against the President seemingly was on its way to the House Judiciary Committee. No matter what happened now, in Congress with impeachment or in the political arena, we could be proud of what we had done and how we had done it.

Our investigation had been conducted with fairness and integrity. The President had attacked us and had made what we knew to be false statements about the tapes. But we had kept the secret of the

* In that case, Mitchell and Maurice Stans, former Nixon campaign finance chairman, had been indicted for conspiracy and perjury in connection with an alleged attempt to improperly influence an SEC investigation into the affairs of international financier (and Nixon contributor) Robert Vesco. Both defendants were eventually acquitted on all charges.