**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ) | |
| IN RE: PETITION OF BENJAMIN ) | |
| WITTES, JACK GOLDSMITH & ) | Misc. Case No. _____ |
| STEPHEN BATES ) | |
| ) | |

**<u>DECLARATION OF JOHN W. DEAN III</u>**

## DECLARATION OF JOHN W. DEAN III

I, John W. Dean III, hereby declare as follows:

1. I submit this declaration in support of a petition to unseal the report of evidence relating to President Nixon's involvement in unlawful activity that the Watergate grand jury transmitted to the House Judiciary Committee for consideration of impeachment in 1974 (the "Road Map").

2. I served as Counsel to the President of the United States (i.e., "White House Counsel") from 1970-1973.

3. Between 1973-1975, I became the key witness for the U.S. Government in the Watergate-related investigations undertaken initially by the United States Attorney for the District of Columbia, followed by the Watergate Special Prosecution Force, the Select Committee on Presidential Campaign Activities of the United States Senate, and the impeachment inquiry of President Richard Nixon undertaken by the Committee on the Judiciary of the United States House of Representatives. Before I became the government's key prosecution witness, I pled guilty to conspiracy to obstruct justice (18 U.S.C. 371) in connection with my role in the so-called Watergate cover-up. I was sentenced to time served, which I spent in the U.S. Marshal's Witness Protection Program while testifying in Watergate-related criminal trials.

4. In my role as White House Counsel and later as a key witness, I had countless conversations with other members of the Nixon White House staff, including President Nixon, Special Prosecutor Leon Jaworski and others investigating and prosecuting violations of the law during the Nixon presidency. Accordingly, I have personal



knowledge of most of the key events and players related to the Watergate scandal, as well as the events that have unfolded in the more than four decades since.

5. My memory of these events was refreshed between 1991 and 2000, in the course of defamation lawsuits that my wife and I filed against a publisher and an author who made false claims about our involvement in the Watergate break-ins. During discovery in *Dean v. St. Martin's Press et al.*, I reviewed countless files from the Watergate Special Prosecution Force at the National Archives, as well as secondary sources and deposition transcripts of many Watergate principals almost two decades after the events. By the time the case was settled, I knew even more about what had happened during Watergate than when I was living through the events.

6. I have written numerous books about Watergate — including *Blind Ambition: The White House Years* (1976, with a new afterword in 2009), *Lost Honor* (1982), *Unmasking Deep Throat* (2002), *Worse Than Watergate: The Secret Presidency of George W. Bush* (2004), and *The Nixon Defense: What He Knew and When He Knew It* (2014) — all of which sought to add to the historical record and to highlight the lessons that can be drawn from the most significant and troublesome political scandal of the twentieth century.

7. Given the perennial interest in Watergate and its continuing relevance to events in American politics, I am regularly asked and agree to provide commentary for national radio and television shows about Watergate-related events in specific and the presidency in general. In addition, I have taught over 150 continuing legal education programs (CLEs) to somewhere between 35,000 to 40,000 attorneys that examine the impact of the American Bar Association's Model Rules of Professional Conduct on select historic events from Watergate with surprising and informative results.



8. Since the commencement of Special Counsel Robert Mueller's investigation of President Trump's involvement in a criminal conspiracy and obstruction of justice, I have appeared on CNN (where I am a regular contributor) as well as NPR and other radio programs to discuss my experience with Watergate as it relates to the current investigation. I have also been interviewed by numerous publications, including the New York Times, Politico Magazine, the Los Angeles Times, The Washington Post, Rolling Stone, Time Magazine, The Telegraph, and other foreign publications.

## THE PUBLIC INTEREST IN THE ROAD MAP

9. I became aware of the Road Map in 1973-1974. At that time, I was no longer White House counsel, rather I was cooperating with Special Prosecutor Leon Jaworski's investigation, and had lengthy conversations with many of the assistant Watergate special prosecutors, particularly James Neal, one of the lead trial attorneys.

