**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE: PETITION OF BENJAMIN )
WITTES, JACK GOLDSMITH & )
STEPHEN BATES )
  )
  )
  )      Misc. Case No. _____
  )
  )
  )
  )
  )
  )
  )
_____ )

## <u>DECLARATION OF JACK L. GOLDSMITH</u>

I, Jack L. Goldsmith, hereby declare as follows:

1. I am the Henry L. Shattuck Professor of Law at Harvard University. I submit this

   declaration to support the above-captioned petition to unseal material relating to

   President Richard Nixon that Watergate Special Prosecutor Leon Jaworski transmitted to

   the House Judiciary Committee with authorization from the United States District Court

   for the District of Columbia in 1974 (the "Road Map").

2. Since 1994, when I became a law professor, I have been teaching and writing about

   presidential power, national security law, cybersecurity, international law, internet law,

   conflicts of law, and foreign relations law. I have written four books, many dozens of law

   review articles, and hundreds of op-eds, blog posts, and other public commentary on

   these topics. I am also co-editor of three casebooks.

3. Two of my books are on the topic of the presidency, presidential power, and presidential history. *See Power and Constraint: The Accountable Presidency After 9/11* (2012); *The Terror Presidency: Law and Judgment Inside the Bush Administration* (2009). I have published approximately twenty law review articles on these specific topics, including in the *Harvard Law Review* and *Yale Law Journal*, among other legal publications. I have also written on the these topics as a commentator in such venues as the *New York Times*, *Washington Post*, *The Atlantic*, *Time*, *The New Republic*, and *The Weekly Standard*. I have been interviewed and quoted scores of times by these and other publications.

4. I am a senior fellow at the Hoover Institution, a public policy and research center at Stanford University. I co-chair the Hoover Institution's Working Group on National Security, Technology and Law, which holds conferences and publishes papers on those topics.

5. I am a co-founder of and frequent contributor to *Lawfare*, an online forum devoted to the analysis of U.S. national security law and policy, broadly conceived. *See* https://www.lawfareblog.com.

6. I served as Assistant Attorney General, Office of Legal Counsel, from October 2003 through July 2004, where I advised the White House, the Attorney General, and federal agencies on constitutional and federal statutory and treaty issues. Before serving in the Justice Department, I served as Special Counsel to the General Counsel of the Department of Defense from September 2002 through June 2003.

7. I have testified twice before Congress on issues of presidential power. *See* Senate Committee on Armed Services, *Hearing on Law of Armed Conflict, the Use of Military Force, and the 2001 Authorization for Use of Military Force* (May 16, 2013); Senate

Committee on the Judiciary, *Preserving the Rule of Law While Combating Terrorism* (Oct. 2, 2007) (sole witness).

8.  Prior to teaching at Harvard Law School, I taught at the University of Chicago Law School from 1997-2002, and at the University of Virginia Law School from 1994-1997.

9.  I clerked for Supreme Court Justice Anthony M. Kennedy from 1990-1991, Judge J. Harvie Wilkinson on the United States Court of Appeals for the Fourth Circuit from 1989-1990, and Judge George Aldrich on the Iran-U.S. Claims Tribunal from 1991-1993.

10. I have a J.D. from Yale Law School, a B.A. and M.A. from Oxford University, and a B.A. from Washington & Lee University.

11. For a fuller collection of my writings that includes lectures, speeches, book reviews, essays, op-eds, and blog posts, see www.jackgoldsmith.org.

12. This declaration is based on my research of publicly available information, including papers of the Senate Select Committee on Presidential Campaign Activities, the papers of the Watergate Special Prosecution Force, the hearings and report of the House Judiciary Committee on its resolution to impeach President Nixon, and numerous books and articles about the history of and legal issues concerning the Watergate scandal and the role of the Office of the Special Prosecutor.

13. This declaration has two objectives. *First*, it provides an overview of my understanding of the Road Map. *Second*, it explains the contemporary interest in the Road Map, and why releasing it is important to the public's understanding of the Mueller investigation.

<u>OVERVIEW OF THE ROAD MAP</u>

14. The 55-page Road Map drafted by Watergate Special Prosecutor Leon Jaworski provides
factual information regarding the investigation into President Nixon's involvement in the
Watergate break-in and cover-up, with supporting documents but no legal conclusions.

15. The Road Map grew out of intensive discussions within the Special Prosecutor's Office
about how to proceed against President Nixon for alleged crimes uncovered by the
Special Prosecutor's investigation of the Watergate scandal. Some members of the
Special Prosecutor's Office wanted to indict President Nixon for obstruction of justice
and related crimes. Others in the Office argued that the Special Prosecutor should draft a
presentment charging President Nixon with crimes, including obstruction of justice.
According to this plan, the grand jury would approve the presentment and the presiding
federal district court judge, John Sirica, would transmit it to the House of Representatives
for its consideration in deliberations about possible impeachment proceedings against
President Nixon.

