**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| IN RE: PETITION OF BENJAMIN WITTES, JACK GOLDSMITH & STEPHEN BATES | ) ) ) ) ) | Misc. Case No. _____ |

**<u>DECLARATION OF PHILIP ALLEN LACOVARA</u>**

## DECLARATION OF PHILIP ALLEN LACOVARA

I, Philip Allen Lacovara, hereby declare as follows:

1.  I have been asked to provide this Declaration in support of a petition to unseal and release the so-called "Road Map" prepared by the Watergate Special Prosecutor's Office. I discuss below the Road Map and my role in its preparation and its submission to the Judiciary Committee of the House of Representatives. As discussed more fully below, I served as the Counsel to the Watergate Special Prosecutor at the time.

## PERSONAL AND PROFESSIONAL BACKGROUND

2.  For more than fifty years, I have worked as a lawyer in government service, private practice, international corporations, and academic institutions.

3.  Since 1967 I have been a member of the New York Bar, and since 1974 I have been a member of the Bar of the United States District Court for the District of Columbia (among other federal courts, including the Supreme Court of the United States [1970]). My membership in the Bar of the District of Columbia derives from my 1974 admission to the Bar of the District Court. Since 2003, I also have been an enrolled Solicitor entitled to practice law in England.

4.  I received my undergraduate degree from Georgetown University in 1963. After graduating from Columbia Law School in 1966, I became the senior law clerk to United States Circuit Judge Harold Leventhal of the United States Court of Appeals for the District of Columbia Circuit. Over the following decades I served on or chaired various committees of that court.

5.  Apart from my service in the Watergate Special Prosecutor's Office, some of my other roles in public service have included: Special Assistant to then-Solicitor General Thurgood Marshall (1967), Assistant to Solicitor General Erwin Griswold (1967-1969), Special Counsel to the New York City Police Commissioner (NYPD) (1971-1972), Deputy Solicitor General of the

United States supervising all federal criminal and national security cases in the Supreme Court (1972-1973), chairman of the Board of Trustees of the Public Defender Service of the District of Columbia, and the designee of President Ronald Reagan on the Judicial Nomination Commission for the District of Columbia.

6. As an Assistant to the Solicitor General and then later as Deputy Solicitor General, I regularly presented to the Supreme Court the position of the Executive Branch on issues of law enforcement, national security, and separation of powers. I have argued more than fifteen cases before the Supreme Court.

7. I have been actively involved with The District of Columbia Bar for decades. At various times I have served on the Bar's Legal Ethics Committee (chairperson of Subcommittee on Code of Professional Conduct), as a member of the Board of Governors of the Bar, as general counsel to the Bar, and in 1988-1989 as President of The District of Columbia Bar. Until 2018, I chaired the Bar's Leadership Development Committee.

8. In private practice, I have been a partner in the Washington and New York offices of two international law firms, Hughes Hubbard & Reed LLP (where I was the managing partner of the Washington office) and Mayer Brown LLP.

9. In the corporate world, I worked as Vice President and Senior Counsel for Legal Policy at General Electric Co. and then as Managing Director, General Counsel, and member of the Management Committee of Morgan Stanley & Co.

10. I have taught various courses on constitutional law, presidential power, and federal jurisdiction and procedure at the university level. For example, I held positions as Adjunct Professor, Department of Political Science, Hunter College of the City University of New York (teaching various courses on presidential powers, terrorism, international law of armed conflict, etc.);

Adjunct Professor at Georgetown University Law Center (federal courts and the federal system), Adjunct Lecturer Columbia Law School (issues in modern policing); and lecturer at John Jay College, City University of New York (civil liberties under the Constitution). I also have delivered formal lectures at Yale Law School (the Anderson Lecture), Columbia Law School (the Harold Leventhal Memorial Lecture), United States Military Academy (West Point), and other universities.

11. I have written frequently on issues of presidential power, control of terrorism, and the international law of armed conflict, and other similar subjects. I have published articles on various topics of public law in *Columbia Law Review, Yale Law Journal, Harvard Journal of International Law, Arizona Law Review, Delaware Law Review, Minnesota Law Review, Inter-American Law Review, St. John's Law Review, Law & Contemporary Problems, New York Times, Washington Post, Los Angeles Times, National Law Journal,* and others.

12. I am a Life Member of the American Law Institute (ALI). I worked with Professor Herbert Wechsler on the drafting of the ALI Model Penal Code, which has been adopted as the basis for the criminal law of most States. I also have been involved in various other ALI projects dealing with criminal law and procedure.

## WATERGATE SPECIAL PROSECUTOR'S OFFICE

13. In 1973 and 1974, I served as Counsel to the Special Prosecutor in the Watergate Special Prosecutor's Office (officially termed the "Watergate Special Prosecution Force" in Department of Justice regulations). As Counsel to the Special Prosecutor, I was the principal legal advisor to Special Prosecutor Archibald Cox and his successor, Leon Jaworski. This included evaluation of all constitutional and other legal issues that arose in the course of the investigation of the Watergate Cover-Up, including President Nixon's role in the cover-up,

and in the course of the other matters that had been assigned to the Special Prosecutor. Together with my staff, I also functioned as the general counsel for the Office, advising on issues of federal criminal law and procedure. We were responsible for briefing and, in many cases, arguing motions and appeals relating to the work of the Office.