10. Although I have never seen it, I have been aware of the Road Map almost from its inception. Before becoming White House Counsel, I had served as Minority Counsel of the House Judiciary Committee, the committee of the House of Representatives where all impeachment proceedings begin. After Nixon removed the initial Watergate Special Prosecutor, Archibald Cox, in what became known as the "Saturday Night Massacre," the House Judiciary Committee began looking seriously at the prospects of impeachment. From my time with the House Judiciary Committee, I was aware that this committee had no institutional experience in investigating impeachable offenses. That this committee was floundering in its investigation soon became a widespread rumor in Washington, D.C., as its specially selected staff assembled evidence from the Senate's investigation and other sources. I believe I first learned of the Watergate Special Prosecution Force's



efforts to assist the House Judiciary Committee from that committee's chief counsel, Jerome "Jerry" Zeifman, a longtime friend whom I met when I worked for the committee. Assistant Watergate Special Prosecutor confirmed to me they were preparing an "index" to assist the House Judiciary Committee focus on the most relevant evidence. It is my understanding that this index was later called the Road Map.

11. Needless to say, the precise nature of the Road Map remains publicly unknown. It can be assumed that the Road Map references the testimony of key witnesses, including myself, documents, and the Nixon tape recordings that were central to the scandal, focusing on evidence that might suggest impeachable offenses. I can recall that there were differences of opinion within the Watergate Special Prosecutor's office about how they, and the grand jury, should or should not work with the House Judiciary Committee. The Special Prosecutors were part of the Justice Department, thus the Executive Branch; the Grand Jury was overseen by the Chief Judge of the U.S. District Court for the District of Columbia, thus associated with the Judicial Branch; and the House Judiciary Committee was part of the Legislative Brach. Because of Rule 6(e) of the Federal Rules of Criminal Procedure relating to grand jury secrecy, and the fact that this undertaking involved unchartered procedures between the three branches of government, much of the endeavor was done in secrecy. But the secrecy cloaking the Road Map's scope and the manner in which it assembled, presented, and connected the evidence leaves a significant gap in Watergate history.

12. The Mueller investigation has many factual parallels to the Watergate investigation. Both investigations raise important questions about presidential power, the separation of powers, and the powers of a prosecutor investigating a sitting president. For these



4

reasons, major news outlets have asked me to give commentary on the political dynamics surrounding President Trump while under investigation, the accountability of the President for obstruction of justice, and the significance of certain developments in the Mueller investigation.

13. From my perspective having lived through Watergate, disclosure of foundational documents in the Watergate investigation, the Road Map included, contribute to the thinking of government investigators as well as defenders of the president on how to proceed, not to mention the public discourse on these important issues in our democracy.

DIMINISHED SECRECY INTERESTS IN THE ROAD MAP

14. Based on my experience as White House Counsel, as a key witness in the Watergate investigation, as a litigant in my defamation lawsuit, and as an author of multiple books on Watergate, I can confidently say that I have reviewed most, if not all, the public record materials relating to Watergate. It is an extensive public record. It is hard to believe that the Road Map contains secrets that have not already been disclosed.

15. For my own part, I know that my testimony before the Senate Select Committee on Campaign Practices, before the House Impeachment Inquiry, and at trial in *U.S. v. Mitchell et al.*, is all a matter of public record. Because of my civil defamation lawsuit, many key documents prepared by the Watergate Special Prosecution Force have been opened. To the extent the Road Map refers to my activities relating to the events associated with Watergate, I have no personal objection to disclosure of such information. My privacy interest is not burdened here.

16. To the best of my knowledge, nearly everyone else who may be implicated by the substance of the Road Map is deceased. The few who are still living would have no



5

reason to object to disclosure of the Road Map given the passage of time, their own

disclosures of their roles in Watergate, and the simple fact that the Watergate story is well

known.

###

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge and belief.

Executed on September 1ˢᵀ, 2018, in Beverly Hills, California.

John W. Dean III