16. Special Counsel Leon Jaworski opposed both courses of action. He doubted that a sitting
president could be indicted for obstruction of justice. These doubts were informed by his
belief that his office should defer to ongoing deliberations in the House Judiciary
Committee about whether to impeach President Nixon. And he opposed the idea of
sending a grand jury presentment to the House because he believed that the Special
Prosecutor should not be seen to prejudge issues under consideration by the House,
because he feared that Judge Sirica would not transmit such a presentment, and because
he wanted to protect the fair trial rights of the presidential aides whom he would soon
indict.

17. Jaworski concluded that the best course of action would be for the grand jury, through
Judge Sirica, to provide the House with some of the evidence it had collected about
Nixon's alleged crimes and thus let the House decide whether and how the evidence
implicated impeachable offenses. The evidence consisted of 800 pages of documents and
thirteen tape recordings of President Nixon's Oval Office conversations. In order to assist
the House in understanding the evidence, the Special Prosecutor's Office included the 55-
page "Road Map" to the evidence. The Road Map did not contain any legal analysis or
draw any legal conclusions. Each page had a sentence or two of factual statements
followed by references to the underlying documents and tapes.

18. The special assistant to Jaworski, James Doyle, explained in his book *Not Above the Law*
how the Road Map worked. As an example, he said that one page of the Road Map might
state: "On March 16, 1973, E. Howard Hunt demanded $120,000." And then that page of
the Road Map would, according to Doyle, "list page references to grand jury testimony
from witnesses who saw Hunt's blackmail note and references to the tapes where Hunt's
demand was discussed." James Doyle*, Not Above the Law: The Battles of Watergate
Prosecutors Cox and Jaworski — A Behind-the-Scenes Account* 290 (Morrow, 1977). As
Jaworski explained in his memoir, *The Right and the Power*, the "success of the plan
depended on our ability to spell out simply the facts of the cover-up story as they
appeared from our investigation and let the [House Judiciary] Committee members reach
their own conclusions." Leon Jaworski, *The Right and the Power: The Prosecution of
Watergate* 101 (Reader's Digest Press, 1976).

19. On March 1, 1974, the grand jury tendered to Judge Sirica a sealed "Report" that
consisted of the Road Map, the underlying evidence, and a two-page transmittal

memorandum that "strongly" recommended that Judge Sirica transmit the underlying materials to the House Judiciary Committee. *In Re Report & Recommendation of June 5, 1972 grand jury*, 370 F. Supp. 1219, 1221 (D.D.C. 1974). The transmittal memorandum explained that the grand jury "has heard evidence that it regards as having a material bearing on matters within the primary jurisdiction of the Committee in its current inquiry, and notes further its belief that it ought now to defer to the House of Representatives for a decision on what action, if any, might be warranted in the circumstances." *Id.*

20. Judge Sirica determined that "delivery to the Committee is eminently proper, and indeed, obligatory." *Id* at 1227. He reached this conclusion after ruling that the Road Map and underlying evidence were material to the House Judiciary Committee's investigation, that the grand jury had power to make the report and recommendation, and that he had the power to disclose the report to the House consistent with the "principles of grand jury secrecy" embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. *Id.* at 1230. The United States Court of Appeals for the District of Columbia Circuit affirmed Judge Sirica's decision. *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974).

## THE ROAD MAP'S RELEVANCE TO CURRENT QUESTIONS OF URGENT PUBLIC CONCERN

21. Special Counsel Mueller is investigating "(i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." Deputy Attorney General Rod Rosenstein, Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters*, May 17, 2017. There are widespread news reports, including some apparently

sourced to the White House, that the Special Counsel may be drafting a report about what

he has discovered about the President's activities related to obstruction of justice and

possibly related to other matters.[1]

22. Since the Mueller investigation began in May 2017, I have written over a dozen articles

and essays about the investigation and related issues in *Lawfare*, *Time*, *The Weekly*

*Standard*, and *The Atlantic*.[2] I have also been interviewed on the PBS NewsHour about

---

[1] *See, e.g.,* Matt Apuzzo, *What Will Mueller Do? The Answer Might Lie in a By-the-Book Past*, N.Y. Times (Aug. 25, 2018); Carol D. Leonnig and Robert Costa, *Mueller Told Trump's Attorneys the President Remains Under Investigation but is Not Currently a Criminal Target*, (Apr. 3, 2018).