14. In that capacity, I argued among other cases *United States v. Nixon*, 418 U.S. 683 (1974) (the "*Nixon Tapes Case*"), before the Supreme Court. As discussed below, I also was responsible for advising on the propriety of developing the "Road Map" and for arguing in court that the information that it contained could properly be released to the House Judiciary Committee.

## THE ROAD MAP

15. The Road Map is a document that, as best I recall, consists of a narrative of the facts that the Special Prosecutor's Office had uncovered relating to the complicity of President Nixon in the Watergate Cover-Up and in other violations of law that were within the jurisdiction of the Office to investigate (including the abuses by the White House "Plumbers," various campaign violations, etc.). The Road Map was drafted by the staff of the Office and summarized tentative findings. It was based on a variety of sources of information, including documentary evidence and interviews obtained outside the grand jury process as well as information presented to the grand jury. It is my recollection that the Road Map also included evidentiary exhibits, some (but not all) of which would be characterized as grand jury materials or as referring to matters occurring before the grand jury.

16. It may be pertinent to understand the origin of the Road Map. President Nixon was a focus of the Special Prosecutor's investigation, although not the only focus. Even before the Supreme Court's decision in the *Nixon Tapes Case* forced the President to release the "smoking gun" tape, which promptly precipitated his resignation, there was substantial evidence that the

President had violated various criminal statutes. At the time (and to this day), there was no authoritative judicial ruling on the critical question whether an incumbent president may be indicted while in office. Based on extensive research and analysis by my staff and by me, we concluded that a president has no special immunity from indictment while in office. Nevertheless, it was certain that indicting the President would complicate the proceedings against the other subjects of the investigation and delay prosecution of charges against them.

17. At the time, we were aware that the House Judiciary Committee, which has jurisdiction over possible impeachments, was conducting an inquiry into whether President Nixon had committed "high crimes and misdemeanors" and thus was liable to impeachment. Accordingly, the Special Prosecutor concluded that (as we later informed the Supreme Court during the briefing of the *Nixon Tapes Case*) the grand jury could identify President Nixon as an *unindicted* co-conspirator in the indictment charging his aides with criminal culpability, but the salient information about the President's own conduct would be transmitted, in an organized form, to the House Judiciary Committee, if that could be done lawfully. I concluded that this course was permissible under Rule 6(e) of the Federal Rules of Criminal Procedure. The Watergate Task Force team then prepared the Road Map.

18. It was understood that it would be prudent to seek judicial approval for this course before actually releasing the Road Map to the House Judiciary Committee. Accordingly, we sought approval from Chief Judge John J. Sirica, who was supervising all grand jury matters at the time. I presented the arguments supporting release of the material, which both Chief Judge Sirica and the *en banc* D.C. Circuit approved (one judge dissenting). See *In re Report & Recommendation of June 5, 1972 Grand Jury Concerning Transmission of Evidence to House of Representatives*, 370 F. Supp. 1219 (D.D.C. 1974), *aff'd sub nom. Haldeman v. Sirica*, 501

F.2d 714 (D.C. Cir. 1974). The Road Map was then transmitted to the House Judiciary Committee. I understand that House members and staff used the Road Map in determining whether to prepare Articles of Impeachment, which the Committee eventually did.

### RELEVANCE OF THE ROAD MAP TO CURRENT ISSUES OF PUBLIC CONCERN

19. I was surprised to learn that that the Road Map was not released years ago. It was the subject of a highly publicized judicial litigation more than forty-four years ago. The Road Map was part of congressional proceedings leading to the approval of Articles of Impeachment adopted by the House Judiciary Committee. It was widely discussed in the published memoirs of various participants in the Watergate investigation. Many historians and scholars have extensively examined the Watergate affair, including the Cover-Up and the ensuing investigations by the Special Prosecutor's Office and the House Judiciary Committee.

20. Indeed, some "revisionist" authors (as I would term them) have sought to argue that the investigation of President Nixon, including the use of the grand jury, was abusive and unfair. In my view, a full vetting of this crucial period of American history would be well served by thorough public access to all of the materials generated by the Special Prosecutor's Office, including the Road Map. In this spirit, years ago I submitted to the National Archives, without restriction, all my Watergate-related files, including confidential internal memoranda and personal diaries and calendars. I know that historians (and critics) have drawn on these materials in evaluating the entire Watergate affair.

21. In addition, an accurate and complete understanding of the Road Map may contribute substantially to an informed discussion of matters of vital, contemporary importance. Specifically, disclosure of the Road Map is likely to contribute to a public understanding of

the options available to Special Counsel Robert Mueller in his current investigation of conduct during the 2016 presidential campaign.