[2] Jack L. Goldsmith, *Mueller Won't Decide Trump's Fate, Only the American Public Can*, Time (June 7, 2018); Jack L. Goldsmith and Maggie McMahon, *The Executive Branch's Extraordinarily Broad View of the Presidential Pardon Power*, Lawfare (May 31, 2018); Jack L. Goldsmith, *The Cycles of Panicked Reactions To Trump*, Lawfare (Apr. 11, 2018); Jack L. Goldsmith, *Can Mueller or Rosenstein Issue an Interim Report on Obstruction?*, Lawfare (Apr. 9, 2018); Jack L. Goldsmith and Maddie McMahon, *Don't Expect a Starr-Like Report from Mueller*, Lawfare (Mar. 22, 2018); Jack L. Goldsmith, *The Downsides of Mueller's Russia Indictment*, Lawfare (Feb. 19, 2018); Jack L. Goldsmith, *Independence and Accountability at the Department of Justice*, Lawfare (Jan. 30, 2018); Jack L. Goldsmith, *Why Hasn't Rod Rosenstein Recused Himself From the Mueller Investigation?*, Lawfare (Jan. 5, 2018); Jack L. Goldsmith, *The President Can't Kill the Mueller Investigation*, Lawfare (Jan. 1, 2018); Jack L. Goldsmith, *In Defense of Rosenstein and Wray's Responses to Trump*, Lawfare (Dec. 6, 2017); Jack L. Goldsmith, *The Cost of Trump's Attacks on the FBI*, The Atlantic (Dec. 4, 2017); Jack L. Goldsmith, *Will Donald Trump Destroy the Presidency?*, The Atlantic (Oct. 2017); Jack L. Goldsmith, *The Trump Interview and DOJ Independence*, Lawfare (July 20, 2017); Jack L. Goldsmith and Benjamin Wittes, *If Rod Rosenstein Recuses: What Happens Next?*, Lawfare (June 16, 2017); Jack L. Goldsmith, *If Trump Fires Mueller (Or Orders His Firing)*, Lawfare (June 13, 2017).

these issues,[3] and quoted in newspaper stories about them in *The New York Times* and

*The Washington Post*.[4]

23. In an article I recently co-wrote on *Lawfare*, I explained how the Special Counsel

regulations, 28 CFR § 600.1 *et seq*., govern, in the first instance, what kind of report

Special Counsel Robert Mueller can provide regarding his investigation of Russian

election interference. Jack Goldsmith & Maddie McMahon, *Don't Expect a Starr-Like

Report from Mueller*, Lawfare (Mar. 22, 2018). The article discussed the relevance of the

Jaworski "Road Map" approach to Special Counsel's Mueller's decision about any such

report. One conclusion of the article was that the regulations rule out disclosure that

contains legal analysis and conclusions, like the one by Independent Counsel Ken Starr in

1999, but permits "a relatively spare factual report to Congress (and maybe the public) at

---

[3] Jack L. Goldsmith (guest), *What Are the Ramifications of Trump's FBI Spy Claims?*, PBS
NewsHour (May 21, 2018); Jack L. Goldsmith (guest), *The Significance of Trump's Reported
Order To Fire Mueller*, PBS NewsHour (Jan. 26, 2018); Jack L. Goldsmith (guest), *Did Trump
Obstruct Justice? New Russia Investigation Details Raise More Questions*, PBS NewsHour (Jan.
5, 2018).

[4] *See, e.g.,* Peter Baker, *Why Is Trump Mad at Sessions? A Tweet Provides the Answer*, N.Y.
Times (June 5, 2018); Michael S. Schmidt, *et al.*, *Trump's Lawyers, in Confidential Memo,
Argue to Head Off a Historic Subpoena*, N.Y. Times (June 2, 2018); Katie Benner, *Trump's
Demands Escalate Pressure on Rosenstein to Preserve Justice Dept.'s Independence*, N.Y.
Times (May 21, 2018); Nicholas Kristof, Opinion, *The Nation Will Pay if Trump Fires Mueller*,
N.Y. Times (Apr. 11, 2018); Charlie Savage, *With Scant Precedent, White House Insists Trump
Could Fire Mueller Himself*, N.Y. Times (Apr. 10, 2018); Michael S. Schmidt, *et al.*, *Trump's
Lawyer Raised Prospect of Pardons for Flynn and Manafort*, N.Y. Times (Mar. 28, 2018);
Sharon LaFraniere, *et al.*, *Trump's Unparalleled War on a Pillar of Society: Law Enforcement*,
N,Y. Times (Feb. 3, 2018); Philip Rucker, *et al.*, *Trump Says He Won't Fire Mueller, as
Campaign to Discredit Russia Probe Heats Up*, Wash. Post (Dec. 17, 2017); Greg Miller, *Russia
Probe Marked by Contrasting Styles of Trump and Mueller*, Wash. Post (Oct. 31, 2017); Philip
Bump, *Can Trump Pardon Anyone? Himself? Can He Fire Mueller? Your Questions, Answered.*,
Wash. Post (July 21, 2017); David Ignatius, *Trump Firing the Special Counsel Would Be
Disastrous*, Wash. Post (June 13, 2017).

the end of the Mueller investigation, which can be seen as a version of the Jaworski model."