22. I have written several articles about Special Counsel Robert Mueller's investigation and the issues that arise out of it. For example, my "op-eds" in the *Washington Post* have addressed issues of the presidential pardon power, possible obstruction of justice by the President, the President's resistance to providing testimony to the Special Counsel and the grand jury, and the alleged immunity of an incumbent president from indictment while in office.[1]  I have also been interviewed and quoted on these topics by multiple news outlets, including NPR,[2] Politico,[3] CNN, CNBC, BBC, etc., where I have discussed the limits of executive power.

---

[1] *See*, *e.g.*, Philip Allen Lacovara, *I Miss Richard Nixon*, Opinion, Wash. Post, Aug. 20, 2018, *available at* https://www.washingtonpost.com/opinions/i-miss-richard-nixon/2018/08/20/ddc065fa-a4a4-11e8-b76b-d513a40042f6_story.html?utm_term=.0c1b9ddaffc5; Philip Allen Lacovara, *Don't Wait for Trump to Testify, Mr. Mueller*, Opinion, Wash. Post, June 17, 2018, *available at* https://www.washingtonpost.com/opinions/dont-wait-for-trump-to-testify-mr-mueller/2018/06/17/1812a654-70d5-11e8-afd5-778aca903bbe_story.html?utm_term=.46cb5810961a; Philip Allen Lacovara, *Even Trump Deserves a Good Lawyer*, Opinion, Wash. Post, Mar. 28, 2018, *available at* https://www.washingtonpost.com/opinions/even-trump-deserves-a-good-lawyer/2018/03/28/83d5772a-32b6-11e8-8bdd-cdb33a5eef83_story.html?utm_term=.eb46079540a7;
Philip Allen Lacovara, *How the Pardon Power Could End Trump's Presidency*, Opinion, Wash. Post, Aug. 29, 2017, *available at* https://www.washingtonpost.com/opinions/how-the-pardon-power-could-end-trumps-presidency/2017/08/29/57365dfc-8cf7-11e7-84c0-02cc069f2c37_story.html?utm_term=.b4e1a69e6e0c; Philip Allen Lacovara, *I Helped Prosecute Watergate. Comey's Statement Is Sufficient Evidence for an Obstruction of Justice Case.*, Opinion, Wash. Post, June 7, 2017, *available at* https://www.washingtonpost.com/opinions/former-watergate-prosecutor-comey-lays-out-sufficient-evidence-for-an-obstruction-of-justice-case/2017/06/07/a12964a4-4be3-11e7-9669-250d0b15f83b_story.html?utm_term=.ac314013ec6d.
[2] *Can the Sitting President of the United States Be Indicted?*, NPR, Aug. 2, 2018, *available at* https://www.npr.org/2018/08/22/641005331/can-the-sitting-president-of-the-united-states-be-indicted.
[3] Darren Samuelsohn, *Russia Probe Lawyers Think Mueller Could Indict Trump*, Politico, Feb. 2, 2018, *available at* https://www.politico.eu/article/russia-probe-investigation-lawyers-think-robert-mueller-could-indict-president-donald-trump/.

23. Recently I was quoted extensively in the *New York Times* discussing how the Road Map relates to current investigations into possible presidential wrongdoing.[4]

24. The Road Map is highly relevant to the public's understanding of the historical and legal frameworks that provide the backdrop for the Mueller investigation. Therefore, its continued secrecy deprives the public of information regarding a vital historical precedent. As the former Counsel to the Watergate Special Prosecutor, I believe that unsealing and releasing the Road Map would significantly enrich the public's understanding of a mechanism that a similarly situated investigator used to ensure that facts developed during a thorough criminal investigation were also available to another governmental institution with its own independent but related constitutional responsibilities.

25. I am familiar with the restrictions contained in Rule 6(e) and the policies underlying those restrictions. The primary goals of the restrictions, as I have understood them, are to protect the secrecy and integrity of pending criminal investigations, to protect witnesses against possible intimidation and reprisal, and to preserve the privacy of witnesses and persons investigated but not indicted.

26. Unsealing and releasing the Road Map (with or without the underlying evidence, including any grand jury testimony) would not conflict with any of those goals. The Watergate investigations were completed four decades ago. The identity of all witnesses was disclosed, one way or another, many years ago. I assume that the actual grand jury testimony of many of the witnesses who also testified at subsequent trials was provided to defense counsel. Most of the witnesses already have died; I think that this observation also may apply to the subjects of

[4] Adam Liptak and Jim Rutenberg, *Cohen Implicates President Trump. What Do Prosecutors Do Now?*, N.Y. Times, Aug. 21, 2018, *available at* https://www.nytimes.com/2018/08/21/us/politics/cohen-trump-indicted.html.

the grand jury proceedings.  Moreover, as I have noted previously, the Road Map has been described extensively in various public proceedings and memoirs.

27. Therefore, I am quite comfortable in concluding that retaining the Road Map under seal would not protect any of the interests underlying the general presumption of grand jury secrecy.  By contrast, promptly unsealing and releasing the Road Map would promote important public interests.

###

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 29, 2018, in Baltimore, Maryland.

Philip Allen Lacovara