24. My article was a response to an article written by Benjamin Wittes and Quinta Jurecic. *Will We Ever Learn What Bob Mueller Knows?*, Lawfare (Mar. 21, 2018). Wittes and Jurecic analyzed several models that might guide Special Prosecutor Mueller in deciding on whether and how to make public the fruits of his investigation. They discuss at length the Jaworski Road Map model of disclosure. While I disagree with Wittes and Jurecic about the range of Mueller's legally available options, we agree on the relevance of the Road Map approach and its availability as an option for Mueller.

25. As that exchange highlights, there is a live public debate about the appropriate framework for Mueller to report any findings to Congress of potentially unlawful conduct by the President. But in the midst of this debate, there is agreement, both in the *Lawfare* exchange and among experts more generally, about the potential relevance of the Road Map to Mueller and Rosenstein's decision about whether and how to disclose the fruits of the investigation to the public, and to the larger public understanding of and debate about the appropriateness of whatever he discloses.[5]

26. As Jaworski's deliberations with his staff prior to settling on the Road Map indicate, an investigation of the president by an executive branch official, and the possibility of disclosing the fruits of that investigation to Congress, raise difficult and sensitive issues of executive power, separation of powers, and individual rights. Because there are few

---

[5] *See, e.g.*, Michael S. Schmidt, *et al.*, *How the Mueller Investigation Could Play Out for Trump*, N.Y. Times (May 23, 2018); Jill Wine-Banks and Gerald Goldman, Opinion, *America Needs to Know What Mueller Knows About Trump. Here's How That Could Happen (Legally).*, NBC News (Apr. 12, 2018).

judicial precedents that expressly govern those issues, the past practices of government actors can inform both legal meanings and proper government practice. *Compare Nat'l Labor Relations Bd. v. Noel Canning*, 134 S.Ct. 2550 (2014). The Road Map is one of two main precedents in this area, the other being the Starr report, which is public. The Road Map was also more successful than the Starr report in informing the House about possibly impeachable offenses by a president while at the same time respecting both the president's prerogatives (President Nixon did not oppose the transmittal of the Road Map) and the House's prerogatives (by not pre-judging the case for impeachment).

27. If Special Counsel Mueller decides to send a report to Congress, perhaps through Deputy Attorney General Rosenstein, the Road Map would thus be a vital touchstone for the public and Congress to assess his actions. It would help the public judge the legality of his actions under the Special Counsel regulations, and the legitimacy of his actions based on a comparison with the Road Map and the Starr Report. If Special Counsel Mueller or Deputy Attorney General Rosenstein decides to issue a report on something akin to the Road Map model, it would be important to compare the level of factual detail that they include in any transmission to Congress with the level of detail in the Road Map.

28. Even if Special Counsel Mueller does not send a report to Congress, the Road Map would be an important point of comparison in judging the validity of Mueller's failure to issue a report. It would also have broader relevance to journalists and scholars who wish to put the Mueller investigation and any report that Mueller may issue in historical context.

29. The Road Map might also have substantive legal relevance. The question whether the president can violate a federal obstruction of justice statute in the discharge of his duties as chief executive is highly contested. Many of President Trump's actions that his critics

say constitute obstruction of justice had parallels in the Nixon presidency. For example,
President Trump has been accused of obstructing justice, or contributing to such
obstruction, in his firing of former FBI Director James Comey and in his many
statements that the Mueller investigation should end. Similarly, President Nixon fired
Special Prosecutor Archibald Cox because he did not approve of some of the steps Cox
took in directing the Watergate investigation towards the President. And President Nixon
stated publicly, in his January 30, 1974 State of the Union address, that "I believe the
time has come to bring that investigation and the other investigations of this matter to an
end." The House of Representatives, in its first article of impeachment, charged President
Nixon with obstruction of justice based in part in his "interfering" with the conduct of
those investigations by various federal agencies, including the FBI. This charge does not
necessarily involve a conclusion that the President violated a federal criminal law. It is
nonetheless potentially highly relevant to Mueller's thinking about obstruction of justice,
and thus to the public's analysis of any decision based on that thinking, whether Special
Prosecutor Jaworski cited the Nixon actions listed above in the Road Map as potentially
relevant evidence — especially if he did so.

30. For these reasons, the continued secrecy of the Road Map deprives the public of
information regarding a vital historical precedent that has direct relevance to one of the
most consequential events that the government is now undertaking. As an expert
following and contributing to these contemporary debates, I believe that releasing the
Road Map would significantly enrich the public's understanding of the Mueller
investigation and any decisions that he makes about informing Congress (or not
informing Congress) about the President's actions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2018.

_____

Jack Goldsmith